# EXHIBIT 2
# Part 1 of 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration ) CDC Number C-90508
Hearing of: )
)
EUGENE REAMS )
_____ )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 13, 2005

12:05 P.M.

PANEL PRESENT:

CAROL DALY, Presiding Commissioner
ROBERT HARMON, Deputy Commissioner

OTHERS PRESENT:

EUGENE REAMS, Inmate
MARY ANN TARDIFF, Attorney for Inmate
RICHARD SACHS, Deputy District Attorney
        Via Videoconference

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

**Sandra Triplett**        **Capitol Electronic Reporting**

ii

## INDEX

                                                                Page

Proceedings...................................... 1
Case Factors.....................................13
Pre-Commitment Factors...........................17
Post-Commitment Factors..........................29
Parole Plans.....................................48
Closing Statements...............................67
Recess...........................................70
Decision.........................................71
Adjournment......................................78
Transcriber Certification........................79

--oOo--

1

1      **P R O C E E D I N G S**

2          **DEPUTY COMMISSIONER HARMON:**  On record.

3          **PRESIDING COMMISSIONER DALY:**  Okay, this is

4      a Subsequent Parole Consideration Hearing on

5      Eugene Reams, CDC number C-90508.  Date of the

6      hearing is 5/13 of '05, and it is 1205 hours.  We

7      are located at Correctional Training Facility at

8      Soledad.  Date received was August 8th of 1984.

9      Life term starts August 11th of 1989, out of the

10     County of San Diego, and the offense is kidnap for

11     robbery with use of a firearm.  Case number

12     CR66202.  Count number four, 209(b) and 12022.5.

13     And the terms are seven years to life with -- plus

14     10 years, four months.  Minimum Eligible Parole

15     Date is August 11th of 1996.  We have an additional

16     offense, robbery, 182/211 out of San Diego.  This

17     is the same case number, count number one.

18     Actually there are multiple offenses and victims

19     in this arrest and I'm going to show all of them

20     as being the same case number out of the County of

21     San Diego.  And so I'll just proceed from there.

22     Grand theft auto, 487.3, count number three.

23     Assault with a deadly weapon, 245(a) (2), count

24     number 11.  Use of a firearm, 12022.5, count

25     number 11 consecutive.  Robbery, 211, count number

26     15 consecutive.  Use of a firearm, 12022.5, count

27     number 15.  Grand theft auto, 10851 of the Vehicle

1    Code, count number two.  Stayed offense of

2    robbery, 211, out of count number five.  Grand

3    theft auto, stayed offense, Vehicle Code 10851,

4    count number six.  And kidnap robbery, 209, which

5    was stayed, count number seven.  Use of a firearm,

6    12022.5, count number seven.  Robbery, stayed

7    offense, 211, count number eight.  Grand theft

8    auto, 10851, count number nine was a stayed

9    offense.  Attempt grand theft auto with use of a

10   firearm, 664/487 and 12022.5, counts number ten.

11   And assault with a firearm, 245(a)(2), count

12   number 12.  Another stayed offense, use of a

13   firearm and assault with a firearm, 12022.5 and

14   245(a)(2), count numbers 12 and 13.  And a stayed

15   offense, use of a firearm, 12022.5, count number

16   13.  We have robbery, 211, count number 14, armed

17   with a firearm, 12022(a), count number 14.  We

18   have robbery and armed with a firearm, 211 and

19   12022(a), counts 16 and 17.  Robbery, 211, count

20   number 17.  Use of a firearm on a robbery was a

21   stayed offense, 12022.5, 211, counts number 18.

22   Use of a firearm, a stayed count, 12022.5.  It is

23   count number 19.  Robbery, 211, count number 19.

24   Use of a firearm, 12022.5, count number 20.  And

25   then we have a stayed offense, assault with a

26   firearm, two assaults with a firearm, counts

27   number 21 and 22, 245(a)(2), stayed offense,

3

1  assault with a firearm, count number 23.  That's a

2  245.  A stayed offense, assault with a firearm,

3  245(a)(2), counts number 24.  Assault with a

4  firearm, 245(a)(2), count number 25.  And assault

5  with a firearm, 245(a), count number 13.  It is

6  noted that all of these are the same case number

7  out of San Diego.  Stayed offense, assault with a

8  firearm, 245(a)(2), out of San Diego, count number

9  26.  Stayed offense, a burglary, 459 of the Penal

10 Code, count number 27.  Okay, now we have a new

11 case number out of San Diego.  Auto theft, 10851

12 out of San Diego.  Case number CR66967.  Count

13 number two.  Auto theft, 10851, same case number,

14 66967, count number 17 and auto theft, 10851, same

15 case number of 66967, count number 20.  Okay,

16 Mr. Reams, this hearing is going to be tape-

17 recorded.  And so for the purposes of voice

18 identification, we're going to go around the room

19 to my left.  Each person is going to state a name,

20 spell a last name.  And then after you have

21 spelled your last name, give your CDC number.

22 Okay.

23         **INMATE REAMS:**  Yes, Ma'am.

24         **PRESIDING COMMISSIONER DALY:**  And also, this

25 hearing is being conducted by videoconference

26 between Soledad State Prison and the San Diego

27 County District Attorney's Office, and it is being

4

1    done by videoconference, pursuant to Penal Code

2    Sections 3043.25.  The District Attorney is going

3    to appear by means of videoconferencing, which

4    means that his testimony and participation will be

5    by means of live audio and video transmission from

6    San Diego to our hearing room here at Soledad.

7    And simultaneously, the District Attorney in San

8    Diego will be receiving live audio and video

9    transmission from the facility here at Soledad.

10   And the hearing is going to be conducted as though

11   all parties are in the same room and following the

12   same rules and procedures that are followed at all

13   such Parole Consideration Hearings.  Now this

14   hearing is also being audio taped and the record

15   of the hearing will be a transcript of that

16   audiotape, pursuant to Penal Code Section 3042(b).

17   Okay.

18           **INMATE REAMS:**  Yes, Ma'am.

19           **PRESIDING COMMISSIONER DALY:**  Now we're

20   going to go around the room here and identify

21   everyone.  Carol Daly, D-A-L-Y, Commissioner,

22   Board of Prison Terms.

23           **DEPUTY COMMISSIONER HARMON:**  Robert Harmon,

24   H-A-R-M-O-N, Deputy Commissioner.

25           **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

26   T-A-R-D-I, double F, Attorney for Mr. Reams.

27           **INMATE REAMS:**  Eugene Reams, R-E-A-M-S,

5

1    Charlie 90508.

2          **PRESIDING COMMISSIONER DALY:**  Okay, and let

3    the record reflect we have two correctional peace

4    officers in the room for security purposes only

5    and we'll now go to San Diego.

