# EXHIBIT 2
# Part 2 of 2

40

1    **INMATE REAMS:** Tells their story and that is

2    probably the most benefit that I've had concerning

3    the victims.

4    **DEPUTY COMMISSIONER HARMON:** Well have you

5    been able to make amends in any way with any of

6    your victims?

7    **INMATE REAMS:** I've not made direct amends

8    to them. No.

9    **DEPUTY COMMISSIONER HARMON:** Okay, what have

10   you done in the area of the Fourth Step?

11   **INMATE REAMS:** I made a fearless and

12   searching moral inventory of myself. I continue

13   to do that daily; every day. That's a part of my

14   meditation process to review what's happened the

15   day before and to -- if you've done any -- if I've

16   done anything that I feel that's not right, to go

17   and make amends for it. And that's a -- I do that

18   once a day and I do it once a week. If anything

19   I've said to somebody that I felt was wrong, I'll

20   let them know.

21   **DEPUTY COMMISSIONER HARMON:** Okay, you've

22   had two 115's. You've had no 128's. Now your

23   115's don't reflect violence or weapons, but each

24   in them self -- each by itself are significant in

25   the sense that the most recent, 12/9 of '97, was

26   for gambling, in parentheses, (bookmaking). You

27   were found guilty.

1      **INMATE REAMS:**  Well they always attach

2   bookmaking to that charge.   Yeah.

3      **DEPUTY COMMISSIONER HARMON:**  Right, right, I

4   think it was the stuff that was found in the desk.

5   Wasn't it?

6      **INMATE REAMS:**  Yeah, that was my folder.   I

7   admitted to it as soon as they found it.

8      **DEPUTY COMMISSIONER HARMON:**  And then in

9   11/13/86, conspiracy to escape, falsification of

10   records or documents.

11      **INMATE REAMS:**  Conspiracy to escape out of

12   Tracy.   Yes.

13      **PRESIDING COMMISSIONER DALY:**  What date was

14   that?

15      **DEPUTY COMMISSIONER HARMON:**  That was in

16   1986.

17      **PRESIDING COMMISSIONER DALY:**  Okay.

18      **DEPUTY COMMISSIONER HARMON:**  Yeah, November.

19   I guess my question with this bookmaking, what's

20   the situation with that?  I mean do you want to

21   explain?

22      **INMATE REAMS:**  Well the situation with that

23   was I was -- I was participating in picking

24   football and who would win and they have a ticket

25   that was going around and that's the -- that's the

26   -- what I had in my folder.  And yeah, I was

27   participating in it and it was wrong and I've no

42

1    longer participated in it.

2    **DEPUTY COMMISSIONER HARMON:** And the

3    conspiracy to escape?

4    **INMATE REAMS:** The conspiracy to escape,

5    I've always said that I knew it was going on. I

6    didn't have any direct involvement in it. It was

7    -- It was behind a confidential informant was the

8    information that was based against me, but I

9    accept full responsibility in that I had knowledge

10   of what was going on and didn't say anything.

11   **DEPUTY COMMISSIONER HARMON:** Okay, I think

12   we've covered all that pretty well. I don't think

13   we've missed too much. Let me ask you this. Do

14   you believe you pose a risk to the people outside

15   of the prison walls today?

16   **INMATE REAMS:** No, I do not.

17   **DEPUTY COMMISSIONER HARMON:** So the follow

18   up question would be, what do you believe makes

19   you a different man today than the man that came

20   into prison?

21   **INMATE REAMS:** The maturity would probably

22   be the best reason is the maturity level. And

23   because with maturity comes an understanding of

24   the self and an understanding of what your goals

25   and what your desires are and without being

26   influenced by anybody else. I make my decisions

27   based on my belief of what's wrong, right and

43

1  wrong, rather than what somebody else says is

2  right and wrong and then going with that, which is

3  what my failing grace was when I committed this

4  crime.  I had somebody that I ultimately

5  respected.  I thought he was a great man.  I

6  really did; and that's where I had him.  And

7  whatever he said, I thought was justified at that

8  time in my life.

9       **DEPUTY COMMISSIONER HARMON:**  Are you

10  speaking of Yellen?

11      **INMATE REAMS:**  Yes.

12      **DEPUTY COMMISSIONER HARMON:**  Sir, go ahead.

13  I'm just trying to keep the picture together here.

14      **INMATE REAMS:**  He essentially talked me into

15  it and made it -- and somehow made it right in my

16  mind that it was okay.  And with the way I looked

17  up to him and the way that I -- the way that I was

18  thinking and the way that I was raised and it just

19  -- it just fit and that's the path that I took

20  with him.  If I would have been my mind -- on my

21  own or by myself, this would have never happened.

22  I was not that kind of individual innately by

23  myself. But when I was mixed within a different

24  environment, I became what I thought he wanted.

25  That's what's changed.  I do what I believe is

26  right in my heart, regardless of -- regardless.

27  If it's right to me, if it's the right thing, if

44

1    it's good for everybody that's there, then that's

2    the right course of action to take.  And if it

3    isn't, I'm not going to do it.  I would rather not

4    do something than do something that's wrong.

5         **DEPUTY COMMISSIONER HARMON:** Did you

6    complete a thought?  I don't want to interrupt

7    you.  Did you complete a thought?

8         **INMATE REAMS:** Yes, Sir.  I was --

9         **DEPUTY COMMISSIONER HARMON:** Because I'm

10   going to move --

11        **INMATE REAMS:** Did I expound too much?

12        **DEPUTY COMMISSIONER HARMON:** No, no.  I'm

13   going to move on to the Doctors' reports and when

14   you pause, I'm not quite sure if you're done or

15   thought or if you're thinking or what.

16        **INMATE REAMS:** I apologize.

17        **DEPUTY COMMISSIONER HARMON:** No, it's not --

18   No, no, no.  Okay, Doctors' reports.  November

19   '04, you have a report from Stack, Doctor Stack,

20   S-T-A-C-K, for the transcriber.  I'm going to take

21   just parts of that report and you're more than

22   welcome to add to that if you wish.  A lot of it

23   is repetitive.  I'm not going to go over that.

