# EXHIBIT 3
# Part 1 of 2

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF SAN DIEGO

### PROBATION OFFICER'S REPORT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA | COURT No. 1) CR 66967  2) CR 66202 |
| vs. | DA FILE No. 1) A 74433  2) A 74093 |
| EUGENE ALVIN REAMS | HEARING DATE 5-31-84 @ 9 a.m. |
| | DEPT. & JUDGE SC 10 - EHRENFREUND |
| | ATTORNEY R. Bourne, Appt. |
| | PROBATION OFFICER F. WITT:kab |
| | PROB. CASE No. A- 622 688 |

Name _____ AKA _____ (Include maiden and former married names)

Address  8857 Hillslope Ave, Spring Valley, CA   ZIP 92077   Phone 469-0705

Sex M  Age 19  Birth Date 1-22-65  Birth Place Orlando, FL

Cauc. ☒  Cau-Mex. ☐  Negro ☐  Oriental ☐  Other _____  Driv. Lic. C 1084968 CA  ☐ DL 254

Ht. 5'9  Wt. 180  Eyes Blu  Hair Brn  Other Identifying Data None
Scars, tattoos, amputations, etc.

Trade _____  Union _____  Soc. Sec. No. 261 65 0624

Dates & Branch of Service None  Rank _____  Type of Discharge _____  Ser. No. _____

Duty Station _____  ☐ 2086

1) CR 66967: Unlawful Take/Drive Vehicle (10851 VC), Cts. 2, 17, & 20;
   (Harvey Waiver)
2) CR 66202: Conspiracy to Commit Robbery (182.1 PC), Count 1;
   Grand Theft Auto (487.3 PC), Counts 2 and 3;
   Kidnapping for Robbery (209(b) PC) - Commit Crime While Armed (12022.5),
      Counts 4 and 7;
   Robbery (211 PC) - Commit Crime While Armed (12022.5), Counts 5 and 8;
   Robbery (211 PC) - Armed While Commit Felony (12022(a)), Counts 14 and 16;
   Robbery (211 PC) - with (12022.5 & 12022(a)), Counts 15, 17, 18, & 19;
      (continued below)

| | | | |
|---|---|---|---|
| | Date Offense Committed 1) 5/9/83-11/18/83  2) 11/5/83-11/21/83 | Date Convicted 1) 5-7-84  2) 4-18-84 | 1) PG  How? 2) V/J |
| Status Custody  Days in Jail This Case ____ | Investigating Arresting Agency SDPD, SDSO, CVPD | Date Complaint Filed  Info XXXXXX | 1) 2-27-84  2) 12-30-83 |
| FBI No. 635 926 CA3 | CII No. A07 393 394 | SDPD No. 83 186728A | SDSO No. 83 186728B |
| Obtained ☐ Last Entry ____ | Obtained ☐ Last Entry ____ | OTHER PD No. 83 0970 82104 | |

Unlawful Taking of Vehicle (10851 VC) - Commit Crime While Armed (12022.5),
   Counts 6 and 9;
Attempt Grand Theft Auto (664/487.3 PC) - Commit Crime While Armed (12022.5),
   Count 10;

(Charges continued on next page)

PROB. 1S (REV. 5-76)

REAMS, Eugene Alvin   CR 66202/CR 66967   - 2 -                          5-31-84

## CUSTODY DATA:

As to CR 66202:

| Date Confined | Date Released | Place | Custody Days |
|---|---|---|---|
| 11-22-83 | In Custody (5-31-84) | Co Jail | 192 |
| | | 4019 PC credits | 96 |
| | | Total CTS | 288 |

As to CR 66967:

| Date Confined | Date Released | Place | Custody Days |
|---|---|---|---|
| 12-9-83 | In Custody (5-31-84) | Co Jail | 175 |
| | | 4019 PC credits | 87 |
| | | Total CTS | 262 |

Caution: If the Court desires to impose consecutive sentences in these cases, it must credit time served in accordance with 2900.5(b) PC, which mandates that credit be given only once for a single period of custody attributable to multiple offenses. Thus, credit for time served on CR 66202 is 288 days (192 actual and 96 days 4019 PC credits), and on CR 66967 is zero.

## PRE-PLEA BARGAIN:

The defendant went to trial in this case and was found guilty of the offenses enumerated in the Related Court Data section of this report.