6          **DEPUTY DISTRICT ATTORNEY SACHS:**  Yes, it's

7    Richard Sachs, S-A-C-H-S, Deputy District

8    Attorney, San Diego County.

9          **PRESIDING COMMISSIONER DALY:**  Okay,

10   Mr. Reams, in front of you is an ADA Statement on

11   the table.  Could you read that out loud into the

12   record, please?

13         **INMATE REAMS:**  The Americans with

14   Disabilities Act, ADA, is a law to help people

15   with disabilities.  Disabilities are problems that

16   make it harder for some people to see, hear,

17   breathe, talk, walk, learn, think, work or take

18   care of themselves than it is for others.  Nobody

19   can be kept out of the public places or activities

20   because of a disability.  If you have a

21   disability, you have a right to ask for help to

22   get ready for your BPT Hearing, get to the

23   hearing, talk, read forms and papers and

24   understand the hearing process.  BPT will look at

25   what you asked for to make sure that you have a

26   disability that is covered by the ADA, and that

27   you have asked for the right kind of help.  If you

6

1    do not get help or if you don't think you got the

2    kind of help you need, ask for a BPT Form 1074

3    Grievance Form.  You can also get help to fill it

4    out.

5        **PRESIDING COMMISSIONER DALY:**  Okay,

6    Mr. Reams, do you understand what the Americans

7    with Disabilities Act is all about?

8        **INMATE REAMS:**  Yes, Ma'am.

9        **PRESIDING COMMISSIONER DALY:**  Okay, and you

10   signed BPT Form 1073 on June 2nd of '04; almost a

11   year ago.  And that was a form asking you if you

12   had a disability as defined under ADA, and you

13   indicated that you did not have.  Is that a true

14   statement?

15       **INMATE REAMS:**  Yes, Ma'am.

16       **PRESIDING COMMISSIONER DALY:**  Okay, and

17   since June of '04 and the current date, has there

18   been any change in your medical status?

19       **INMATE REAMS:**  No, Ma'am.

20       **PRESIDING COMMISSIONER DALY:**  Okay, so let

21   me ask you some questions.  Do you have any

22   difficulties walking up and down stairs or for

23   distances of more than 100 yards?

24       **INMATE REAMS:**  No, Ma'am.

25       **PRESIDING COMMISSIONER DALY:**  And do you

26   wear glasses at all?

27       **INMATE REAMS:**  No, Ma'am.

7

1       **PRESIDING COMMISSIONER DALY:**  Okay, so you

2   were able to read today without your glasses.  Do

3   you have any hearing impairments?

4       **INMATE REAMS:**  No, Ma'am.

5       **PRESIDING COMMISSIONER DALY:**  Have you ever

6   been included in a Triple CMS or EOP Program since

7   you've been in prison?

8       **INMATE REAMS:**  No, Ma'am.

9       **PRESIDING COMMISSIONER DALY:**  And you know

10  what those programs are?

11      **INMATE REAMS:**  I am --

12      **PRESIDING COMMISSIONER DALY:**  They're the

13  Mental Health Programs.

14      **INMATE REAMS:**  Yes.

15      **PRESIDING COMMISSIONER DALY:**  All right, and

16  have you ever been prescribed any psychotropic

17  medication either in prison or on the streets?

18      **INMATE REAMS:**  No, Ma'am.

19      **PRESIDING COMMISSIONER DALY:**  Okay, and how

20  far did you get in school before coming to prison?

21      **INMATE REAMS:**  Graduated.

22      **PRESIDING COMMISSIONER DALY:**  And did you,

23  when you were going to school, did you have to

24  take any special education classes?

25      **INMATE REAMS:**  No, Ma'am.

26      **PRESIDING COMMISSIONER DALY:**  All right, and

27  sir, do you suffer from any disability that would

8

1    prevent you from going forward with this hearing

2    today?

3              **INMATE REAMS:**  No, Ma'am, I do not.

4              **PRESIDING COMMISSIONER DALY:**  Okay, this

5    hearing is being conducted pursuant to Penal Code

6    Sections 3041, 3042, and the rules and regulations

7    of the Board of Prison Terms governing Parole

8    Consideration Hearings for life inmates.  Now the

9    purpose of today's hearing is to once again

10   consider your suitability for parole.  In doing

11   so, we will consider the number and the nature of

12   the crimes that you were committed for.  We're

13   going to look at your prior criminal history, your

14   social history as well as your behavior and your

15   programming since your commitment to prison.  We

16   have had an opportunity to review your Central

17   File.  Your prior transcripts are available here.

18   I've just read a couple of them.  And you will be

19   given an opportunity to correct or clarify the

20   record.  Now we will consider your progress since

21   your last hearing, your psychological report and

22   any other information that has a bearing on your

23   suitability for parole.  And if there are any

24   change in parole plans, it needs to be brought to

25   our attention.  Now we will reach a decision today

26   and inform you whether we find you suitable for

27   parole or not and the reasons for our decision.

9

1    And if you are found suitable for parole, the

2    length of your confinement will be explained to

3    you.  Now before we recess for deliberations

4    today, the District Attorney, your attorney and

5    then you will be given an opportunity to make a

6    statement regarding your parole suitability.  Your

7    statement will be limited to why you feel you are

8    suitable for parole at this time.  The California

9    Code of Regulations or actually then after that,

10   then we're going to recess, clear the room and do

11   our deliberations.  And then once we have arrived

12   at a decision, we will resume the hearing and

13   announce that decision.  Now the California Code

14   of Regulations state that regardless of the amount

15   of time served, a life inmate shall be found

16   unsuitable for and denied parole if in the

17   judgment of the Panel, releasing the prisoner

18   would pose an unreasonable risk of danger to

19   society.  Now you have certain rights and those

20   rights include the right to a timely notice of

21   this hearing, the right to review your Central

22   File and the right to present relevant documents.

23   Counsel, do you feel your client's rights have

24   been met thus far regarding this hearing?

25           **ATTORNEY TARDIFF:**  I do.

26           **PRESIDING COMMISSIONER DALY:**  And you have

27   an additional right to be heard by an impartial

10

1    Panel.   Looking at the Panel seated before you

2    today, do you have any objection to either Member

3    of this Panel?