24   But it is the psychosocial assessment.  And Doctor

25   Stack, in the area of clinical assessment writes

26   here in part, during the November 19th, 2004,

27   psychological evaluation, inmate Reams was alert

1    and oriented in the four spheres.  His speech was

2    articulate and contextually meaningful.  He

3    presented as an individual with above average

4    intelligence.  There was no evidence of a thought

5    or a mood disorder and, in fact, he demonstrated

6    significant flexibility in his affect.  As during

7    the 2000 evaluation, he was able to discuss the

8    instant offenses with insight, empathy for the

9    victims and their families and what appeared to be

10   sincere remorse for his misdeeds.  He demonstrated

11   insight, appropriate judgment and his impulse

12   control appeared to be intact and appropriate.

13   Under current diagnostic impressions, under Axis

14   I, II, and III:  No Diagnosis.  Axis IV:

15   Incarceration.  Axis V:  A GAF of 90.  In the area

16   of assessment of dangerousness, the Doctor writes

17   in part, inmate Reams' violence potential within a

18   controlled setting is considered to be well below

19   average relative to this Level Two inmate

20   population and if released to the community, his

21   violence potential is estimated to be no greater

22   than that of the average citizen in the community.

23   Alcohol and/or drug abuse do not appear to be risk

24   factors.  Under clinical observations, comments or

25   recommendations, in part, this inmate does not

26   have a mental health disorder that would

27   necessitate treatment, either during his

46

1    incarceration period or following upon parole.

2    That is signed by Doctor Stack.  The report that

3    was completed prior to that was from R.S. Coates,

4    C-O-A-T-E-S, Clinical Psychologist. And that's for

5    the transcriber.  In Doctor Coates' report, under

6    the area of clinical assessment, she wrote --

7    Excuse me just a second.

8            **[Thereupon, the tape was turned over.]**

9            **DEPUTY COMMISSIONER HARMON:**  And we're going

10    to the clinical assessment on Doctor Coates'

11    report.

12            **INMATE REAMS:**  Okay.

13            **DEPUTY COMMISSIONER HARMON:**  Okay, and it

14    says in part here, current mental status and

15    treatment needs.  It says during the clinical

16    interview, inmate Reams was alert and oriented.

17    There was no evidence of a mood or a thought

18    disorder.  His insight, judgment and impulsivity

19    all appear to be intact and appropriate.  Under

20    current diagnostic impressions, under Axis I, II,

21    III:  No Diagnosis.  Axis IV [sic] at the time was

22    a GAF of 90.  Prior evaluations conducted on

23    inmate Reams suggested that he has Adult Anti

24    Social Behavior and Sociopathic Traits.  This

25    examiner has not found that to be the case at this

26    point in his incarceration.  Under assessment of

27    dangerousness, in part, Inmate Reams' violence

1    potential within a controlled setting is

2    considered to be well below average relative to

3    the Level Two inmate population, and if released

4    to the community, violence potential is estimated

5    to be no more than the average citizen in the

6    community.  There are no significant risk factors,

7    which could be precursors to violence for this

8    inmate.  Under clinical observations, comments and

9    recommendations, in part the Doctor writes, this

10   inmate does not have a mental health disorder

11   which would necessitate treatment either during

12   his incarceration period or following upon parole.

13   And that is signed by Doctor Coates.  Now what

14   I've done there, Mr. Reams, is I've taken parts of

15   your two most recent Doctors' reports and I've

16   taken parts of your counselor's report and I've

17   taken parts of your institutional adjustment.  Now

18   I may have inadvertently left out areas that are

19   very important to you.  I'm going to return to the

20   Chair here to discuss your parole plans.  But

21   before I do, is there anything that you wish to

22   add in any of those areas?

23         **INMATE REAMS:**  I feel you've covered it

24   fully.

25         **DEPUTY COMMISSIONER HARMON:**  Okay, thank

26   you.  I'll return to the Chair.

27         **PRESIDING COMMISSIONER DALY:**  Okay, what are

48

1    you going to do?  Where are you going to live?

2    What are your parole plans?

3         **INMATE REAMS:**  Parole plans are to parole to

4    Los Angeles.  My parents have a business there.

5         **PRESIDING COMMISSIONER DALY:**  Is that your

6    mother and stepfather?

7         **INMATE REAMS:**  That's my father and

8    stepmother.

9         **PRESIDING COMMISSIONER DALY:**  Your father

10   and stepmother.

11        **INMATE REAMS:**  That's correct.

12        **PRESIDING COMMISSIONER DALY:**  Okay, I

13   thought your father was living in Kansas.

14        **INMATE REAMS:**  They do.  They own two

15   businesses.  One there and one in Kansas.

16        **PRESIDING COMMISSIONER DALY:**  Okay, all

17   right.  And who are you going to live with?

18        **INMATE REAMS:**  I'm going to live with

19   myself.

20        **PRESIDING COMMISSIONER DALY:**  And where?

21        **INMATE REAMS:**  At the business.  The

22   business has a studio apartment there.

23        **PRESIDING COMMISSIONER DALY:**  A studio

24   apartment at the business.  Okay, let me look at

25   the letters here that you have.  Harmony Health on

26   Tweedy Boulevard, Southgate, California.  Is that

27   right?

49

1        INMATE REAMS:  That's correct.

2        PRESIDING COMMISSIONER DALY:  Eugene Alvin

3    Reams will be employed at the above address.  His

4    job will be an unarmed night watchman.  Job

5    description may include other duties.  Gene and

6    Leona Reams.  So I think he -- we just have two

7    letters; one for both of us, I believe.  Okay,

8    it's not totally specific, but it's owned by your

9    parents.