As to CR 66967: "For a plea of guilty to Counts 2, 17 & 20, Dist. Atty agrees to dismiss all other counts in CR 66967. Dist. Atty to agree to sentence in each count to run concurrent to each other and concurrent to any sentence imposed in CR 66202 - Harvey Waiver."

## STATUS OF COPARTICIPANTS:

As to CR 66202: Codefendants Michael Samuel Yellen and Harold William Taylor also went to trial and were found guilty of offenses shown in the following section of this report. They will be appearing for sentencing at the same time as the defendant.

As to CR 66967: Codefendant Michael Yellen has plead not guilty and is scheduled to go to trial in this case on 6-4-84. He is charged, as was the defendant, with seven counts of 487.3 PC, seven counts of 10851 VC, and seven counts of 496.1 PC, arising out of seven thefts of automobiles.

REAMS, Eugene Alvin   CR 66202/CR 66967   - 3 -   5-31-84

RELATED COURT DATA:

As to CR 66202: The Counts, Code sections, and the verdicts for the defendants are as follows:

| Counts | Charge | Defendant Reams | Defendant Yellen | Defendant Taylor |
|---|---|---|---|---|
| Count 1 | 182.1 PC | Guilty | Guilty | Guilty |
| Count 2 | 487.3 PC | Guilty | N/A | N/A |
| Count 3 | 487.3 PC | Guilty | Guilty | N/A |
| Count 4 | 209(b) PC | Guilty + 12022.5 | Guilty + 12022(a) | Guilty + 12022.5 |
| Count 5 | 211 PC | Guilty + 12022.5 | Guilty + 12022(a) | Guilty + 12022.5 |
| Count 6 | 10851 VC | Guilty + 12022.5 | Guilty + 12022(a) | Guilty + 12022.5 |
| Count 7 | 209(b) PC | Guilty + 12022.5 | Guilty + 12022(a) | Guilty + 12022(a) |
| Count 8 | 211 PC | Guilty + 12022.5 | Guilty + 12022(a) | Guilty + 12022(a) |
| Count 9 | 10851 VC | Guilty + 12022.5 | Guilty + 12022(a) | Guilty + 12022(a) |
| Count 10 | 664/487.3 PC | Guilty + 12022.5 | Guilty + 12022.5 | Guilty + 12022.5 |
| Count 11 | 245(a)(2) PC | Guilty + 12022.5 | Guilty + 12022.5 | Guilty + 12022.5 |
| Count 12 | 245(a)(2) PC | Guilty + 12022.5 | Guilty + 12022.5 | Guilty + 12022.5 |
| Count 13 | 245(a)(2) PC | Guilty + 12022.5 | Guilty + 12022.5 | Guilty + 12022.5 |
| Count 14 | 211 PC | Guilty + 12022(a) | Not Guilty | Guilty + 12022.5 + 12022(a) |

original follows

CR 66202/CR 66967        - 4 -    BEST AVAILABLE COPY  5-31-84

|  |  | | | |
|---|---|---|---|---|
|  |  | Guilty + 12022.5 + 12022(a) | Not Guilty | Guilty + 12022(a) |
|  |  | Guilty + 12022(a) | Not Guilty | Guilty + 12022.5 + 12022(a) |
|  | 211 PC | Guilty + 12022.5 + 12022(a) | Not Guilty | Guilty + 12022(a) |
| Count 18 | 211 PC | Guilty + 12022.5 + 12022(a) | Not Guilty | Guilty + 12022.5 + 12022(a) |
| Count 19 | 211 PC | Guilty + 12022.5 + 12022(a) | Not Guilty | Guilty + 12022(a) |
| Count 20 | 245(a)(2) PC | Guilty + 12022.5 | Guilty | Guilty (Not armed) |
| Count 21 | 245(a)(2) PC | Guilty + 12022.5 | Guilty | Guilty + 12022.5 |
| Count 22 | 245(a)(2) PC | Guilty + 12022.5 | Guilty | Guilty + 12022.5 |
| Count 23 | 245(a)(2) PC | Guilty + 12022.5 | Guilty | Guilty (Not armed) |
| Count 24 | 245(a)(2) PC | Guilty + 12022.5 | Guilty | Guilty (Not armed) |
| Count 25 | 245(a)(2) PC | Guilty + 12022.5 | Guilty | Guilty (Not armed) |
| Count 26 | 245(a)(2) PC | Guilty + 12022.5 | Guilty | Guilty (Not armed) |
| Count 27 | 459 PC | Guilty + 12022.5 + 12022(a) | Guilty + 12022(a) | Guilty + 12022.5 + 12022(a) |