4            INMATE REAMS:   No, I do not.

5            PRESIDING COMMISSIONER DALY:   Okay, and

6    Counsel, do you have any objection?

7            ATTORNEY TARDIFF:   No, I don't.

8            PRESIDING COMMISSIONER DALY:   Now you will

9    receive a copy of our written tentative decision

10   today.   The decision becomes effective within 120

11   days.   During that 120 days, you will receive

12   another copy of the decision as well as a

13   transcript of this hearing.   Now as of May 1st,

14   2004, there are major changes in your former right

15   to appeal Board of Prison Terms' decisions

16   directly back to the Board.   The old Board

17   regulations have been repealed and the current

18   policy is entitled Administrative Appeals,

19   Correspondence and Grievances Concerning Board of

20   Prison Terms Decisions.   And you can find that

21   policy in the prison law library.   Now you are not

22   required to admit to your offense nor are you

23   required to discuss your offenses here today.

24   However, the Panel does accept as true the

25   findings of the court.   Do you understand what

26   that means?

27           INMATE REAMS:   Yes, Ma'am, I do.

11

1    **PRESIDING COMMISSIONER DALY:**  Okay, and do

2    we have any confidential material to be used here

3    today?

4    **DEPUTY COMMISSIONER HARMON:**  No, we don't.

5    **PRESIDING COMMISSIONER DALY:**  Okay, and I've

6    passed a hearing checklist and I've marked it

7    Exhibit Number One.  Counsel, do you have all

8    those documents?

9    **ATTORNEY TARDIFF:**  I do.

10    **PRESIDING COMMISSIONER DALY:**  And District

11    Attorney, do you have all those documents?

12    **DEPUTY DISTRICT ATTORNEY SACHS:**  Yes, I will

13    stipulate that I have all those documents,

14    Commissioner.

15    **PRESIDING COMMISSIONER DALY:**  Okay, and do

16    you have any additional documents to be submitted,

17    Counsel, other than the two letters that you've

18    already given me?

19    **ATTORNEY TARDIFF:**  No.

20    **PRESIDING COMMISSIONER DALY:**  And do you

21    have any preliminary objections?

22    **ATTORNEY TARDIFF:**  No.

23    **PRESIDING COMMISSIONER DALY:**  Okay, and is

24    Mr. Reams going to be speaking with us?

25    **ATTORNEY TARDIFF:**  Yes.

26    **PRESIDING COMMISSIONER DALY:**  Okay,

27    Mr. Reams, raise your right hand so I can swear

12

1    you in.  Do you solemnly swear or affirm testimony

2    you give at the hearing today will be the truth,

3    the whole truth and nothing but the truth?

4          INMATE REAMS:  Yes, I do.

5          PRESIDING COMMISSIONER DALY:  Okay,

6    Mr. Reams, I don't think -- I've read your Board

7    report.  You're familiar with your Board report?

8          INMATE REAMS:  Yes, Ma'am.

9          PRESIDING COMMISSIONER DALY:  And it spells

10   out all of the details of all of the crimes that

11   you were involved in.  But I don't think you've

12   ever really had a hearing where everybody went

13   through each crime, per se.  Did they?  Did they

14   just kind of incorporate them?

15         INMATE REAMS:  I've been -- I've been

16   through the crime extensively in numerous

17   hearings.  As to --

18         PRESIDING COMMISSIONER DALY:  Right.

19         INMATE REAMS:  -- who did what and when, I

20   have no idea.

21         PRESIDING COMMISSIONER DALY:  Yeah.

22         INMATE REAMS:  You have the records before

23   you, I'm sure you --

24         PRESIDING COMMISSIONER DALY:  I know.

25         INMATE REAMS:  -- can review that and --

26         PRESIDING COMMISSIONER DALY:  It is.  It is

27   before us.  So I just want to indicate for the

1    record, I'm going to talk about the initial crime.

2    And this occurred after midnight on November of .

3    '83.  And an alarm company received a phone call

4    from someone identifying himself as John

5    Stevenson, who was an employee of Kelco Research

6    Company on Aero, A-E-R-O, Court in San Diego, to

7    report suspicious activity around the business and

8    to ask that someone from the alarm security check

9    the area.  And the personnel checked their files

10   and they could not identify a John Stevenson as an

11   employee, so as a consequence, no one from ADT was

12   sent to check on the business.  And then about

13   2:04 a.m., on the same date, police responded to

14   an attempted burglary at the Kelco Research

15   Company.  An alarm had been set off by a rock that

16   had been thrown through a glass door.  A nearby

17   window had also been kicked out.  Two ADT security

18   officers, Calvin Nixon and Allen Childs, also

19   responded.  They remained at the building to

20   maintain security because of the broken windows.

21   Nixon subsequently returned to his office to check

22   on an on-call guard who could be notified to

23   replace him and Childs.  Nixon then returned to

24   the Kelco building and about ten minutes after

25   returning to the business, Nixon observed a yellow

26   Porsche driving east on Aero Drive.  It slowed and

27   turned around at the next intersection and

14

1    returned to the site.  It stopped just beyond
2    Nixon's car and Eugene Reams got out of the
3    passenger side and pointed a gun at Nixon.  Nixon
4    recognized Reams as being an ex-ADT employee.
5    After Reams ordered Nixon to freeze, the driver of
6    the Porsche, Harold Taylor, got out, pointed a
7    shotgun at Nixon, chambered a round and ordered
8    him to turn around and raise his hands.  One of
9    these two men then removed Nixon's .38 revolver
10   from his holster and handcuffed him with his own
11   handcuffs before ordering him to lie face down on
12   the ground.  One of the robbers then went to
13   Nixon's ADT vehicle and got the keys from the
14   ignition.  The trunk was open and a box containing
15   a large number of keys was moved around.  Both men
16   picked up Nixon by the arms and walked him over to
17   his vehicle.  He was placed in the rear seat area
18   and ordered to lie down on the rear floorboard.
19   At least two people got in the front seat of the
20   vehicle and started driving away.  Nixon heard the
21   Porsche start up and follow them.  He recognized
22   the voice of Reams, who he said was in the front
23   seat.  Nixon was driven to the Industrial
24   Indemnity Corporation on Camino del Rio South,
25   where he was told to get out of the car.  Reams
26   and Taylor walked Nixon across a lawn to some gas
27   meters, where he was handcuffed to the meters with

15

1   another set of handcuffs.  The two returned to the
2   car and removed the box of keys from the trunk.
3   One of the two came back to gag Nixon with a sock
4   and told him he would be released in about three
5   hours.  Nixon subsequently un-cuffed himself with
6   a spare key and went for help.  Nixon was able to
7   identify Reams and provided a description of one
8   of the other two accomplices and he identified the
9   weapon with which Reams was armed as being either
10  a .38 caliber or a .357 magnum revolver.  Is that
11  what happened?