10        INMATE REAMS:  That's correct.

11        PRESIDING COMMISSIONER DALY:  So, Harmony

12   Health.  Tell me -- Tell me about this business.

13        INMATE REAMS:  I have a couple of -- It's a

14   vitamin business.  It's owned by my parents.  I

15   have a couple of pictures if you would like to see

16   them of the -- of the business in Kansas.  I was

17   unable to obtain the business in -- a picture of

18   the business in LA.

19        PRESIDING COMMISSIONER DALY:  So is it mail

20   order?

21        INMATE REAMS:  It's mail order and also they

22   have a store there where the people can come in

23   there.

24        PRESIDING COMMISSIONER DALY:  Walk in.

25        INMATE REAMS:  Yeah, walk in.

26        PRESIDING COMMISSIONER DALY:  With a

27   storefront.

50

1          INMATE REAMS:  I do have a picture of the --

2   of the inside of the one at Harmony Health at the

3   store.

4          PRESIDING COMMISSIONER DALY:  In Kansas?

5          INMATE REAMS:  No, the one in Los Angeles.

6          PRESIDING COMMISSIONER DALY:  Okay, in LA?

7          INMATE REAMS:  Yes, this is the one in Los

8   Angeles.

9          PRESIDING COMMISSIONER DALY:  Okay, all

10  right.  So it has a studio apartment and that's

11  where you're going to be staying and they're going

12  to be working for you.

13         INMATE REAMS:  I'll be working for them.

14         PRESIDING COMMISSIONER DALY:  I meant for

15  them.  It doesn't say what your salary is going to

16  be or anything.  Do you know?

17         INMATE REAMS:  No, I don't.

18         PRESIDING COMMISSIONER DALY:  Okay.

19         INMATE REAMS:  I'm sure -- I'm sure --

20         PRESIDING COMMISSIONER DALY:  Well at least

21  you'll have a roof over your head.

22         INMATE REAMS:  Well I believe last time that

23  I had a letter from them, it was like $8.00 an

24  hour.

25         PRESIDING COMMISSIONER DALY:  Okay, so

26  that's where you're going to live and that's where

27  you're going to work.  What do you -- Is there

51

1    anything that you think that you need on -- as

2    follows -- as far as follow up on self-help

3    programs or therapy or anything when you're

4    released?

5        **INMATE REAMS:**  I don't know if I need any

6    follow up, but I would like to involve myself in

7    the community in some way or form.  I would like

8    to donate some of my time, if I have any, to

9    whatever projects are available.  The thing that

10   immediately comes to concern is helping the

11   homeless, because I've got great experience in

12   culinary, so I can handle all facets of that.  I

13   mean if they need somebody, I'd be more than --

14   more than happy to donate some of my time to help

15   with that.

16       **PRESIDING COMMISSIONER DALY:**  Okay, anything

17   else about your parole plans then that I don't

18   have?

19       **INMATE REAMS:**  What letters do you have for

20   parole plans?  Do you have the one from my parents

21   for the --

22       **PRESIDING COMMISSIONER DALY:**  I don't.  Do

23   we have any letters in the file that didn't come

24   in since I got my packet ahead of time?  I have a

25   letter of opposition, but I don't have any other

26   letters of support.

27       **INMATE REAMS:**  I have three letters of

 1    support.  One from my parents, one from a friend

 2    of the family's named --

 3        **PRESIDING COMMISSIONER DALY:**  Officer, would

 4    you bring those over to me and at the same time,

 5    will you bring me the pictures over then.

 6        **INMATE REAMS:**  I think that's everything.

 7    Thank you.

 8        **PRESIDING COMMISSIONER DALY:**  Okay, and this

 9    is a picture of your --

10        **INMATE REAMS:**  Of my parents.

11        **PRESIDING COMMISSIONER DALY:**  And this is

12    your dad and stepmother?

13        **INMATE REAMS:**  That's correct.

14        **PRESIDING COMMISSIONER DALY:**  Okay, and how

15    long have they been married?

16        **INMATE REAMS:**  Since 1989.

17        **PRESIDING COMMISSIONER DALY:**  Okay, all

18    right.  We have a letter here from Eugene and

19    Leona Reams.  Now did this come in in December of

20    '04?  This is the envelope for it?

21        **INMATE REAMS:**  Yes, it is.

22        **PRESIDING COMMISSIONER DALY:**  Okay, my son

23    was removed from society 21 years ago and my

24    seventh letter of support.  My letters of support

25    for my only child have outlined the exact nature

26    of the support our family will give.  Our family

27    members are willing to actively help him

53

1    reintegrate back into society.  We are in a
2    position to cover his initial financial expenses.
3    I will personally be there to greet him when he
4    leaves Soledad Training Facility.  I will give
5    Eugene all needed assurance to ensure his success
6    on parole.  He realizes the level of support and
7    confidence that his family has in him.  I will
8    review and assist in his efforts to comply with
9    all the rules and regulations governing his
10   conditions of parole and I will assist him in his
11   efforts to rejoin society with a positive manner.
12   He has a part time job with us as a computer
13   operator in the bookkeeping department.  We have
14   two businesses; one in Southgate and one in Iola,
15   Kansas.  When my son is released from prison, my
16   projected itinerary as follows:  Upon confirmation
17   of his release, I will have a room selected in San
18   Diego.  I will pay and -- So is your room going to
19   be the studio apartment at the --
20        **INMATE REAMS:**  That's changed, because I was
21   under the -- I was under the belief that under no
22   circumstances could I parole anywhere but to San
23   Diego.
24        **PRESIDING COMMISSIONER DALY:**  Right, but you
25   can anywhere in California.
26        **INMATE REAMS:**  I wasn't aware of that.
27        **PRESIDING COMMISSIONER DALY:**  Yeah, okay.