THE OFFENSE:

As to CR 66202:  The following was compiled from police reports and other material in the District Attorney's file, not including testimony presented during the trial.  (Where subsequently identified, the suspects' name will be used):

REAMS, Eugene Alvin   CR 66202/CR 66967      - 5 -                          5-31-84

As to Count Two: In the evening of 11-5-83, the victim, Michael Terzibachian, reported to San Diego Police that his 1983 Porche 930 had been stolen. He related that he had advertized the vehicle for sale and that an individual, later identified as Reams, responded. During a test drive with Terzibachian, Reams had asked to drive the vehicle. As Terzibachian got out of the vehicle, Reams locked the door and drove the vehicle off.

Terzibachian said that at 4 a.m. the next day, he received an anonymous phone call saying that the vehicle was in the parking lot of the Hotel del Coronado. He went to the hotel and recovered it, filing a vehicle recovery report with Coronado Police.

Later that night, at approximately 9 p.m., another attempt was made to steal the vehicle from the parking lot of the victim's apartment complex. The vehicle door was found open, evidently having been opened with the key taken during the auto theft, which set off the vehicle's alarm.

As to Count Three: On 11-18-83, a salesman at Pioneer Porche, Allen Silverman, reported that a 1977 Porche 911 Targa, black over yellow, was stolen during a test drive. He related that two individuals, later identified as Reams and Yellen, had come to the business and asked to take the vehicle, which was on consignment, for a test drive. Reams got into the back seat and Yellen got into the passenger seat and Silverman drove. After a short while, Yellen asked to test drive the vehicle himself and, as Silverman got out of the car, Yellen jumped into the driver's seat, locked the door, and drove the vehicle away.

As to Counts Four, Five, and Six: Shortly after midnight on 11-19-83, someone identifying himself as John Stevenson called the ADT Security Office and identified himself as an employee of Kelco Research Company on Aero Court in the city of San Diego. He reported that he had seen suspicious activity around the business and asked that someone be sent to check the area. The ADT personnel checked their files and could not locate a John Stevenson as an employee. Therefore, no ADT personnel was sent to check the business.

Approximately an hour and a half later, at 2:04 a.m., police responded to an attempted burglary at the Kelco Research Company referred to above. They discovered that the alarm had been set off by a boulder that had been thrown through a glass door. Also, it appeared that another window had been kicked out. Tire tracks leading from the parking lot to the front door were seen and photographed. The building was dusted for fingerprints. Two ADT security officers, Calvin Nixon and Allen Childs, also responded. They remained at the building to maintain security because of the broken windows.

Subsequently, Agent Nixon returned to his office to check for an on-call guard that could be notified to replace him and Childs. He notified Harry Fournier and arranged to meet him at the Kelco building. Nixon then returned to Kelco.

Approximately ten minutes after returning to the business, Nixon observed a yellow Porche driving east on Aero Drive. It slowed and turned around at the next intersection, returning to the site. It stopped just beyond Nixon's car, whereupon the passenger door opened and Reams got out and pointed a gun at Nixon. Nixon recognized Reams as being an ex-ADT employee with whom he had worked in the past. After Reams got out and ordered him to freeze, the driver of the Porche got out and pointed a full-length shotgun at him and put a round in the chamber. This individual was later identified as Taylor. Taylor ordered him to turn around and raise his hands. One of the two then removed Nixon's .38 caliber Smith & Wesson from his holster, then took his handcuffs from his belt and handcuffed his hands behind him. He was then ordered to lie face down on the ground.

One of the defendants then went to Nixon's ADT vehicle and got the keys from the ignition. The trunk, which contained a large number of keys, was opened and the box containing the keys was moved around in the trunk. Both defendants subsequently conferred out of earshot, then came over, picked Nixon up by the arms and walked him over to his vehicle. Nixon was placed in the rear seat area and ordered to lie down on the rear floorboard. At least two people got in the front seat of the vehicle and started driving away. Nixon heard the Porche start up and drive away with them, following. He then realized that a third person had been in the Porche. He recognized the voice of Reams, who he said was in the front seat.