12          **INMATE REAMS:**  Yes, Ma'am.

13          **PRESIDING COMMISSIONER DALY:**  Okay, as can
14  be determined from all of the offenses that were
15  written down in the Board report dated June of
16  2002, all of these offenses are broken down with
17  the multiple crimes.  And all of these -- Many of
18  them involved handguns.  And not going into detail
19  a lot about it, what was the reason for this crime
20  spree?  I think Commissioner Moore said at your
21  last hearing this was a five day long crime spree,
22  19 victims, 14 of which were bound and gagged and
23  tied and some 27 total counts.  What was your
24  reason for going on this crime spree?

25          **INMATE REAMS:**  I've explained the reasons in
26  every hearing prior to this one.

27          **PRESIDING COMMISSIONER DALY:**  Okay, so do

16

1    you will -- do you just prefer not to talk about

2    it at this point?

3         **INMATE REAMS:**  If you have anything that's a

4    discrepancy or anything that's in question, I'd be

5    more than happy to clarify it for you.

6         **PRESIDING COMMISSIONER DALY:**  So my question

7    to you at this hearing is why did you commit all

8    these crimes?

9         **INMATE REAMS:**  My contention has always been

10   that my reasoning for committing the crimes has no

11   validity or no justification whatsoever.  And I've

12   explained the facts of the reason why the crimes

13   happened and I'm not sure why we're going into

14   this.

15        **PRESIDING COMMISSIONER DALY:**  Because this

16   is a new Parole Consideration Hearing with a new

17   Panel and I've read the record and I'm familiar

18   with it and I just wanted to see what your reasons

19   for and do you accept responsibility for all these

20   crimes?

21        **INMATE REAMS:**  I accept full responsibility.

22   None of my actions were justified whatsoever.

23        **PRESIDING COMMISSIONER DALY:**  Do you think

24   there was a lot of fear on the part of all these

25   women or these women.  I was looking at the Crisis

26   Center laudatory that you had.  On the part of all

27   these victims, that they thought maybe they might

17

1    die.

2        **INMATE REAMS:**   I have no doubt that that's

3    probably what they thought.   They had no idea --

4        **PRESIDING COMMISSIONER DALY:**   Probably a

5    tremendous amount of fear.

6        **INMATE REAMS:**   -- how dangerous I was.   Yes.

7        **PRESIDING COMMISSIONER DALY:**   Okay, so

8    you've accepted full responsibility for all of

9    these crimes.

10       **INMATE REAMS:**   I've accepted full

11   responsibility for these crimes since the

12   probation report.

13       **PRESIDING COMMISSIONER DALY:**   I know.   Okay.

14       **INMATE REAMS:**   And in every hearing that's

15   been so far.   There's no -- There's no question as

16   to what my culpability was in any of these crimes.

17       **PRESIDING COMMISSIONER DALY:**   Okay, enough

18   said then.   Right?

19       **INMATE REAMS:**   Unless you have something

20   more you'd like to clarify.

21       **PRESIDING COMMISSIONER DALY:**   No, let's look

22   at your juvenile, your criminal record.   As a

23   juvenile, you had six Vehicle Code violations

24   between June of '81 and August of '83.   They were

25   all moving violations.   Three were for speeding.

26   And you had a misdemeanor conviction for carrying

27   a concealed weapon.   How old were you when you

18

1    started carrying a gun?

2         **INMATE REAMS:**  16.

3         **PRESIDING COMMISSIONER DALY:**  And why did

4    you start carrying a gun?

5         **INMATE REAMS:**  Because I was working for an

6    ADT security company.

7         **PRESIDING COMMISSIONER DALY:**  At 16?

8         **INMATE REAMS:**  Yes, Ma'am.

9         **PRESIDING COMMISSIONER DALY:**  And you were

10   armed?

11        **INMATE REAMS:**  Yes, Ma'am.

12        **PRESIDING COMMISSIONER DALY:**  Did you have

13   to qualify with it?

14        **INMATE REAMS:**  Yes, Ma'am.

15        **PRESIDING COMMISSIONER DALY:**  Okay, and so

16   you had a permit to carry it only while you were

17   working?

18        **INMATE REAMS:**  That's correct.

19        **PRESIDING COMMISSIONER DALY:**  And so what

20   gun did you use when you were committing these

21   crimes?

22        **INMATE REAMS:**  The same weapon.

23        **PRESIDING COMMISSIONER DALY:**  Okay, and were

24   you still an employee?

25        **INMATE REAMS:**  No, Ma'am.

26        **PRESIDING COMMISSIONER DALY:**  Okay, so you

27   kept the weapon.  Was it your own personal weapon?

19

1      **INMATE REAMS:**  It was my father's.

2      **PRESIDING COMMISSIONER DALY:**  Okay, and then

3      your criminal -- your adult criminal history is

4      the offenses that you're in prison for.

5      **INMATE REAMS:**  Yes, Ma'am.

6      **PRESIDING COMMISSIONER DALY:**  Okay, so they

7      all came lumped together.  Anything else that you

8      want to say about your criminal history?  Pretty

9      minor compared to everything that got you in here

10     in a lump together.

11     **INMATE REAMS:**  You mean the --

12     **PRESIDING COMMISSIONER DALY:**  Right.

13     **INMATE REAMS:**  -- juvenile record?

14     **PRESIDING COMMISSIONER DALY:**  Uh-hmm.

15     **INMATE REAMS:**  Yeah, there's -- there was no

16     juvenile record prior to the --

17     **PRESIDING COMMISSIONER DALY:**  Yeah.

18     **INMATE REAMS:**  -- prior to the commitment

19     other than the weapon offense.

20     **PRESIDING COMMISSIONER DALY:**  And your

21     speeding.

22     **INMATE REAMS:**  And the speeding.  Yes,

23     Ma'am.

24     **PRESIDING COMMISSIONER DALY:**  Okay.

25     **INMATE REAMS:**  I had a lead foot.

26     **PRESIDING COMMISSIONER DALY:**  Okay, your

27     social factors.  You were born in Florida; an only

20

1    child.