54

1      **INMATE REAMS:**  At the previous hearings I've
2   submitted documentation to go to Los Angeles, and
3   I've always been told no.
4      **PRESIDING COMMISSIONER DALY:**  And actually
5   it changed a couple of years ago; about three
6   years ago.
7      **INMATE REAMS:**  Right.
8      **PRESIDING COMMISSIONER DALY:**  That you
9   contain -- That you can parole anywhere in
10  California.  Said he's going to pay your living
11  expenses for the first two months of your parole.
12  He will report to parole office when he's supposed
13  to.  I, as his father, will reside with him for a
14  period of time.  This will serve to assist in
15  re-acclimating him back into society.  If there is
16  a need, I will spend more time.  However, I don't
17  expect this will be necessary.  I don't know what
18  more I could do to assure the Board that my son's
19  parole plans are adequate, verifiable and
20  complete.  My wife, his stepmother, and I own two
21  health food stores.  One is located in Southgate
22  area of LA and the other, Iola, Kansas.  And
23  finances for parole will not be a problem.  No one
24  other than my son's victims is more painfully
25  aware of Eugene's negative impact on the lives of
26  others as the result of his criminal actions than
27  his family and friends.  We've discussed this

55

```
1    openly and at length within our family structure,
2    with our friends and with Eugene, himself.  He has
3    admitted responsibility for his crimes and
4    accepted his punishment.  The time has come for
5    his incarceration to end.  We have been following
6    his progress in prison.  We are aware of his many
7    certificates and accomplishments.  We are happy to
8    learn that our encouragement helped him motivate
9    and complete his two vocational trades and his
10   academic studies.  So this is written by your dad.
11   A very good letter of support.  And then these --
12   Who is the picture of?
13           INMATE REAMS:  That's Helen, who I am
14   primarily friends with.  That's her husband and
15   her two sons.  Actually one is her son and one is
16   the --
17           PRESIDING COMMISSIONER DALY:  Okay, and so
18   how did you meet Helen and Harrison Young?
19           INMATE REAMS:  Friends of the family.
20           PRESIDING COMMISSIONER DALY:  Okay, we
21   continue to correspond with you.  In order to have
22   validity with the Board, it is important in our
23   estimation that we share some of the personal
24   information.  So they just go on and talk about,
25   you know, their work and her husband is a retired
26   Master Sergeant with the Marine Corps, having been
27   in 23 years.  He's also a former LA Police
```

56

1    Officer, an Orange County Sheriff and he is

2    currently teaching a day class for learning

3    handicapped. And then what she's doing. Said we

4    would not write to you endorsing Mr. Reams nor

5    putting our integrity at stake if we did not fully

6    believe that if paroled, he could be a positive

7    and contributing member of society. And then of

8    course, everybody always knows -- wants to know

9    how come you're still in. I meant most of the

10   inmates' families think that. Okay.

11        **INMATE REAMS:** That's a natural question.

12        **PRESIDING COMMISSIONER DALY:** You have an

13   outstanding work ethic and it's our desire to

14   provide ongoing support and encouragement. When

15   paroled, we are committed to being a support

16   system for him the rest of his life. We commit to

17   help provide housing, job placement, spiritual and

18   emotional counseling, educational needs and

19   monetary support as needed and we are the owner of

20   several rental properties and trust and we would

21   like to hire Reams to help with our bookkeeping.

22   He would be able to do this from any area with

23   access to a computer, which we are willing to

24   provide. We hope to have a -- be a stable support

25   as he transitions from Soledad to the outside

26   world. You've grown from a rebellious teenager to

27   a responsible and caring adult. Harrison and

57

1   Helen Young.  Okay, good letters of support.

2        **INMATE REAMS:**  I think those are probably

3   just additional copies.

4        **PRESIDING COMMISSIONER DALY:**  These are

5   copies; additional copies.  Okay, and then who is

6   Betty Hernandez?

7        **INMATE REAMS:**  She is my --

8        **PRESIDING COMMISSIONER DALY:**  This is your

9   aunt.

10        **INMATE REAMS:**  My aunt.  That's correct.

11        **PRESIDING COMMISSIONER DALY:**  Okay, and she

12   says you're a serving a seven to life for a

13   kidnapping and robbery and he was removed from our

14   family about 21 years ago.  We were very close.  I

15   was very proud to hear him regard me as his

16   favorite aunt.  And she says she's maintained

17   contact with you by visiting, accepting collect

18   calls and maintaining written communication. She

19   knows about all of your accomplishments.  When

20   Eugene is paroled, I will maintain our personal

21   relationship and encourage him to continue to

22   become a productive member of society.  I expect

23   great things from him and am confident he has

24   learned his lesson.  He has an extended and

25   supportive family and we are coordinating our

26   efforts to provide for his every need.  And we are

27   tailoring our support for the area.  And she was

58

1    under the understanding that you had to parole to

2    San Diego, but you now that you can go anywhere.

3    And of course, she's disappointed that you haven't

4    been paroled yet.  So very nice.  You have some

5    good letters of support and you've had good

6    support from your family.

7         INMATE REAMS:  Thank you.  I'm very lucky.

8         PRESIDING COMMISSIONER DALY:  We send out

9    3042 notices, and those are notices that go out to

10   law enforcement, District Attorney, the courts,

11   victim's next of kin.  And we do have a letter

12   that was received from the San Diego County

13   District Attorney's Office, but we also have a

14   representative from that office, who will speak at

15   the appropriate time.  So I will not read the

16   letter.  With that, we're open for questions.  Do

17   you -- I mean when you read over this arrest

18   record, when the police went to the hotel, when

19   they -- a search of the hotel room, they recovered

20   handcuffs, four handy talkie radios, keys for cash

21   registers and for the safe, four of the five

22   jackets taken from a Neiman Marcus store, a

23   revolver, keys, flashlight taken from Calvin

24   Nixon, a security guard uniform, a gun belt, a

25   pager from Mario Castaneda, registration slips,

26   .12 gauge shotgun, a loaded .38 revolver, speed

27   loaders and a box of ammunition and a bag

59

1    containing $2,369.94, and other items of clothing

2    and keys.  This was a pretty sophisticated

3    operation.