Nixon was driven to the Industrial Indemnity Corporation on Camino del Rio South, where he was told to get out of the car. He noted that Industrial Indemnity was another company that contracted with ADT Security Service for their security. After they arrived, he noticed that the Porche was parked near his car.

Reams and Taylor walked Nixon across some lawn to the site of some gas meters where he was handcuffed to the meters with another set of handcuffs. The defendants returned to his car and removed the box of keys that was in its trunk. One of the defendants came back and gagged Nixon with a sock and told him he would be released in approximately three hours. He then heard the Porche start up and drive away.

Nixon subsequently uncuffed himself with a spare key that he had in his pocket and went for help. He broke a window in a complex in an unsuccessful attempt to set off an alarm. He then ran nearby and contacted a female in a business establishment and asked her to telephone police, which she did. He subsequently discovered that the box containing numerous ADT keys had been taken by the defendants from his car.

REAMS, Eugene Alvin    CR 66202/CR 66967    - 7 -    5-31-84

Nixon was able to identify Reams and provided a description for the second individual, Taylor. However, he never saw or heard the other individual, later summized as being Yellen. He identified the weapon with which Reams was armed as being either a .38 caliber or .357 Magnum revolver.

As to Counts Seven, Eight, and Nine: On 11-19-83, Chula Vista Police responded to Prestige Auto Brokers, at 696 Broadway, in response to a report of a robbery and auto theft. They contacted the victim, Mario Castaneda, who reported that at 8:30 p.m. two suspects, later identified as Taylor and Reams, had come to the business and had inquired about a blue Chevrolet van. They asked whether they could take it for a test drive. While Castaneda was preparing the vehicle for the drive, Reams went into the business and made a phone call. They subsequently drove off with Castaneda driving, and Reams and Taylor in the vehicle. Taylor then asked to drive, whereupon Castaneda pulled the vehicle over and let him do so. While changing seats, Castaneda observed a black over yellow Porche with one occupant drive up behind it and stop. After getting back in the van, Taylor pulled out a small handgun and pointed it at the victim. He ordered him to lie on the floor of the van.

Reams ordered the victim to lay flat on the van, then ordered him to give him any cash that he had. He then ordered Castaneda to give him his ring. He was told not to do anything and they would let him off shortly.

The van was driven several blocks and made several turns. During that time, Castaneda was able to observe that the black over yellow Porche was following. After getting gas, the vehicle was driven onto Interstate 5 northward and eventually pulled over on the center divider. The victim was released from the van and, at that time, noticed the black and yellow Porche on the freeway divider in front of the van.

The victim reported that the defendants had removed a paging device that had been given to him by his employer, who had felt the defendants to look suspicious. The device was thrown in an unknown location. He observed that the revolver held by the defendants was either a .38 revolver or a .357 Magnum revolver.

The victim valued the ring, which had a diamond and six little diamonds in it, at $1,800. Cash of $182 was taken from him. The pager was valued at $350, and the van at $6,900.

As to Counts Ten, Eleven, Twelve, and Thirteen: In the afternoon of 11-20-83, Victim Michael Terzibachian received a phone call from someone indicating he wanted to buy Terzibachian's Porche that he had for sale. He agreed to meet with them and, shortly thereafter, Yellen and Taylor came to the residence, arriving in the black and yellow Porche.

REAMS, Eugene Alvin    CR 66202/CR 66967    - 8 -                     5-31-84

Terzibachian became suspicious when the only subject of conversation was the car's alarm system. However, as the vehicle had a dead battery, they could not take it for a test drive as they wished. They gave the names "Steve" and "John Smith," but refused to leave phone numbers or addresses where they could be reached.

After they left, they called back at 2:45 p.m. and asked Terzibachian to bring the Porche to an address in La Jolla so their father could look at it. Terzibachian was still suspicious and drove to the address in another car and noted that the residence was a "mansion," inconsistent with a residence the defendants would have lived in. He felt it was a trick and did not stop.

At approximately 6:40 p.m., the Terzibachian residence was buzzed from the security gate, however, there was no answer to their response. Believing somebody may have been checking to see if they were home with the intent of stealing their Porche, the Terzibachians went downstairs to the lobby. There, they confronted Reams, Yellen, and Taylor. They called to a neighbor, John Deuer, who was nearby, as the defendants were acting suspiciously. The defendants then each pulled revolvers from their waistbands and pointed them at the victims. They then fled from the apartment as Deuer went to a phone to notify police.