2         **INMATE REAMS:**  Yes, Ma'am.

3         **PRESIDING COMMISSIONER DALY:**  Said your

4    parents were barbers and you graduated from high

5    school at the age of 16.  So was it an accelerated

6    graduation?

7         **INMATE REAMS:**  Yes.

8         **PRESIDING COMMISSIONER DALY:**  Because of

9    your scholastics?

10        **INMATE REAMS:**  Yes.

11        **PRESIDING COMMISSIONER DALY:**  Okay, after

12   you finished high school, did you take any other

13   courses?

14        **INMATE REAMS:**  I went to Southwestern

15   College with the intention of getting an AA Degree

16   in criminal justice.

17        **PRESIDING COMMISSIONER DALY:**  Okay, and so

18   how much time did you put in there?

19        **INMATE REAMS:**  Three semesters.

20        **PRESIDING COMMISSIONER DALY:**  Okay, so why

21   didn't you finish out your schooling and be -- and

22   become an officer?

23        **INMATE REAMS:**  My parents ran out of --

24   Well, money became tight for my parents.  They

25   were funding me in going to college.

26        **PRESIDING COMMISSIONER DALY:**  Could you have

27   worked and paid your own way?

21

1   **INMATE REAMS:** I was attempting to get a

2 job. I was seeking a job since from employment --

3 Once the -- Once my parents informed me they could

4 no longer pay for me to go to college, I started

5 seeking employment. And it was during the

6 recession of 1983, and I just could not find a

7 job. I was 18 years old. Even to work in a

8 convenience store, you had to be 19. And I just

9 -- I finally did find a job part time working as

10 another security company in the north county.

11   **PRESIDING COMMISSIONER DALY:** So you had

12 three semesters of criminal justice.

13   **INMATE REAMS:** Yes, Ma'am.

14   **PRESIDING COMMISSIONER DALY:** So did you

15 take enough classes to be familiar with the law

16 and to know what happens to people that violate

17 the law?

18   **INMATE REAMS:** Yes, Ma'am, I sure did.

19   **PRESIDING COMMISSIONER DALY:** You know it

20 just -- it's so astounding that you had that

21 background and then you chose to go this way,

22 because I have no doubt that you could have been a

23 very good officer. So you quit school and when

24 your parents ran out of money.

25   **INMATE REAMS:** I didn't quit. I could no

26 longer continue to go.

27   **PRESIDING COMMISSIONER DALY:** Okay.

22

1      **INMATE REAMS:**  It wasn't quitting.

2      **PRESIDING COMMISSIONER DALY:**  All right.

3      **INMATE REAMS:**  I mean you meant if I could

4  have --

5      **PRESIDING COMMISSIONER DALY:**  All right.

6      **INMATE REAMS:**  If I could have got a job

7  and --

8      **PRESIDING COMMISSIONER DALY:**  Okay.

9      **INMATE REAMS:**  -- had the funds, I would

10  have continued going, I'm just saying.

11      **PRESIDING COMMISSIONER DALY:**  Okay, you were

12  living at home until about a month before your

13  arrest and it says your father kicked you out of

14  the house because of disagreements.  What

15  happened?

16      **INMATE REAMS:**  After I worked for the ADT

17  Company, as I said before, the weapons belonged to

18  my father.  I took one of the weapons from him and

19  he discovered it, and that's what got me kicked

20  out of the house.

21      **PRESIDING COMMISSIONER DALY:**  Okay.

22      **INMATE REAMS:**  I had -- I had it in my

23  possession.  I had lost it and when he found about

24  it, he asked me what happened and I didn't tell

25  him that I had lost it, so he called the Sheriff's

26  Department to report the gun stolen and then due

27  to the -- due to the lack of trust that he felt

23

1    that he had with me, he kicked me out of the

2    house.

3         PRESIDING COMMISSIONER DALY:  So was that

4    the right thing to do?

5         INMATE REAMS:  Absolutely.

6         PRESIDING COMMISSIONER DALY:  Okay.

7         INMATE REAMS:  Well I don't know if it was

8    the absolutely right thing to do, but there was

9    some intervention that I needed at that point.

10        PRESIDING COMMISSIONER DALY:  Sure.

11        INMATE REAMS:  I don't know if it was being

12   kicked out of the house, but something needed to

13   be done.

14        PRESIDING COMMISSIONER DALY:  Do you

15   understand why he reported it stolen?

16        INMATE REAMS:  Oh, yes.

17        PRESIDING COMMISSIONER DALY:  Yeah.

18        INMATE REAMS:  Yes.

19        PRESIDING COMMISSIONER DALY:  Because he

20   didn't want to be responsible.

21        INMATE REAMS:  Right, right.

22        PRESIDING COMMISSIONER DALY:  Okay.

23        INMATE REAMS:  I don't blame him for that at

24   all.

25        PRESIDING COMMISSIONER DALY:  So what was

26   your relationship like with your parents?

27        INMATE REAMS:  It was very good up until

24

1    probably the last year.

2        **PRESIDING COMMISSIONER DALY:**  And that was

3    when you were misbehaving and committing crimes?

4        **INMATE REAMS:**  That's when.  Yeah.

5        **PRESIDING COMMISSIONER DALY:**  Okay.

6        **INMATE REAMS:**  It was very good up until

7    that point.

8        **PRESIDING COMMISSIONER DALY:**  It said that

9    you felt suicidal at one point.

10       **INMATE REAMS:**  At the point that the -- that

11   I realized how much trouble I was in.  Yeah.

12       **PRESIDING COMMISSIONER DALY:**  Okay, and so

13   how do you feel now?

14       **INMATE REAMS:**  How do I feel now?

15       **PRESIDING COMMISSIONER DALY:**  Uh-hmm.

16       **INMATE REAMS:**  Hopeful.  Hopeful as to have

17   a life.

18       **PRESIDING COMMISSIONER DALY:**  Okay, you were

19   not using alcohol or drugs?

20       **INMATE REAMS:**  No, Ma'am.

21       **PRESIDING COMMISSIONER DALY:**  You were sober

22   when you committed these crimes.

23       **INMATE REAMS:**  Absolutely.

24       **PRESIDING COMMISSIONER DALY:**  So you knew

25   what you were doing.

26       **INMATE REAMS:**  I knew exactly what I was

27   doing.

25

1    **PRESIDING COMMISSIONER DALY:**  Okay, you were

2    never married.