4         INMATE REAMS:  I don't think it was

5    sophisticated.  I think it was more of a Keystone

6    Cops situation.

7         PRESIDING COMMISSIONER DALY:  Okay, all

8    right.  So the two-way radios and that, is those

9    were taken from --

10        INMATE REAMS:  Those were taken from Neiman

11   Marcus.

12        PRESIDING COMMISSIONER DALY:  Okay.

13        INMATE REAMS:  Yeah, they belonged to Neiman

14   Marcus.

15        PRESIDING COMMISSIONER DALY:  All right, and

16   then --

17        INMATE REAMS:  Which was that day, I believe

18   or the day -- Let's see, Tuesday.  I believe the

19   robbery happened on Monday, then we were arrested

20   on Tuesday.

21        PRESIDING COMMISSIONER DALY:  Okay.

22        INMATE REAMS:  I'm not sure.

23        PRESIDING COMMISSIONER DALY:  You've done a

24   lot of computer work.

25        INMATE REAMS:  Yeah, I'm a good

26   administrative assistant.

27        PRESIDING COMMISSIONER DALY:  So have you

1    ever developed a resume?  Have you ever sat down

2    and looked at your whole history of incarceration,

3    every class you've taken, all of the vocational?

4    Have you ever really outlined everything and

5    pulled --

6              **INMATE REAMS:**  Oh, yeah.

7              **PRESIDING COMMISSIONER DALY:**  -- it

8    together?

9              **INMATE REAMS:**  I have a resume.  Yeah.

10             **PRESIDING COMMISSIONER DALY:**  Do you have it

11   with you?

12             **INMATE REAMS:**  I don't believe so.

13             **PRESIDING COMMISSIONER DALY:**  So does it

14   list all of your self-help, all of your vocational

15   studies?

16             **INMATE REAMS:**  It lists all my certificates.

17             **PRESIDING COMMISSIONER DALY:**  Okay.

18             **INMATE REAMS:**  It lists not specific jobs,

19   but what I -- what those jobs entailed and what I

20   did, and that's pretty much it.  I don't have

21   anything on the self-help side other than to

22   articulate my involvement with the community.

23             **PRESIDING COMMISSIONER DALY:**  Okay, do you

24   have any questions?

25             **DEPUTY COMMISSIONER HARMON:**  Back in '95,

26   Doctor Kitt, one of the things he said in here was

27   that you were emotionally stable at that time.

61

1   And you know, since you've been incarcerated and

2   life hasn't gotten easier on the outside, life has

3   gotten harder.  What do you think is going to keep

4   you from regressing and getting back to the point

5   where you wish some police officer is going to

6   shoot and kill you?

7        **INMATE REAMS:**  I don't -- It's impossible

8   for me to ever get to that point again.  It was

9   the -- It was naïve-ness back then and my

10  immaturity that allowed me to be influenced.  That

11  I allowed myself to be influenced.  That no longer

12  exists.  I am my own person and I do what I

13  believe is right.  And I try to do the right thing

14  in all situations.  You get to that point by

15  wanting to be killed by an officer, a suicide by a

16  police is what you're essentially talking about,

17  by not being a person, not knowing who you are.

18  And what teenager at 18 knows who they are?  I

19  mean that's understandable that not every teenager

20  goes to this length, but the situation that I

21  involved myself in is what led -- is what led to

22  that.  And today, that situation is no longer

23  there.  I feel like a healed person, a healed

24  being.  I am my own person.  I am no longer

25  influenced over by anybody or anybody else.  I

26  carry myself and conduct myself in the best manner

27  and with honor.  That's what's going to keep me

62

```
 1    from being a problem to society, to anybody else
 2    is my belief in myself and my understanding of it
 3    and knowing who I am and my involvement in looking
 4    at people as -- and understanding them.  When I
 5    was 18, all I saw was myself.  I didn't see -- I
 6    didn't the victims.  I didn't see anybody else's
 7    really involvement.  It never really impacted me
 8    the way it has since my mom got mugged.  That
 9    started me on the path of realization of there's
10    another side to life other than just what is
11    reflecting in the mirror.
12         DEPUTY COMMISSIONER HARMON:  Did you
13    complete a thought?
14         INMATE REAMS:  I believe I did.
15         DEPUTY COMMISSIONER HARMON:  Okay, thanks.
16    That's all I have and the District Attorney is
17    back on there, by the way.
18         PRESIDING COMMISSIONER DALY:  Okay, but I
19    -- you know I want to go back, because I'm looking
20    at this case as everybody else would look at it.
21         INMATE REAMS:  Yes, Ma'am.
22         PRESIDING COMMISSIONER DALY:  And in 1995, I
23    meant we sat here and we talked about your alcohol
24    and drug history and you said you had none.
25         INMATE REAMS:  I had -- Well I had
26    involvement in marijuana, but I meant I had no
27    real history of it.  There was separate incidents,
```

63

1    but the -- I've admitted to the marijuana use.

2    It's throughout my record and since you'd reviewed

3    the record, I just --

4        **PRESIDING COMMISSIONER DALY:**  Okay.

5        **INMATE REAMS:**  -- assumed that you were

6    talking about anything of substantial.

7        **PRESIDING COMMISSIONER DALY:**  Okay, well

8    because in May of '95, Doctor Kitt, who did the

9    report said that you -- he lists Cannabis Abuse.

10        **INMATE REAMS:**  Sure, and it's in several of

11    the reports.

12        **PRESIDING COMMISSIONER DALY:**  So how much

13    pot did you use?

14        **INMATE REAMS:**  I smoked probably a total

15    times of six or seven times.

16        **PRESIDING COMMISSIONER DALY:**  Okay, so the

17    Doctor also says that during observation in the

18    institution, it is not possible to determine if he

19    has made any significant psychiatric change that

20    would transfer to his behavior in a free

21    environment.  In a less controlled setting, such

22    as a return to the community, his future behavior

23    is still potentially the same as prior to

24    incarceration.  Okay, that's in '95.

25        **INMATE REAMS:**  That's in 1995.

26        **PRESIDING COMMISSIONER DALY:**  Right, ten

27    years ago.  Okay, so then I'm looking to see how

1    is it -- it's addressed in the future psychiatric

2    reports.  And in '97, they just said that they

3    don't really -- they don't really address what had

4    -- what had been said before.