(Shortly after the above incident, police recovered the black and yellow Porche in the second level of the parking lot at Fashion Valley. The vehicle was dusted for fingerprints, then impounded.)

As to Counts Fourteen through Twenty-Seven:  Shortly before 7 a.m., on 11-21-83, Kelly Haliburton, a security agent at Neiman Marcus Department Store, at 280 Fashion Valley Road in San Diego, opened up the store, letting in five employees. The employees were Lucy Tarin, Richard Reyes, Carl Christensen, James Croft, and Manuel Rebelo. Several minutes later, Haliburton opened the door once again in response to a knock, letting in Jalanda Harrison. Immediately behind Harrison, Reams and Taylor entered, both of whom were holding handguns. Reams was wearing a ladies nylon stocking as a mask, but Taylor had no mask on. Haliburton subsequently identified Reams as "Geno," a friend of Yellen's who, at the time, was employed as a security agent at Neiman Marcus. She noted that Reams attempted to keep his face from her in an apparent attempt at keeping her from identifying him.

Reams and Taylor ordered the employees who were still present, Haliburton, Tarin, Reyes, Christensen, and Harrison, into the security area and tied them up, using tape. The other two employees, Croft and Rebelo, had gone upstairs, but subsequently came downstairs when they were accosted by the defendants who pointed guns at them and ordered them also to go into the security office, where they were tied up and blind folded.

REAMS, Eugene Alvin    CR 66202/CR 66967    - 9 -                5-31-84

As other employees arrived, each was threatened with a gun by one of the defendants, ordered into the security area, tied up and blind folded. These employees were James Patterson, Roxi Elisondo, Michael Simmons, John Paton, Samuel Johnson, Betty Hopkins, and Clarence Rutlaw.

While this was going on, the defendants took property from the victims as follows: $6 in cash from Haliburton's purse and a set of keys for the store; $100 in cash from Rebelo's wallet; $40 in cash from Harrison's purse; $85 in cash from Patterson's wallet; $50 in cash and an immigration card from Elisondo's purse; $10 in cash from Simmons' wallet; a wallet with I.D., $40 in cash from Johnson, as well as a watch valued at $350.

While in the security office, the victims heard the back door opening, as though another accomplice was let in. However, none of the victims observed any other suspects.

Reams asked Haliburton for the keys to the fur locker, which she gave him. He also got the keys for the cash registers. The defendants used the handi-talkees ordinarily used by store security to communicate with one another while they were in the store. They also obtained handcuffs from the security department. At least one of the suspects remained with the victims during the entire incident, while the other, or others, went through the store.

While in the security area, one of the victims, Betty Hopkins, was threatened by Reams when she took the tape off her face put there by him. He said if she did not "cool it," he was going to shoot her.

After approximately an hour, no noises indicating the defendants were still in the store could be heard, and the victims were able to untie themselves and report the incident to police.

Subsequent investigation showed that the defendants had taken three pairs of handcuffs, four handi-talkee radios, five men's fur-lined jackets, and approximately $2,950 in cash which was taken from numerous cash registers through the store. It was noted that several of the cash registers were in concealed places, indicating that the perpetrators knew their locations beforehand. The fur-lined men's jackets were reported to have a value of between $2,000 and $3,000 apiece.

The Arrest:    Interviews subsequently conducted by police pointed to the defendants as being the perpetrators of the above offenses. On 11-22-83, it was ascertained that the defendants were staying in Room 123 of the Best Western Motel on San Ysidro Boulevard. A surveillance was established, including placing an officer in the room next door. Conversations were heard, as well as noises indicating weapons were in

REAMS, Eugene Alvin   CR 66202/CR 66967     - 10 -                    5-31-84

the room. Taylor and Reams were both seen to step outside of the room, smoke cigarettes, and make a phone call at approximately 10:42 a.m. A white female was also found to be in the room.

At 11:07, a yellow cab arrived, let the occupants of Room 123 know he was there, then went to the gas station nearby. He subsequently returned, and Reams and Taylor got in the vehicle. The taxi was subsequently stopped and the occupants ordered to exit with their hands on their heads. Reams ran east across a nearby field and detectives pursued him. As he was attempting to jump a fence, he was shot at twice, one round hitting him in the leg. After initially failing to comply with further orders, he subsequently did and was taken into custody. Taylor was taken into custody from the taxi cab.