3        **INMATE REAMS:**  No, Ma'am.

4        **PRESIDING COMMISSIONER DALY:**  And you have

5    no children.

6        **INMATE REAMS:**  No, Ma'am.

7        **PRESIDING COMMISSIONER DALY:**  Who is your

8    social support on the outside?

9        **INMATE REAMS:**  My family.  I've got extended

10   family and I've got friends.

11       **PRESIDING COMMISSIONER DALY:**  Okay, and your

12   parents, are they still living?

13       **INMATE REAMS:**  Yes, both of them.  They're

14   separated.  My mom lives in LA and my dad lives in

15   Kansas.

16       **PRESIDING COMMISSIONER DALY:**  Okay, and you

17   have good support from them.

18       **INMATE REAMS:**  I have excellent support from

19   them.

20       **PRESIDING COMMISSIONER DALY:**  Okay, so you

21   talk to them on the phone and --

22       **INMATE REAMS:**  Talk to them.  They visit

23   whenever they can.

24       **PRESIDING COMMISSIONER DALY:**  Okay.

25       **INMATE REAMS:**  About two or three times a

26   year.

27       **PRESIDING COMMISSIONER DALY:**  Good.  So

1   what's changed on you?

2           **INMATE REAMS:**  Everything.

3           **PRESIDING COMMISSIONER DALY:**  So like what

4   do you mean by everything?

5           **INMATE REAMS:**  Everything has changed.

6   There's no -- The person that you're reading about

7   there no longer exists.  I'm a totally different

8   person.  The things that were important to me back

9   then are no longer important to me.  The maturity

10  that I've gained.  I'm no longer influenced by

11  other people.  I do what I believe is right.  I

12  try to do the right thing and I'm more than

13  willing to do without.

14          **PRESIDING COMMISSIONER DALY:**  So what and

15  that would --

16          **INMATE REAMS:**  Whatever my needs are.

17          **PRESIDING COMMISSIONER DALY:**  That would be

18  my question.  What would happen when you get out

19  and you see what everybody else has?

20          **INMATE REAMS:**  It doesn't -- It doesn't

21  affect me.  It's what I have, and I've got peace.

22          **PRESIDING COMMISSIONER DALY:**  Okay, so how

23  did you get that peace?

24          **INMATE REAMS:**  Maturity, I guess.  Maturity

25  and involving myself in helping other people and

26  realizing that life is about other people and not

27  about myself.

27

1          **PRESIDING COMMISSIONER DALY:**  Okay, you've

2    been very fortunate to have good family support.

3          **INMATE REAMS:**  I've been very fortunate.

4    There's a lot of people in here that do not have

5    any help whatsoever.

6          **PRESIDING COMMISSIONER DALY:**  That have no

7    one.  Right.

8          **INMATE REAMS:**  I'm very lucky.

9          **PRESIDING COMMISSIONER DALY:**  Okay, anything

10   else you want to say about your background, about

11   the commitment offense or anything?

12         **INMATE REAMS:**  The only thing I have to say

13   is that I am 100 percent sorry.

14         **PRESIDING COMMISSIONER DALY:**  Okay.

15         **INMATE REAMS:**  That any of this ever

16   happened.

17         **PRESIDING COMMISSIONER DALY:**  All right.

18   When you first came in, you were reluctant to say

19   whether or not you had any objection to this Panel

20   and I sensed a little bit of reluctance.  Do I

21   want to call it hostility?

22         **INMATE REAMS:**  No, no hostility.

23         **PRESIDING COMMISSIONER DALY:**  Okay.

24         **INMATE REAMS:**  But I was aware that you were

25   on the Panel that found one of my co-defendants

26   suitable for parole.  So I didn't -- I didn't know

27   how that would affect our relationship, but I'm

28

1    sure that you -- that it's not a factor.

2        **PRESIDING COMMISSIONER DALY:**  Okay, we do 21

3    hearings a week and you times that by four years.

4    I don't remember all of the hearings.

5        **INMATE REAMS:**  Oh, I didn't expect you to

6    remember.  I was just saying from my point of view

7    and looking at you, I could see that you'll do

8    what you believe is right.

9        **PRESIDING COMMISSIONER DALY:**  Okay, I -- and

10   the reason I was asking when you were so hesitant

11   to say whether or not you objected to me being on

12   the Panel, because I did sign off in denying your

13   appeal.  Do you remember?  Do you remember that?

14       **INMATE REAMS:**  No.

15       **PRESIDING COMMISSIONER DALY:**  And that was

16   back in August of '03, and I signed -- No, it was

17   I signed off in May of '02.  And those are routine

18   when they come, you know, to the Board of Prison

19   Terms and they're signed off.  I didn't remember

20   it until I just looked at it, because we sign off

21   on hundreds of them.

22       **INMATE REAMS:**  Yeah, yeah, I'm sure that --

23       **PRESIDING COMMISSIONER DALY:**  Okay, I just

24   wanted -- I just wanted to clarify and make sure

25   that you were comfortable and that there weren't

26   any issues.  Okay.

27       **INMATE REAMS:**  Yes, Ma'am.

29

1         PRESIDING COMMISSIONER DALY:  All right.

2   Commissioner Harmon.

3         DEPUTY COMMISSIONER HARMON:  Okay, thank

4   you.  Good afternoon, Mr. Reams.

5         INMATE REAMS:  Good afternoon, Mr. Harmon.

6         DEPUTY COMMISSIONER HARMON:  Listen very

7   carefully.  If the information I'm providing is

8   inaccurate, then we need to clear it up for the

9   record.  I'm going to start off by showing that or

10  stating that the last hearing was September 11th of

11  '03.  At that time you had a one year denial.  And

12  then after that on 12/6/04, your hearing was

13  postponed.  You were received at CTF February 23rd,

14  1993, from Corcoran State Prison.  Custody Level

15  today is Medium A with a revised Classification

16  Score of 19.  Does that all sound right to you?

17        INMATE REAMS:  Yeah, you mean received here

18  at Soledad or into the CDC system?

19        DEPUTY COMMISSIONER HARMON:  Soledad.

20        INMATE REAMS:  Okay, that's correct.

21        DEPUTY COMMISSIONER HARMON:  We're going to

22  -- We're going to focus on your counselor's

23  report.  We're going to look at the period of time

24  since your last hearing primarily.  And the

25  counselor writes here in part, from 6/03 to 6/04.