5        **ATTORNEY TARDIFF:**  Yeah, on that '97 report,

6    I just have one page.

7        **PRESIDING COMMISSIONER DALY:**  That's all I

8    have.

9        **ATTORNEY TARDIFF:**  Is that all you have?  I

10   think it must be missing.

11       **PRESIDING COMMISSIONER DALY:**  Look and see

12   if there is additional on the '97, because I want

13   to see if it's addressed.  Then in the '98 report,

14   he says that the recommendations and conclusions

15   of the most recent Board of Prison Terms' report,

16   psychological evaluation are still accurate and

17   valid.  So I don't know if there was more to the

18   '97 or if he's referring back to the '95.

19       **ATTORNEY TARDIFF:**  There must be more to the

20   '97 than one page.

21       **INMATE REAMS:**  No, it was just one page.

22       **PRESIDING COMMISSIONER DALY:**  Well I don't

23   know what they're referring to.

24       **ATTORNEY TARDIFF:**  So that's all there was?

25       **INMATE REAMS:**  Wait a minute.  Let me see

26   this again.

27       **PRESIDING COMMISSIONER DALY:**  Just one page?

65

1          **ATTORNEY TARDIFF:**  But it's not even signed

2      or anything.

3          **INMATE REAMS:**  Oh, this is -- this is the

4      one -- this is the one that was one page.  This

5      one from the '97.  You're right.  There is several

6      pages on that.

7          **ATTORNEY TARDIFF:**  It might be not in the

8      C-File.  I mean there's no signature.

9          **PRESIDING COMMISSIONER DALY:**  Because

10     there's no signature or anything on it and there's

11     nothing in the C-File.  Right?

12         **INMATE REAMS:**  I was just reviewing that

13     this morning too, and I had copies of it.

14         **DEPUTY COMMISSIONER HARMON:**  The C-File

15     shows one page.

16         **ATTORNEY TARDIFF:**  And I don't know what

17     they're referring to.

18         **PRESIDING COMMISSIONER DALY:**  So in coming

19     to the '98 report, I don't know what he's

20     referring to when he says that the psychological

21     evaluations are still accurate and valid.  And

22     then we go to 2000.

23         **INMATE REAMS:**  Okay, here's the -- I have a

24     copy of the '97 report and I -- and it's two

25     pages.  Here's the second page if you'd like to

26     see it.  I thought I had it, but I wasn't sure.

27         **PRESIDING COMMISSIONER DALY:**  Would you

66

1    bring that over to us, Officer.

2         **ATTORNEY TARDIFF:**  Well let me look at it.

3         **INMATE REAMS:**  Well I'm going to point out

4    what she's specifically talking about, which is

5    this right here.

6         **PRESIDING COMMISSIONER DALY:**  Okay, so the

7    second page in '97, was authored by Doctor Terrini

8    and it says Anti Social Personality Disorder

9    Improved and he still lists Adult Anti Social

10   Behavior and Marijuana Abuse in Axis I.  And he

11   says that you're competent and responsible for

12   your behavior and says regarding your violence

13   potential, given greater maturity, your lack of

14   115's and his -- your violence potential is

15   estimated below average relative to the inmate

16   population.  And there seems to be no need for --

17   the inmate is not in need of any mental health.

18   So all he does is compare you to the average

19   inmate relative to that inmate population.  Okay,

20   so I'm just trying to get some clarification and

21   I'll get that back to you with all this.  So then

22   we go to 2000, and they don't really -- they just

23   say that you don't have a mental health disorder

24   which would need treatment.  And in 2000, they

25   just say that you're -- you would be a low risk.

26   Okay, District Attorney, do you have any

27   questions?

67

1        **DEPUTY DISTRICT ATTORNEY SACHS:**  I have no

2   questions for the inmate, Commissioner.

3        **PRESIDING COMMISSIONER DALY:**  Okay.

4        **DEPUTY DISTRICT ATTORNEY SACHS:**  Thank you.

5   Counsel?

6        **ATTORNEY TARDIFF:**  No.

7        **PRESIDING COMMISSIONER DALY:**  District

8   Attorney, go to closing.

9        **DEPUTY DISTRICT ATTORNEY SACHS:**  On behalf

10  of The People of the State of California, we would

11  respectfully oppose parole because we do feel that

12  the release of Mr. Reams would pose an

13  unreasonable risk of danger to society.  This

14  offense was carried out in a dispassionate and

15  calculated manner in which multiple victims were

16  attacked and suffered incidents.  The commitment

17  offense demonstrates a crime spree that included

18  multiple crimes, such as kidnapping for robbery,

19  robbery and burglary and given the totality of all

20  of the circumstances in this case, we do not feel

21  that he is suitable for parole at this time or

22  would behave any differently in an uncontrolled

23  setting and that further observation and

24  incarceration is necessary in order to ensure that

25  public safety is not in -- not compromised by an

26  improvident release upon parole at this time.

27  Therefore, we are opposed to parole.

68

1      **PRESIDING COMMISSIONER DALY:**  Counsel.

2      **ATTORNEY TARDIFF:**  Thank you.  In terms of

3   Mr. Reams' pre-incarceration history as well as

4   his post-incarceration history, it's quite

5   positive.  He came from a good background; high

6   school graduate, some college.  His family

7   appeared to be supportive of him emotionally,

8   that's for sure, and financially until they

9   couldn't any longer.  And I don't see that there's

10  any problem in that area.  He also had no prior

11  criminal history at all.  In terms of the crime

12  itself, he's always accurately described the

13  commitment offense and his version has been

14  substantially the same as the official versions

15  from throughout his incarceration.  The psych

16  evaluations state, particularly the most recent

17  ones, that -- and that includes the 2000 and the

18  2004, that he had insight and empathy.  He showed

19  sincere remorse, appropriate judgment.  He has

20  good impulse control, therefore, he seems to have

21  gotten a grasp of the commitment offenses and why

22  they occurred, which is the insight that is needed

23  to ensure that he is no longer a risk to society.