Shortly afterwards, Yellen and Shelton left the motel room. They were taken into custody uneventfully, however, Yellen was found to have in his possession a .357 Magnum revolver.

Yellen and Taylor were subsequently admonished of their rights and refused to make statements.

A Search Warrant for the motel room was obtained and executed. In the room was found the handcuffs taken from the Neiman Marcus Store, the four walkee-talkees, four of the five jackets, the keys for the registers and the fur safe, the revolver and flashlight taken from Calvin Nixon, a security guard uniform and gun belt, registration slip for the stolen 1978 Chevrolet van, a loaded Remington .12 gauge shotgun, a loaded .38 caliber handgun, speed loaders, a box of ammunition, keys taken from Calvin Nixon, a pager taken from Mario Castaneda, a canvas bag containing $2,369.94, and other items of clothing and keys.

Reams was subsequently contacted at University Hospital and refused to make a statement without counsel.

As to CR 66967:

As to Counts One, Two, and Three:   On 5-10-83, the victim, Marilyn Barnes, reported that her 1977 Volkswagon van had been stolen from a parking lot, at 400 "D" Street in Chula Vista, sometime between 10 p.m. the following night and 7:30 that morning. She reported the offense to the Chula Vista Police Department.

As to Counts Four, Five, and Six:   On 9-11-83, the victim, Paul Gonya, reported to the Sheriff's Department that his 1971 Datson 240Z had been stolen from the driveway at 3074 Holly Road in Alpine. He said the vehicle was for sale and had been advertised, and several people had come to look at it.

The vehicle was subsequently found, stripped of interior parts, engine, and fenders, in a canyon area on Ranger Road.

REAMS, Eugene Alvin   CR 66202/CR 66967     - 11 -              5-31-84

As to Counts Seven, Eight, and Nine:  On 10-3-83, the victim, Michael Zancanella, reported that his 1974 Datsun 260Z was stolen from his residence at 4601 63rd Street in San Diego. He filed a report with the San Diego Police Department.

The vehicle was discovered partially stripped on 10-8-83 in a Navy housing area on Oriskany Road.

As to Counts Ten, Eleven, and Twelve:  On 10-20-83, the victim, Kenneth Zammit, reported to the San Diego Sheriff's Department that his 1974 Datsun 260Z had been stolen from his residence in Poway sometime the night before.

On 10-23-83, the vehicle was discovered on Dusk Drive, found to have been stripped and the engine removed. Additionally, the VIN numbers on the dash, as well as the doorjam, had been cut out.

Counts Thirteen, Fourteen, and Fifteen:  On 10-28-83, the victim, Ellen Smith, an employee at European Sports Car on Mission Gorge Road, reported that a vehicle had been stolen. She said that an individual, later identified as the defendant, had come in and asked for a test drive of a 1976 Datsun 280Z. The victim had given the defendant the car keys and, before she could get in the car, he drove it away.

On 11-18-83, the vehicle was recovered on Appian Drive.

As to Counts Sixteen, Seventeen, and Eighteen:  The victim, Richard French, a salesman at Encinitas Team Datsun, reported to the San Diego Sheriff's Department on 11-13-83 that a 1982 Datsun 280ZX had been stolen from the business. He said an individual, later identified as the defendant, had come to the business and asked for a test drive in the vehicle. The defendant was given the keys and drove the vehicle to the gas pumps with a salesman as a passenger. The salesman filled the vehicle with gas and, as he returned the key to the office, the defendant drove the vehicle to the lot exit. He failed to stop and continued driving the vehicle away onto Interstate 5, northbound. A chase by the victim proved futile.

A witness in Leucadia subsequently reported seeing two Datsun Z cars parked near her residence with two individuals appearing to exchange license plates between the vehicles. One of the vehicles appeared to have been the Datsun stolen from Encinitas Team Datsun.

As to Counts Nineteen, Twenty, and Twenty-One:  On 11-14-83, Jose Castellanos, a salesman at Terry Allen Datsun on El Cajon Boulevard, reported that a vehicle had been stolen from the business. He reported that at approximately 1 p.m. an individual, later identified as the defendant, had come onto the lot saying that he had a 1982

REAMS, Eugene Alvin    CR 66202/CR 66967    - 12 -    5-31-84

Datsun to turn in on a 1982 Datsun 280ZX Turbo, which was on the lot. They went for a test drive in the 280ZX, with Castellanos driving. Approximately a block away, he pulled over to permit the defendant to drive. As they switched seats, the defendant got in, however, he had locked the passenger door, preventing the salesman from reentering the vehicle. After knocking on the window several times, the defendant "very calmly just drove away." The victim flagged down a passing vehicle and explained what had happened. After a short chase and several turns, the defendant entered Interstate 8, afterwhich time the victim lost sight of the vehicle.