26  Says you remained at CTF in the general

27  population, Medium A Custody.  It says inmate

 1    Reams took the test of Adult Basic Education on
 2    8/5/96, resulting in a total score of 12.9, based
 3    on a chrono.  It says you remain assigned as a
 4    production coordinator in the computer repair
 5    program until August 16th of '03.  And then in
 6    parentheses, it says (due to a closure of the said
 7    program.)  End of parentheses.  Receiving average
 8    grades.  Then it says you were assigned to the
 9    culinary as a dockworker on 9/6/03 to date.  Talks
10    about group activities.  A laudatory for AA
11    participation.  Also for your volunteer
12    participation in the 2003 Children's Holiday
13    Festival.  There was no psychiatric treatment and
14    no negative discipline.  And then they submitted
15    an update, an addendum here, and it shows that
16    from 6/15 of '04 to 4/11/05, you remained at CTF
17    in the general population, Medium A Custody.  You
18    continued to be assigned to the culinary back
19    dock.  There's no supervisor report available at
20    the time of the writing.  It says that you
21    completed the 13 week Impact Program Workshop
22    based on a chrono.  You continue to attend the
23    Twelve Step Program, based on a chrono.  And in
24    '04, you got recognition for your participation in
25    the Annual Children's Holiday Festival.  No
26    psychiatric treatment, no negative discipline.
27    And that's pretty much, it brings it up to date

1   other than the postponement was due to not having

2   a psychological evaluation report ready.  The

3   report on file at the time of your hearing.

4        **INMATE REAMS:**  That's correct.

5        **DEPUTY COMMISSIONER HARMON:**  So is that all

6   up to date?  Are you still doing the same job?

7   Are you still in the same assignment?

8        **INMATE REAMS:**  All correct.  Yes, Sir.

9        **DEPUTY COMMISSIONER HARMON:**  Okay.

10       **PRESIDING COMMISSIONER DALY:**  And that's

11  culinary on the dock?

12       **INMATE REAMS:**  Yes, Ma'am.

13       **PRESIDING COMMISSIONER DALY:**  Okay.

14       **DEPUTY COMMISSIONER HARMON:**  I went through

15  your file.  Needless to say, you've got hundreds

16  of pages.  What I've been able to decipher at this

17  point anyway is that in the area of vocational

18  programs, let's see.  You completed the vocational

19  information technologies program in 1996.  In

20  2004, you completed the vocational computer

21  refurbishing program.  You also received a

22  certificate of completion for business

23  applications in 1997, through the Valley Adult

24  School and a certificate of completion for

25  Business Principles and Management.  I noted at

26  one time in there you had worked as a teacher's

27  aide in vocational landscape, but I didn't see you

32

1   actually --

2          **INMATE REAMS:**  In vocational landscape?

3          **DEPUTY COMMISSIONER HARMON:**  Yeah, unless

4   maybe it's somebody else's.  That's what I was

5   going to ask you.  Is that somebody else's chrono?

6          **INMATE REAMS:**  It would have to be.  I've

7   never been in vocational landscaping.

8          **DEPUTY COMMISSIONER HARMON:**  Yeah, I didn't

9   see it in there, but there's a -- there is a

10  chrono in there talking about you as a teacher's

11  aide.  At least I think it's you and I'll double

12  check.  That's what I wanted to --

13         **INMATE REAMS:**  I was a teacher's aide while

14  I was in the computer class, which was the

15  information technologies.

16         **DEPUTY COMMISSIONER HARMON:**  Yeah.

17         **INMATE REAMS:**  After completing the course,

18  I became a teacher's aide in there.

19         **DEPUTY COMMISSIONER HARMON:**  Yeah, this

20  would be in '92.

21         **INMATE REAMS:**  No.  No, definitely not.

22  Definitely not.

23         **DEPUTY COMMISSIONER HARMON:**  Because of

24  these, besides all the vocational programs that

25  you've been involved in, you've done -- we've

26  talked about as kitchen work.  You've been in --

27  You've held various clerical positions and of

33

1    course, the vocational programs.  All indications

2    are is that you have a high school diploma and you

3    indicated that you have some college.  However, I

4    didn't find a copy of your college transcript in

5    there or a copy of your high school diploma.

6        **INMATE REAMS:**  I submitted a copy on

7    previous occasions, so if it's -- if it's not in

8    there, I --

9        **DEPUTY COMMISSIONER HARMON:**  Well did you do

10   an Olson Review?

11       **INMATE REAMS:**  Yes.

12       **DEPUTY COMMISSIONER HARMON:**  Did you -- Did

13   you see them in there?

14       **INMATE REAMS:**  No, I wasn't looking for that

15   document.

16       **DEPUTY COMMISSIONER HARMON:**  Okay, I

17   couldn't find it.  But then again, I could have

18   missed it, you know.

19       **INMATE REAMS:**  It's only three semesters

20   anyway.

21       **DEPUTY COMMISSIONER HARMON:**  Well that's,

22   you know that's --

23       **INMATE REAMS:**  And it was in 1983 or '82, I

24   mean, so --

25       **DEPUTY COMMISSIONER HARMON:**  That's fine.

26       **INMATE REAMS:**  Okay, I'm just --

27       **DEPUTY COMMISSIONER HARMON:**  It's better

34

1    than somebody with a high school diploma.

2         **ATTORNEY TARDIFF:**  But you need to make sure

3    that the documents are in your C-File.

4         **DEPUTY COMMISSIONER HARMON:**  Yeah.

5         **ATTORNEY TARDIFF:**  Because that's what they

6    look at.   If it's not in there and you submitted

7    it at a hearing, they can't put anything in your

8    C-File.

9         **INMATE REAMS:**  Okay, I understand.

10        **DEPUTY COMMISSIONER HARMON:**  Yeah, we don't

11   put anything in there or take it out.

12        **INMATE REAMS:**   Right.

13        **DEPUTY COMMISSIONER HARMON:**  Yeah.   So

14   anyway, you might want to -- you might want to

15   clear that up, but the other information seems to

16   be clear that there is definitely education -- an

17   education background.  Self-help group activities,

18   some of the programs that you've participated in

19   your incarceration period include, but not limited

20   to Life Skills in '94, American in '92.   From July

21   through September of '02, you were participating

22   in the Distance Learning Program.   In '97, with

23   Doctor Bakeman, you did some individual therapy.

24   You took an 18 hour program in '02, Creative

25   Conflict Resolution.   You were part of the Men's

26   Advisory Council in '01.   In 1997, you

27   participated in the Science of Mind Treatment and

35

1    Meditation.   That was an 11 week program.

2         INMATE REAMS:  Yes, it was.

3         DEPUTY COMMISSIONER HARMON:  And you also

4    took the various Hepatitis, STD's, TB educational

5    programs.  You did the Impact Program.  You've

6    watched the Destinos (phonetic) video, which I

7    guess you were trying to learn a second language.