24  In terms of his post-conviction factors, he's

25  participated in a lot of self-help and pretty much

26  has gotten into all the areas; Anger Control,

27  Individual Therapy, Meditation, Impact, AA.  He's

```
 1    done volunteer work.  He's educationally upgraded
 2    himself.  His work history since he's been
 3    incarcerated has been positive and stable.  He has
 4    vocations.  He's only had two 115's.  The last one
 5    was in '97.  That's eight years ago; non-violent
 6    in nature.  He's had a high GAF Score of 90.
 7    There are no risk factors that need to be of
 8    concern should he be released out into the
 9    community.  There's no substance abuse that needs
10    to be dealt with.  There's no thought or mood
11    disorders.  He has strong family support.  He has
12    a job and he has housing.  His 2000 and 2004 psych
13    evaluations are all -- both of those state that he
14    would pose a low degree of risk or his risk
15    potential is the same as the average individual in
16    the community.  And that goes from 2000, so we
17    have now five years of where he is low.  I do
18    agree that these, the '98 and '97 evaluations are
19    difficult to interpret.  The '98 doesn't say
20    anything in it.  The '97 just says he shows
21    considerable insight.  His judgment was good.  I
22    think the mental health issue has been clarified
23    in the 2000 evaluation, and that was with regard
24    to the personality -- Adult Anti Social and
25    Sociopathic.  And that was not found to be the
26    case at this point, and that was five years ago.
27    And most currently, again, it was not found to be
```

70

1    present.  So if that were, in fact, present at

2    some time, it apparently has left him or however

3    you say it, diminished, removed itself from him

4    within his incarceration history.  So I would

5    submit that further incarceration would be of no

6    benefit to society at this point and that he has

7    done all the necessary programming and exploration

8    of himself to render that he is no longer a risk

9    to society.  Thank you.

10          **PRESIDING COMMISSIONER DALY:**  Okay,

11   Mr. Reams, this is your opportunity to make a

12   statement to the Panel as to why you feel you are

13   suitable for parole at this time.

14          **INMATE REAMS:**  I feel I'm suitable for

15   parole at this time because I am no longer a

16   threat to society.  I've matured and developed

17   myself and I'm -- and I honestly believe that I am

18   a healed human being.  Thank you.

19          **PRESIDING COMMISSIONER DALY:**  Okay, I wanted

20   to make sure you completed that thought.  It's

21   1320.  We're going to recess for deliberations.

22                    **R E C E S S**

23                     --o0o--

24

25

26

27

71

1      **CALIFORNIA BOARD OF PRISON TERMS**

2      **D E C I S I O N**

3          **PRESIDING COMMISSIONER DALY:** Okay, we're back

4      on record in the matter of Eugene Reams. And the

5      Panel has reviewed all of the information received

6      from the public and relied on the -- Wait a

7      minute. I need to bring the DA back here. Okay,

8      the Panel is back on record in the matter of

9      Eugene Reams. And the Panel has --

10         **DEPUTY DISTRICT ATTORNEY SACHS:** I'm back.

11     Thank you.

12         **PRESIDING COMMISSIONER DALY:** Thank you. Has

13     relied on all of the information received from the

14     public in concluding that the prisoner is not yet

15     suitable for parole and would pose an unreasonable

16     risk of danger to society or a threat to public

17     safety if released from prison. The offenses were

18     carried out with a great amount of callous

19     disregard for what the victims were going through.

20     There were about 19 victims who were attacked.

21     There were 27 counts of offenses. And 14 of the

22     victims were bound and gagged. These crimes were

23     carried out in a very calculated manner in that

24     they were all pre-planned. And the victims were

25     abused by being bound and gagged and the offenses

26     were carried out in a manner that showed a total

27     **EUGENE REAMS    C-90508    DECISION PAGE 1    5/13/05**

1    disregard for the fear of the victims at the time.

2    And the motive for the crimes were very trivial in

3    relation to the offenses in that these were

4    strictly for material gains and selfish reasons.

5    These conclusions are drawn from a Statement of

6    Facts, that the prisoner and his crime partner

7    were responsible for multiple car thefts,

8    robberies and assaults of 27 counts with 19

9    victims.  And they resulted in the accumulation of

10   the commitment offense and the current arrest and

11   incarceration.  The prisoner has actually minimal

12   criminal history.  He had nothing -- As a -- As a

13   juvenile he had three speeding violations and he

14   also had possession, a misdemeanor conviction for

15   carrying a concealed weapon in 1982.  And with the

16   adult convictions, these were his only offenses.

17   He had not been arrested before.  However, these

18   offenses were multiple in nature.  And actually he

19   had a stable social history and as far as his

20   parental upbringing, he did have very very limited

21   use of marijuana.  And so his background does not

22   indicate a lot of severe problems.  He's only had

23   two 115's since he has been incarcerated and the

24   last one was in 1997, for gambling.  He has been

25   programming in a continuous steady manner.  And

26   the psychiatric/psychological report dated 7/15 of

27   **EUGENE REAMS   C-90508   DECISION PAGE 2    5/13/05**

73

1    '04, by Doctor Stack appears to be supportive and

2    is a very adequate report.  And the parole plans

3    appear to be in order and he has good support from

4    his family.  The Hearing Panel notes that 3042

5    notices indicate an opposition to a finding of

6    parole suitability.  Specifically from the

7    District Attorney of San Diego County who was

8    present at the hearing today and had also sent in

9    a letter of opposition.  This is in looking at

10   what all you've done, Mr. Reams, you've -- Gosh,

11   you've held a number of work assignments and some

12   of them are the project coordinator in the

13   computer room, culinary dockworker, tier tender,

14   clerk, porter, dining hall.  You are a high school

15   graduate.  You've worked as a teacher's aide.