On 11-17-83, police were contacted by a Tom Burtrum, who told them that Reams and Yellen had been involved in a series of auto thefts in the area, and that both were living at 6536 Bougainville Road. Burtrum said there were two Datsun Z cars parked in the driveway at the residence and that either one, or both, was stolen. He advised police to be careful because both individuals were known to be armed and that they had a police scanner with police frequencies.

Police went to the residence shortly after midnight and observed two late model Datsun Z cars in the driveway. Neither had front plates. A check of the VIN numbers showed one registered to R.H. Yellen, and another to have been stolen. It was confirmed that Michael Yellen lived at the address.

Surveillance was continued and, at 7:30 a.m., the defendant drove into the residence in a 280ZX, which was later found to have been the one stolen from Terry Allen Datsun. However, the license plate on it was from Victim Gonya's vehicle. Reams subsequently drove away. At 8:45 a.m., Yellen was contacted at the residence. He said that the stolen vehicle that was in the driveway had been left there by a friend. He was admonished and refused to speak with police. He declined to let officers look in the garage.

Yellen's father was called, who gave police permission to look in the garage. At that point, Yellen told police that "Bobby Harris" had left the Z car in the driveway and had given him numerous other parts.

When police went into the garage, they observed three Datsun Z car engines on the floor, four transmissions, radiators, and numerous vehicle parts. In the rafters were various body parts, including those from Gonya's vehicle.

The defendant arrived at 9:30 and was questioned. He said he had been staying at the residence for four or five months, and that Yellen had given him permission to drive the Datsun he was driving, but did not know where Yellen had gotten it.

Reams own 240Z was inspected and a 260Z engine was found in it. He claimed he did not know where he got the engine.

REAMS, Eugene Alvin   CR 66202/CR 66967      - 13 -                    5-31-84

Subsequent checks of the cars recovered (as noted in the Offense Section) were traced to parts and the vehicles located at Yellen's residence. A book that was in the Volkswagon van when it was stolen was found in Yellen's garage.

Both defendants were taken into custody 11-22-83 in connection with case CR 66202. Neither defendant made statements.

VICTIM INFORMATION:

Letters have been sent to victims of both cases, however, responses had not been received prior to dictation of this report. It is anticipated that a supplemental report will be filed with various victims' statements prior to the Court hearing.

DEFENDANT'S STATEMENT:

The defendant was sent two questionnaires, one for each case. On one application he wrote, "My case is in appeal and I do not want to say anything that might incriminate myself or hurt my case. I will have to talk to my attorney." Where asked whether he had any special problems, the defendant wrote, "I was having problems with my family but have since been resolved."

Evidently believing the second questionnaire was regarding the same case, the defendant wrote on it, "My case is in appeal. I've been advised by my attorney - Mr. Bourne - not to say anything. If you need more information contact my lawyer concerning the crime."

The defendant was contacted in County Jail by the Probation Officer to obtain a social history and his statements regarding the offenses to which he pled guilty. He was found to be forthright and apparently candid. He said that his involvement and participation was fairly accurately depicted in the case that went to trial (CR 66202), with minor variations, and he admitted the thefts of the automobiles he was charged with stealing in connection with the case in which he pled guilty (CR 66967).

The defendant does not agree with the nature of his conviction in connection with the kidnapping charges. It is those convictions he intends to appeal, saying that the offense in each case of which he should have been found guilty was Penal Code Section 207, and not 209. He differentiated the two sections by saying that PC 207 is "simple kidnapping," whereas PC 209 was kidnapping with the intent to commit robbery. He felt that in neither kidnapping case did he do so with the intent to commit robbery. In the case of Victim Nixon, the robbery took place prior to the kidnapping and included only taking the victim's gun, so nobody would be injured, and his handcuffs, so that he could secure the victim. In addition, they took the keys

REAMS, Eugene Alvin   CR 66202/CR 66967      - 14 -                    5-31-84

from the victim's car, but, again, this was before the kidnapping of the victim. He noted that the victim was elderly, and that he assured the victim that if he were not found in three hours, he, the defendant, would notify authorities as to the victim's location.