8         INMATE REAMS:  I was just seeing what it --

9    what the program was about.

10        DEPUTY COMMISSIONER HARMON:  Did you ever

11   learn a second language?

12        INMATE REAMS:  The very beginning.  I mean

13   I never got any in-depth involvement in it.

14        DEPUTY COMMISSIONER HARMON:  Okay.  Now one

15   thing I -- Let's see, before I do that.  In '97,

16   you took a real estate principles course.

17        INMATE REAMS:  Yes.

18        DEPUTY COMMISSIONER HARMON:  And I noted

19   that also.  Is that something you did on your own?

20        INMATE REAMS:  Yes, they were offering all

21   different kinds of programs.  That's where I took

22   the business management also, at the same place.

23        DEPUTY COMMISSIONER HARMON:  Okay, now a

24   chrono that I found in there is back in '99, you

25   were recognized for your assistance in the

26   development for the curriculum for the Project

27   Change Program.  Is that right?

36

1          **INMATE REAMS:**  Yes.

2          **DEPUTY COMMISSIONER HARMON:**  Did you ever

3    take the program?

4          **INMATE REAMS:**  The Project Change?

5          **DEPUTY COMMISSIONER HARMON:**  Yeah.

6          **INMATE REAMS:**  No, we only -- I was only

7    able to support it.  It was the work that was

8    being done was being done out of the information

9    technologies area and then we were assisting with

10   any documents or anything they needed.

11         **DEPUTY COMMISSIONER HARMON:**  Why didn't you

12   take the program?  A lot of the guys here have

13   been bringing it forward.

14         **INMATE REAMS:**  I'm not sure.  When was it,

15   the program?

16         **DEPUTY COMMISSIONER HARMON:**  Well it says

17   that you assisted in the development of the

18   curriculum back in '99.  And I'm simply asking

19   you, did you participate in the program once it

20   was put together?  Because your fellow inmates in

21   here have come forward over the last week with

22   certificates of completion in that program.

23         **INMATE REAMS:**  Project Change?

24         **DEPUTY COMMISSIONER HARMON:**  Yeah.

25         **INMATE REAMS:**  I didn't -- I had no idea it

26   was running.  I know at one point.  Who was

27   running that program?  Do you know who runs that

37

1    program?

2        **DEPUTY COMMISSIONER HARMON:**    I asked you

3    first.    I don't know.

4        **INMATE REAMS:**    I'm not -- I'm not sure

5    either.

6        **DEPUTY COMMISSIONER HARMON:**    It's a 44 week

7    program and it's -- and the last I heard it was

8    offered in the Central Facility.

9        **INMATE REAMS:**    Didn't know it was available.

10       **DEPUTY COMMISSIONER HARMON:**    Are you in

11   Central?

12       **INMATE REAMS:**    Yes, Sir.

13       **DEPUTY COMMISSIONER HARMON:**    And you didn't

14   know?

15       **ATTORNEY TARDIFF:**    It's been available for

16   quite a while.

17       **DEPUTY COMMISSIONER HARMON:**    Yeah.

18       **INMATE REAMS:**    Project Change?

19       **ATTORNEY TARDIFF:**    Yeah.

20       **INMATE REAMS:**    That's new to me.

21       **DEPUTY COMMISSIONER HARMON:**    Okay.

22       **INMATE REAMS:**    Does the Friends Outside run

23   that?

24       **ATTORNEY TARDIFF:**    No, it's run here.

25       **INMATE REAMS:**    Okay, I'm unaware that it was

26   continuing.

27       **DEPUTY COMMISSIONER HARMON:**    Well you've got

38

1    -- you've received recognition for your efforts in

2    putting the program together, so.

3           **INMATE REAMS:**  I've received recognition

4    during that time for several projects that I

5    worked on.  That was just one of them.

6           **DEPUTY COMMISSIONER HARMON:**  Yeah, I guess

7    it was graphics in that or something, if I

8    remember reading it right.

9           **INMATE REAMS:**  Right.

10          **DEPUTY COMMISSIONER HARMON:**  I also noted

11   that, you know, the Annual Children's Holiday

12   Festival in one form or another for a number of

13   years.  You've received recognition for that and

14   also you did some volunteer work.  I guess you

15   were part of several guys that were cataloging

16   books for the Protestant Chapel.

17          **INMATE REAMS:**  Yes.

18          **DEPUTY COMMISSIONER HARMON:**  Do you remember

19   that?

20          **INMATE REAMS:**  That was another project I

21   worked on.

22          **DEPUTY COMMISSIONER HARMON:**  Right, I found

23   that in there.

24          **INMATE REAMS:**  They needed a library system

25   for a book checkout.

26          **DEPUTY COMMISSIONER HARMON:**  Okay, I think

27   I've got most of the self-help group programs.

39

1   Have I missed anything?

2          **INMATE REAMS:**  Not that I'm aware of.

3          **DEPUTY COMMISSIONER HARMON:**  And of course,

4   the laudatory chronos in AA and then you've been

5   participating in AA.  What is your background with

6   alcohol and drugs?

7          **INMATE REAMS:**  Non-existent.

8          **DEPUTY COMMISSIONER HARMON:**  That's what I

9   thought.  Well what is your -- what is your

10  purpose with the AA?

11         **INMATE REAMS:**  Self-help.

12         **DEPUTY COMMISSIONER HARMON:**  Okay, do you

13  know the Twelve Steps?

14         **INMATE REAMS:**  I know -- Yeah, pretty well.

15  I'm not -- I don't know if I know them by memory,

16  but I know a lot of the Steps.  Yes.

17         **DEPUTY COMMISSIONER HARMON:**  Okay, well I'm

18  not here to trick you.  What have you done in the

19  areas of the Eighth and Ninth Steps?

20         **INMATE REAMS:**  Eighth and Ninth.  You're

21  talking about the victims and the reconciliation

22  with the victims.  What I've done was the Impact

23  Program was probably the most that I've done with

24  the victims in hearing -- They have a story, the

25  victim comes in related to whatever crime that

26  they're doing that particular week.

27         **DEPUTY COMMISSIONER HARMON:**  Right.