16   You've taken some Destinos classes.  In vocation,

17   you have your vocational computer technology and

18   refurbishing.  You've taken some business

19   management and business applications.  You've been

20   involved in AA, Men's Advisory Council,

21   Communicable Diseases classes, Impact, Science of

22   the Mind and Meditation, Creative Conflict, One-

23   on-One with Doctor Bakeman, Real Estate Principles

24   course, Distance Learning Program, American and

25   Life Skills and you have several laudatory chronos

26   in your file; the Children's Holiday Festival, AA

27   **EUGENE REAMS   C-90508   DECISION PAGE 3   5/13/05**

74

1    participation, setting up the curriculum for

2    Project Change, cataloging books for the

3    Protestant Chapel.  So you've been involved in a

4    lot of positive things.  However, these positive

5    aspects do not outweigh the factors of

6    unsuitability.  This is going to be a one year

7    denial, Mr. Reams.  And I'm going to make a couple

8    of comments to you, and this is just my personal

9    observation.  But I totally believe that in doing

10   a hearing, I need to give you honest feedback on

11   what my thoughts were.  It was really my intent to

12   come in here today and to go through absolutely

13   every one of the crimes and talk with them about

14   -- with you about them.  And you cut me off.

15        **INMATE REAMS:**  Yes, Ma'am.

16        **PRESIDING COMMISSIONER DALY:**  You said you

17   didn't want to talk about them.  You'd talked

18   about them.  Everything you had to say has been

19   said.  Who was sitting on the other side of the

20   table determining whether or not you're suitable

21   for parole?  And I just -- I felt rather defiant

22   and that was why I asked you if you had some

23   hostility towards me, because I looked at how long

24   you've been down.  I looked at everything that you

25   have been doing and then looking at the good

26   support that you have from your family, your job,

27   **EUGENE REAMS  C-90508  DECISION PAGE 4   5/13/05**

75

1    your parole plans and everything lined up.  I
2    wanted to go through these one by one, read them
3    on the record because quite frankly, I don't
4    believe that they've ever been thoroughly gone
5    through by any Panel.
6         **INMATE REAMS:**  They were.
7         **PRESIDING COMMISSIONER DALY:**  As reading them
8    verbatim and talking about each one of the crimes.
9    And I really wanted to do that today and you cut
10   me off and you didn't really want to do it.  And
11   so I just have to tell you that when a Panel is
12   ready to give you a date, in order to send it
13   forward to Decision Review and then for it to go
14   to the Governor's Office, we have to show that the
15   crime was thoroughly discussed and acknowledged
16   and that we have a good understanding of your
17   acceptance of responsibility and how you feel
18   about it and consideration given to the impact on
19   the victims and everything.  And I, quite frankly,
20   didn't feel I had a chance to do that today.
21   Okay, that was number one.  Number two, what I
22   think would be very good for you to do because you
23   can see what all my scribbling of the things that
24   you've done.  I think you should go back from the
25   time that you entered and I think that you ought
26   to, along with your resume, list every one of the
27   **EUGENE REAMS   C-90508   DECISION PAGE 5    5/13/05**

76

1     self-help classes you've ever been involved with.

2     List all of the vocational things that you've been

3     doing.  You read books.  If you read books, list

4     the books and things that you've read and really

5     have them outlined and prepared to give them to

6     the Panel next time you come in.  I mean I went

7     through here and I dug out a lot of stuff.  But I

8     think for you to just recap it, to bring a resume

9     in and have it presented for you.  I think that it

10    would be really helpful and it isn't that we don't

11    have the ability to do it, but we just want to

12    make sure that we're not missing anything.  So

13    this is going to be a one year denial.  And we're

14    just asking that you remain disciplinary free and

15    continue with whatever vocational programming and

16    whatever self-help that you can do.  And then

17    we'll see you in one year.  You have the

18    possibility of getting out and you know the

19    Governor doesn't have the final say so on your

20    case.

21         **INMATE REAMS:**  I'm aware of that.

22         **PRESIDING COMMISSIONER DALY:**  Okay, so it's

23    the Panel Member who comes in and has to argue

24    with all of the other to present your case to the

25    other Commissioners.  And right now, I'd be hard

26    pressed to say that, you know, that I looked at

27    **EUGENE REAMS   C-90508   DECISION PAGE 6    5/13/05**

77

1    everything thoroughly and that I really feel that

2    you're suitable.  I was cut short, so I -- that's

3    my impression, so I'm leaving you with that.  And

4    we'll see you in one year.  Any comments,

5    Commissioner Harmon?

6        **DEPUTY COMMISSIONER HARMON:**  I don't think I

7    can add too much to that other than to tell you

8    that you are a good candidate and you're getting

9    better.  A lot of the things that you were talking

10   about in terms of the positive movement you've

11   made over the years in terms of finding yourself

12   and things like that, I think they're true.  I do

13   believe you and I think you're going to make it

14   out there.  And there's some rough edges maybe

15   that need to be smoothed out a little bit here as

16   identified by the Commissioner.  But I would

17   expect that in the near future you're going to be

18   successful and I think you need (indiscernible) to

19   address all those issues again.  And I wish you

20   luck, sir.

21       **INMATE REAMS:**  Thank you.

22       **PRESIDING COMMISSIONER DALY:**  Okay.

23       **DEPUTY COMMISSIONER HARMON:**  Okay.

24       **PRESIDING COMMISSIONER DALY:**  All right.  That

25   concludes the hearing.  It's 1400 hours.

26       **INMATE REAMS:**  Thank you.

27   **EUGENE REAMS   C-90508   DECISION PAGE 7   5/13/05**

78

1    **DEPUTY DISTRICT ATTORNEY SACHS:**  Thank you.

2    **PRESIDING COMMISSIONER DALY:**  Thank you.

3                              --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON Sep. 10, 2005**

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **EUGENE REAMS   C-90508   DECISION PAGE 8   5/13/05**

79

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, SANDRA TRIPLETT, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 78, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of EUGENE REAMS, CDC No. C-90508, on MAY 13, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 26, 2005, at Sacramento County, California.

Sandra Triplett
Transcriber
**CAPITOL ELECTRONIC REPORTING**