In connection with Victim Castaneda, he did not force the victim to give him his wallet or ring. He did ask the victim whether he had money for gas, whereupon the victim gave him his wallet. He took $40 from the victim's wallet and returned what was left. He did not ask the victim for his ring, however, the victim voluntarily took it off his hand and left it in the van.

The defendant explained his involvement in the cases, and it became evident that both were related to a large extent.

The defendant explained that he first became involved with the taking of automobiles when the Volkswagon van was taken. He, Burtrum, Taylor, and Yellen were involved, and the van was taken for the stereo and speakers in it and money that the owner was reported to have secreted in it. The defendant acted as a lookout while the van was being broken into, and he admitted driving it away, as he had had experience in driving such a vehicle previously. The vehicle was abandoned in an apartment complex parking lot near one of the participant's residence. He indicated the idea of taking the van was an idea reached by all participants.

In early September, the defendant blew the engine in his 240Z, and he needed another engine to replace it. He was not working at the time and he did not have the money to afford it. Therefore, he and Yellen decided to steal a car to replace the engine. They posed as buyers and went to look at Gonya's car. They found it acceptable and they returned that night to take it, which they did. They subsequently replaced the defendant's engine with Gonya's, and rolled the car down a hill near Yellen's home and abandoned it.

Shortly after that, the engine in Yellen's 240Z blew, and they decided to take another similar car to replace it's engine. They again posed as buyers and found Zancanella's Z for sale and returned at night and stole it. They then replaced Yellen's engine with the stolen vehicle's engine. Again, they rolled the car down a hill near Yellen's home and abandoned it.

Shortly thereafter, Yellen blew the replaced engine in his car, and they essentially repeated the offense with Zammit's car.

Once again, within a short while, the defendant's replaced engine blew a gasket, and he and Yellen once again stole a car for the replacement engine. This was the vehicle taken from European Sports Car Company on 10-28-83.

REAMS, Eugene Alvin    CR 66202/CR 66967    - 15 -                    5-31-84

The defendant explained that, up to this point, the thefts of the automobiles were committed simply to keep their own vehicles running. Each theft was preceded with an inquiry as to whether or not the owner was covered by insurance, so that the victims would not personally take the loss. He said that, at one point, one of the sellers was selling the car because his wife was pregnant, so they decided not to take that vehicle. At the time, the defendant was working but eight hours a week at Assurance Security and he needed his vehicle to look for other employment, which he says he was doing constantly with no success.

To elaborate, and to explain subsequent events, comments and explanations given by the defendant will be related here.

The defendant explained that, for virtually all of his life, he wanted to be a police officer. To that end, he did well in high school, graduating at the age of 16. Shortly after graduation, he obtained a job at ADT Security, where he worked for a year between April of 1981 and April of 1982, while attending South Western Junior College on a part-time basis, taking courses in criminology. His parents then agreed that they would pay his way if he quit work, which he did. However, they ran out of money and he was forced to look for other work and could only find part-time work at Assurance Security for only eight hours a week.

Concurrently, the defendant was attempting to join either Chula Vista or National City Police Department Reserves, with an eye to getting hired on a full-time basis. However, while they were permitted to hire people under 21, the defendant was told there was virtually no chance of being hired until he was 21. The defendant found himself becoming very angry at that arbitrary decision when he felt more qualified than police officers who were already on the force.

The defendant subsequently found himself with very little money at his disposal, approximately $35 a week, and he became desperate financially. Further, his parents and he got into a dispute, leading to his being kicked out of their house. Having nowhere else to go, he moved in with Codefendant Michael Yellen and his father in the latter part of October 1983. It was after that that he, Yellen, Taylor, and, to an extent, Burtrum began talking about ways to get money.

The defendant explained that the initial idea was to burglarize the Brink's Office where Burtrum had, on one occasion, seen a room full of money. After some discussion, Burtrum pulled out, saying he wanted no part of that sort of plan. However, the defendant, Taylor, and Yellen pursued the plan. One of the aspects of that plan was to get a fast car for an escape, so they looked in the magazine, The Auto Trader, for vehicles that might suit their purpose. They picked out the Porche belonging to Terzibachian, so Reams and Yellen went to the