# EXHIBIT 4

C-file copy

## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## AUGUST 2004 CALENDAR

**REAMS, EUGENE**                                                  C90508

I.     **COMMITMENT FACTORS:**

A.     **Life Crime:**

1.     **Summary of Crime:** All relevant documents from the previous hearing including the transcripts have been considered and that information appears valid. The writer has no further information to add.

2.     **Prisoner's Version:** Remains the same as stated in the previous hearing.

3.     **Aggravating/Mitigating Circumstances:**

a.     **Aggravating Factors:** Remains the same as stated in the previous hearing.

b.     **Mitigating Factors:** Remains the same as stated in the previous hearing.

B.     **Multiple Crime(s):** N/A.

1.     **Summary of Crime:** N/A.

2.     **Prisoner's Version:** N/A.

II.    **PRECONVICTION FACTORS:**

A.     **Juvenile Record:** Documents from the previous hearing have been considered and that information remains valid.

B.     **Adult Convictions:** Documents from the previous hearing have been considered and that information remains valid.

C.     **Personal Factors:** Documents from the previous hearing have been considered and that information remains valid.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
AUGUST 2004 CALENDAR

III.    **POSTCONVICTION FACTORS:**

A.    **Special Programming/Accommodations:**  None.

B.    **Custody History:**  Documents from the previous hearing(s) have been considered and that information remains valid.  Since his last Board of Prison Terms (BPT) hearing on 8/6/03 in which his parole was denied for one (1) year, inmate Reams has remained at the Correctional Training Facility (CTF), in the General Population (GP).  He has retained his custody at Medium A with a preliminary/behavior Classification Score of 0 and a Mandatory Minimum Placement Score of 19 (the change is due to the revised classification scoring system effective 10/15/02).

C.    **Therapy and Self-Help Activities:**  Refer to the Postconviction Progress Report for details.

D.    **Disciplinary History:**  Disciplinary free since 1997.

E.    **Other:**  N/A.

IV.    **FUTURE PLANS:**

A.    **Residence:**  Inmate Reams plans to request an out-of-state parole to reside with his parents, Eugene and Leanna Reams at 524 North Chestnut, Iola, Kansas 66749 with telephone number 620-365-0051, otherwise he will seek the assistance of governmental agencies in San Diego, California his last legal county of residence.

B.    **Employment:**  Inmate Reams plans to request an out-of-state parole to Iola, Kansas to work with his parents, in their family business, otherwise he will seek employment in the Computer Repair industry in San Diego, California, his last legal county of residence.

C.    **Assessment:**  Refer to Section VI, Summary for details.

V.    **USINS STATUS:**  Inmate Reams is a United States citizen born on 1/22/65 in Florida.

VI.    **SUMMARY:**

REAMS, EUGENE          C90508                    CTF-SOLEDAD              **AUG/2004**

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
AUGUST 2004 CALENDAR

A.   Considering the commitment offense, prior record and prison adjustment, the writer believes the prisoner would probably pose a low degree of threat to the public at this time, if released from prison. Inmate Reams has been incarcerated for over 19 years, he has matured and shown marked progress towards maintaining an overall positive attitude. He has been disciplinary free since 1997. Additionally, he has acquired a Certificate of Completion in Vocational Computer Refurbishing, an employable trade. Finally, he has achievable and realistic parole plans.

B.   Prior to release the prisoner could benefit from:

1)   Remain disciplinary free.
2)   Participate in self-help programs, when available.

C.   This report is based upon 3 hours of Central File research, an interview with inmate Reams and incidental contact with the prisoner during this period of review.

D.   Inmate Reams reviewed his Central File per Olson on 5/19/04.

E.   No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

REAMS, EUGENE          C90508                    CTF-SOLEDAD          **AUG/2004**

_____  7-15-04
F. I. DeGuzman                Date
Correctional Counselor I


_____  7-15-04
R. Leach                      Date
Correctional Counselor II


_____  7-21-04
R. Pope                       Date
Facility Captain


_____  7-22-04
D. S. Levorse                 Date
Classification and Parole Representative


REAMS, EUGENE        C90508        CTF-SOLEDAD        AUG/2004

BOARD OF PRISON TERMS                                                                   STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
  TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
  TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
         ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 6/4/03 to 6/14/04 (Present) | | | **PLACEMENT**:  Remains housed at CTF, in the GP. **CUSTODY**:  Remains at Medium A. **VOC. TRAINING**:   None noted during this period. **ACADEMICS:** Inmate Reams took the Test of Adult Basic Education (TABE) on 8/5/96 resulting in a total score of 12.9 per CDC 128B dated 5/20/04. **WORK RECORD**:   Remains assigned as a Production Coordinator in the Computer Repair Program (CRP) until 8/16/03 (due to closure of said program), receiving average grades per the Work Supervisor's Report (CDC 101) dated 12/5/03.  Assigned to the Culinary as a Dock Worker on 9/6/03 to date. **GROUP ACTIVITIES**:   Laudatory chrono for participation in the Alcoholic Anonymous (AA) Program per CDC 128B dated 12/15/03.  Laudatory chrono for volunteer participation in the 2003 Children's Holiday Festival per CDC 128B dated 1/16/04. **PSYCH. TREATMENT**:   None noted this period. **PRISON BEHAVIOR**:  Disciplinary free this period. **OTHER**:  N/A. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE 6-14-04 |
|---|---|---|
| REAMS | C90508 | CTF-SOLEDAD     AUG/2004 |

C-file copy

## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## JUNE 2003 CALENDAR

REAMS,                    COPY TO INMATE ON                    C90508
                         6/24/03

I.    **COMMITMENT FACTORS:**

    A.    **Life Crime:** Remains the same as stated in the previous hearing.

        1.    **Summary of Crime:** All relevant documents from the previous hearing including the transcripts have been considered and that information appears valid. The writer has no further information to add.

        2.    **Prisoner's Version:** Remains the same as stated in the previous hearing.

        3.    **Aggravating/Mitigating Circumstances:**

            a.    **Aggravating Factors:** Remains the same as stated in the previous hearing.

            b.    **Mitigating Factors:** Remains the same as stated in the previous hearing.

    B.    **Multiple Crime(s):** All relevant documents from the previous hearing including the transcripts have been considered and that information appears valid.

        1.    **Summary of Crime:** Remains the same as stated in the previous hearing.

        2.    **Prisoner's Version:** Remains the same.

II.   **PRECONVICTION FACTORS:**

    A.    **Juvenile Record:** Documents from the previous hearing have been considered and that information remains valid.

    B.    **Adult Convictions:** Documents from the previous hearing have been considered and that information remains valid.

  C. **Personal Factors:** Documents from the previous hearing have been considered and that information remains valid.

## III. POSTCONVICTION FACTORS:

  A. **Special Programming/Accommodations:** None.

  B. **Custody History:** Documents from the previous hearing(s) have been considered and that information remains valid. Reams continues to be housed at CTF, remains MED A custody and has zero points. He continues to work in the Vocational Computer Repair Program with excellent work reports.

  C. **Therapy and Self-Help Activities:** Noted are numerous CDC 128B's for various programs such as AA and NA which will be outlined in the Postconviction progress report.

  D. **Disciplinary History:** Remains disciplinary-free.

  E. **Other:** None.

## IV. FUTURE PLANS:

  A. **Residence:** Remains the same as stated in the previous hearing.

  B. **Employment:** Remains the same as stated in the previous hearing.

  C. **Assessment:** Reams has made alternate plans in state as well as out of state which may increase his chance of success. He is also performing very well in his vocational program.

## V. USINS STATUS: U.S. citizen.

## VI. SUMMARY:

  A. Considering the commitment offense, prior record, prior board report and prison adjustment, the writer believes the prisoner would probably pose a low degree of threat to the public at this time, if released from prison. This is based mostly on Reams doing an excellent program while being incarcerated. Reams committed his crime at a early age (18), he appears to have matured and is presently well adjusted if released.

Case 3:07-cv-03640-WHA    Document 3-7    Filed 09/19/2007    Page 9 of 27

B.    Prior to release the prisoner could benefit from: continuing to remain disciplinary-free, continuing to upgrade educationally and participate in self-help and therapy.

C.    This report is based upon two (2) hours of Central file research, an interview with Inmate Reams and incidental contact with the prisoner during this period of review and over his twenty years of incarceration.

D.    Inmate Reams declined a review of his Central File on 3/21/03.

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

_____     6/3/03
M. Morton                           Date
Correctional Counselor I


_____     6/4/03
R. Leach                            Date
Correctional Counselor II


_____     6-6-03
R. Lopez                            Date
Facility Captain (A)


_____     6-9-03
D. S. Levorse                       Date
Classification and Parole Representative

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

**INSTRUCTIONS**
  TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT☒
  TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
  ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6/02 to 6/03 (Present) | | | **PLACEMENT:** CTF. <br> **CUSTODY:** MED A. <br> **VOCATIONAL TRAINING:** Computer Repair, (2) Laudatory work chrono's CDC 128B's dated 5/31/02. Reams also received excellent work reports for this period. <br> **ACADEMICS:** None. <br> **WORK RECORD:** None. <br> **GROUP ACTIVITIES:** CDC 128B's for AA and NA dated 2/15/02, 4/10/02, 7/17/02, 10/16/02 and 1/8/03. <br> **PSYCH. TREATMENT:** None. <br> **PRISON BEHAVIOR:** Remained disciplinary-free. <br> **OTHER:** CDC-128B's for conflict resolution dated 5/15/02, also participation in distance learning dated 6/20/02, 9/26/02 and 2/24/03. CDC-128B for Participation in Annual Children's Festival dated 12/15/02. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE |
|---|---|---|
| *M. Met* | | 6/3/03 |
| REAMS          C-90508 | CTF-SOLEDAD | JUN/2003 |

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2002 CALENDAR

*C-file copy*

**REAMS, EUGENE**

**C90508**

I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Kidnap for Robbery, 209(b) PC with Use of Firearm, 12022.5 PC, Count 4, Robbery, PC 211 with Use of a Firearm, 12022.5 PC, Count 5, and Auto Theft, 10851 VC with Use of Firearm, 12022.5 PC, Count 6, Case #CR66202. Sentenced to 7 years to Life (to be served concurrent with Count 7) plus two years for Use of Firearm on Count 4 (sentence on Counts 5 and 6 stayed), total term, including counts listed under sections B, C, and D below, is 7 years to Life plus 10 years, 4 months. Life term started 8/11/89, MEPD: 8/11/96. Victim: Calvin Nixon, age unknown.

1.    **Summary of Crime:** Shortly after midnight on 11/19/83, the ADT Security Company received a telephone call from someone identifying himself as John Stevenson, an employee of Kelco Research Company on Aero Court in San Diego, to report suspicious activity around the business and to ask that someone from ADT Security check the area. ADT personnel checked their files and couldn't identify John Stevenson as an employee. As a consequence, no one from ADT was sent to check the business. At about 0204 on the same date, police responded to an attempted burglary at the Kelco Research Company. An alarm had been set off by a rock that had been thrown through a glass door. A nearby window had also been kicked out. Two ADT Security Officers, Calvin Nixon and Allen Childs, also responded. They remained at the building to maintain security because of the broken windows. Nixon subsequently returned to his office to check on an on-call guard who could be notified to replace him and Childs. Nixon then returned to the Kelco building. About ten minutes after returning to the business, Nixon observed a yellow Porche driving East on Aero Drive. It slowed and turned around at the next intersection and returned to the site. It stopped just beyond Nixon's car, and Eugene Reams got out of the passenger's side and pointed a gun at Nixon. Nixon recognized Reams as being an Ex-ADC employee. After Reams ordered Nixon to freeze, the driver of the Porche, Harold Taylor, got out, pointed a shotgun at Nixon, chambered a round, and ordered him to turn around and raise his hands. One of these two then removed Nixon's .38 revolver from his holster and handcuffed him with his own handcuffs before ordering him to lay face down on the ground. One of the robbers then went to Nixon's ADT vehicle and got the keys from the ignition. The trunk was opened, and a box containing a large number of keys was moved around.

Both men picked up Nixon by the arms and walked him over to his vehicle. He was placed in the rear seat area and ordered to lie down on the rear floorboard. At least two people got in the front seat of the vehicle and started driving away. Nixon heard the Porche start up and follow them. He recognized the voice of Reams, who he said was in the front seat. Nixon was driven to the Industrial Indemnity Corporation on Camino Del Rio South, where he was told to get out of the car, Reams and Taylor walked Nixon across a lawn to some gas meters, where he was handcuffed to the meters with another set of cuffs. The two returned to the car and removed the box of keys from the trunk. One of the two came back to gag Nixon with a sock and told him that he would be released in about three hours. Nixon subsequently un-cuffed himself with a spare key and went for help. Nixon was able to identify Reams and provided a description of one of the other two accomplices. He identified the weapon with which Reams was armed as either .38 caliber or .357 Magnum revolver. [POR, pp 5/7.]

2.    **Prisoner's Version:** See section I.D. 2.

B.    **Aggravating/Mitigating Circumstances:**

1.    **Aggravating Factors:** The following factors in aggravation were noted per DOM Section 62090.11.2.1.1.

   a.    During the commission of the crime the inmate had a clear opportunity to cease, but instead continued. Reams did not need to kidnap either Mr. Calvin Nixon or Mr. Mario Castaneda in order to complete the robberies.

   b.    The inmate has engaged in other reliably documented criminal conduct which was an integral part of the crime for which he is currently committed.

   c.    Reams was involved in criminal activity which culminated into the convictions of two Life crimes and multiple convictions for a ten (10) year four (4) month determinant sentence.

2.    **Mitigating Factors:** The following factor in mitigation was noted per DOM Section 62090.11.2.1.2: The inmate has a minimal or no history of criminal behavior.

C.    **Multiple Crime:** (Other Life Crime) Kidnap for robbery, 209(b) PC with Use of Firearm, 12022.5 PC, Count 7, Robbery, PC 211 with Use of Firearm, 12022.5 PC, Count 8, and Auto Theft, 10851 VC with Use of Firearm, 12022.5 PC, Count

9, Case #CR66202. Sentenced to 7 to Life (to be served concurrent with Count 4), Victim: Mario Castaneda, age unknown.

3. **Offense Summary:** At about 8:30 p.m. on 11/19/83, Eugene Reams and accomplice Harold Taylor approached Mario Castaneda at Prestige Auto Brokers, located at 696 Broadway in Chula Vista. They inquired about a blue Chevrolet van and asked to take it for a test drive. While Castaneda prepared the vehicle for the drive, Reams went into the business office and made a phone call. They subsequently took off with Castaneda driving and Reams and Taylor in the vehicle. Taylor asked to drive, Castaneda pulled the vehicle over to let him do so while changing seats, Castaneda observed a black-over-yellow Porche with one occupant drive up behind the van and stop. After getting back in the van, Taylor pulled out a handgun, pointed it at Castaneda, and ordered him to lie on the floor of the van. Reams ordered Castaneda to lie flat and then ordered him to give Reams any cash that he had. Reams then ordered Castaneda to hand over a ring. He was told not to do anything and they would let him off shortly. The van was driven several blocks and made several turns. During that time, Castaneda was able to observe that the black-over-yellow Porche was following. After stopping to get some gas, the van was driven onto North-bound Interstate five and eventually pulled over the center divider. Castaneda was released from the van and at that time noticed the black-over-yellow Porche on the freeway driving in front of the van. Castaneda reported that Reams and Taylor had removed a paging device which was thrown out at an unknown location. He observed that the handgun used was either a .38 or a .357 Magnum revolver. Castaneda lost $182 in cash and reported the value of the stolen ring at $1,800.00 the pager at $350 and the van at $6,900.00. [POR, pp 7]

4. **Prisoner's Version:** See section I.D.2.

5. **Aggravating Circumstances:** Remain the same as noted in Section I.A.3.

6. **Mitigating Circumstances:** Remain the same as noted in Section I.A.4.

D. **Multiple Crime, Case #66967:** Grand Theft Auto, 487.3 PC, Counts 1, 4, 7, 10, 13, 16 and 19, victims Marilyn Barnes, Paul Gonya, Michael Zancanella, Kenneth Zammit, European Sports Car Company, Encinitas Team Datsun, and Terry Allen Datsun; Auto Theft, 10851 VC, Counts 2,5, 8, 11, 14, 17 and 20, the District Attorney agreed to dismiss all other counts in case #CR66967 and agreed to sentence each count to run concurrent to each other and concurrent to any sentence imposed in case #CR6620, per Harvey Waiver.

1.    **Offense Summary:** [regarding counts 1, 2 and 3] On 5/10/83, Marilyn
Barnes reported to the Chula Vista Police Department that her 1977
Volkswagen van had been stolen from a parking lot at 400 "D" Street in
Chula Vista sometime between 10:00 P.M. the previous night and 7:30
that morning. [regarding counts 4,5 and 6] On 9/11/83, Paul Gonya
reported to the San Diego Sheriff's Department that his 1971 Datsun 240Z
stolen from the driveway at 3074 Holly Road in Alpine. The vehicle had
been advertised for sale, and several people had looked at it. The vehicle
was subsequently found, stripped of interior parts, engine and fenders, in a
canyon area on Ranger Road.

[regarding counts 7, 8, and 9] On 10/3/83, Michael Zancadella reported to
the San Diego Police Department that his 1974 Datsun 260Z was stolen
from his residence at 4601 63rd Street in San Diego. The vehicle was
recovered on 10/8/83, partially stripped in a Navy housing area on Oriskny
Road.

[regarding counts 10, 11 and 12] On 10/20/83, Kenneth Zammit reported
to the San Diego [regarding counts 4, 5 and 6]. On 9/11/83. Michael
Zancanella reported to the San Diego Police Department that his 1974
Datsun 260Z was stolen from his residence at 4601 63rd Street in San
Diego. The vehicle was recovered on 10/8/83, stripped with the engine
removed. Additionally, the VIN numbers on the dash and the door jam had
been cut out.

[regarding counts 13, 14 and 15] On 10/28/83, Ellen Smith, an employee
at European Sports Car Company on Mission Gorge Road reported that a
1976 Datsun 280Z had been stolen from the business. She said that an
individual, later identified to be Reams, had come in and asked to test
drive that car. Smith had given Reams the car keys and, before she could
get in the car, he drove it away. It was recovered on 11/18/83 on Appian
Drive.

[regarding counts 16, 17 and 18] On 11/13/83, Richard French, a salesman
at Encinitas Team Datsun reported to the San Diego Sheriff's Department
that a 1982 Datsun 280ZX had been stolen from the business. He said that
an individual, later identified as Reams, had come in and asked to test
drive the car. Reams was given the keys and drove the vehicle to the gas
pumps with a salesman as a passenger. The salesman filled the car with
gas. As he returned the gas key to the office, Reams drove the car to the lot
exit. He failed to stop and continued on the North-bound Interstate five
(5). A witness in Leucadaia subsequently reported seeing two Datsun Z
cars parked near her residence with two individuals appearing to exchange

license plates between the vehicles. One of the cars appeared to be the Datsun stolen from Encinitas Team Datsun.

[regarding counts 19, 20 and 21] On 11/13/83, Jose Castellanos, a salesman at Terry Allen Datsun reported that a 1982 Datsun 280ZX Turbo had been stolen from the business. He stated that at about 1:00 P.M., an individual, later identified as Reams, had come onto the lot, saying that he had a 1982 Datsun to turn in on a 1982 Datsun 280ZX Turbo, which was on the lot. They went for a test drive with Castellano driving. Approximately a block away, he pulled over to permit Reams to drive. As they switched seats, Reams got in the drivers seat; however, he had locked the passenger door, preventing the salesman from re-entering the car. Reams then drove away. Castellanos flagged down a passing vehicle and explained what had happened. After a short chase and several turns, Reams entered Interstate 8 after which Castellanos lost sight of the car.

On 11/17/83, police were contacted by Tom Burtrum, who told them at Eugene Reams and Michael Yellen had been involved in a series of auto thefts in the area and that both were living at 6536 Bougainville Road. Burtrum said that there were two Datsun Z cars parked in the driveway at that residence and that one or both were stolen. He advised police to be careful because both individuals were known to be armed and that they had a radio scanner with police frequencies. Police went to the residence shortly after midnight and observed two late model Datsun Z cars in the driveway. Neither had front plates. A check of the VIN numbers showed one car registered to R.H. Yellen and the other car to have been stolen. Police confirmed that Michael Yellen lived at that address. Surveillance continued, and at 7:30 A.M. Reams drove up to the residence in a 280Z Datsun which was later found to be the one stolen on 11/14/83 from Terry Allen Datsun. However, the license plate on the vehicle was from Paul Gonya's Datsun. Reams subsequently drove away. At 8:45 A.M., Yellen was contacted at the residence. He said that the stolen vehicle in the driveway had been left there by a friend. He refused to speak further with police or to let the officers look into the garage. Yellen's father was called, who gave police permission to look in the garage. At that point, Yellen told police that a "Bobby Harris" had left the Datsun Z in the driveway and had given him numerous other parts. When police went into the garage, they observed three Datsun Z car engines on the floor, four transmissions, radiators and numerous vehicle parts. In the rafters were various body parts, including those from Paul Gonya's vehicle. Reams arrived again at 9:30 A.M. and was questioned. He said he had been staying at the residence for four (4) or five (5) months, and that Yellen had given him permission to drive the Datsun he was driving, although he did not know where Yellen had gotten it. Ream's own 240Z was inspected and

a 260Z engine was found in it. He stated he did not know where he got the engine. Subsequent checks of the recovered cars were traced to the parts and vehicles located at Yellen's residence. A book that was in the Volkswagon van when it was stolen from Marilyn Barnes was found in Yellen's garage. Yellen and Reams were taken into custody on 11/22/3 in connection with case #CR66202. Neither person made statements. [POR pp 10/13]

2. **Prisoner's Version:** See Section I.D.2.

3. **Aggravating Circumstances:** The inmate was engaged in other reliably documented criminal conduct which was an integral part of the crime for which he is currently committed. Reams was involved in criminal activity which culminated into convictions of two life crimes and multiple convictions for a ten (10) year four-(4) month determinant sentence.

4. **Mitigating Circumstances:** Remain the same as noted in Section I.A.4.

E. **Multiple Crime Case #66202:** Conspiracy to Commit Robbery, 182.1/211 PC, Count 1 sentence one (1) year, Victims: Alan Silverman, Calvin Nixon, Mario Castaneda, and Michael Tezibachian; Grand Theft Auto, 487.3 PC, Counts 2 and 3, sentence 8 months on Count 3, Victims: Michael Tezibachian and Alan Silverman; Attempted Grand Theft Auto, 664/487.3 PC with Use of Firearm, 12022.5 PC Count 10, Victim: Michael Tezibachian; Assault with Firearm, 245(a)(2) PC with Use of Firearm, 12022.5 PC, Counts 11, 12, 13, 20, 21, 22, 23, 24, 25 and 26, sentence three (3) years on count 11 and two (2) years on 120222.5 count 11, victims Michael Tezibachian, Rebecca Tezibachian, Joseph Deuer, Lucy Tarin, Richard Reyes, Carl Christensen, James Croft, John Patton, Betty Hopkins and Clarence Rutland; Robbery, PC 211 while Armed with Firearms, 12022(a) PC, Counts 14 and 16, victims Kelly Haliburton and Jalanda Harrison, Robbery, 211 PC with Use of Firearm, 12022.5 PC, Counts 15, 17, 18 and 19, sentence one (1) year on count 15 and eight (8) months on 12022.5 count 15, victims Manuel Rebelo, Roxi Elisondo, Michael Simmons and Samuel Johnson; Burglary, 459 PC with Use of Firearm, 12022.5 PC and Armed with Firearms, 12022(a) PC Count 27, Victim Neiman Marcus Department Store.

1. **Offense Summary:** [regarding count 1] On or about and between the dates of 11/17/83 and 11/21/83, Eugene Reams conspired with crime partners Harold Taylor and Michael Yellen to commit the crime of robbery. The object of the conspiracy was to steal vehicles, keys and guns to be used in a robbery that eventually occurred at Neiman Marcus on 11/21/83. To effect the objects of the conspiracy, the following overt acts were committed:

**(a.)** Reams and Yellen stole a 1977 yellow/black Porch from Alan Silverman during a test drive at the Pioneer Porche dealership on 11/18/83 (see count 3).

**(b.)** On 11/19/83, Reams with two accomplices attempted a break-in at Kelco Industries in San Diego to lure ADT security personnel out to the Kelco Building.

**(c.)** On 11/19/83, Reams with two accomplices Kidnapped Calvin Nixon, an ADT employee, after he responded to the Kelco break-in alarm (see count 4).

**(d.)** On 11/19/83, Reams with two accomplices robbed Calvin Nixon of his gun and the coded security keys of buildings protected by ADT security personnel (see count 5).

**(e.)** On 11/19/83, Reams with two accomplices stole a 1978 blue Chevy van from Mario Castaneda at the Presige Auto Sales dealership in Chula Vista (see count 9).

**(f.)** On 11/20/83, Reams with two accomplices attempted to steal a 1977 Porche belonging to Michael Tezibachian (see count 10). [Information sheet for case #CR66202, pp 1-2].

[Regarding count 2] On 11/5/83, Michael Tezibachian reported to San Diego Police that his 1983 Porche 930 had been stolen. He related that an individual later identified as Reams responded to a "for sale" advertisement and went with Tezibachian for a test drive. Reams asked to drive the vehicle. As Terzibachian got out of the vehicle, Reams locked the door and drove off. At 4:00 A.M. on 11/6/83, Terzibachian received an anonymous phone call saying that the Porche was in the Hotel Del Coronado parking lot. He went to the hotel, recovered his car and filed a vehicle recovery report with the Coronado Police.

[regarding count 3] On 11/18/83, Allen Silverman, a salesman at Pioneer Porche reported that a black over yellow 1977 Porche 911 Targa was stolen during a test drive. He stated that two individuals, later identified as Reams and Yellen, came to the business and asked to take the vehicle, which was on consignment for a test drive. Reams got into the back seat, Yellen got into the front passenger seat, and Silverman drove. After a short while, Yellen asked to test drive the car himself. As Silverman got out of the car, Yellen jumped into the driver's seat, locked the door, and drove the car away.

[regarding counts 10, 11, 12, and 13] On 11/20/83, Michael Terzibachian received a phone call from someone who wanted to buy the Porche that Terzibachian had for sale. Shortly thereafter, Yellen and Taylor came to the residence, arriving in a black and

yellow Porche. Terzibachian became suspicious when the only subject of conversation was the car's alarm system. Due to a dead battery, Yellen and Taylor could not take the car for a test drive as they had wished. They gave the names of "Steve" and "John Smith," but refused to leave phone numbers or addressed where they could be reached. After they left, they called back and asked Terzibachian to bring the Porche to an address in another car. He noticed that the residence was a "mansion" inconsistent with the residence the defendants would have lived in. He felt it was a trick and did not stop.

Shortly after this incident, the police recovered the black and yellow Porche in the second level of the parking lot at Fashion Valley.

[regarding counts 14 through 27] Shortly before 7:00 A.M. on 11/21/83, Kelly Haliburton, a security agent at Neiman Marcus Department Store at 280 Fashion Valley road in San Diego, opened up the store, letting in five employees: Lucy Tarin, Richard Reyes, Carl Christensen, James Croft and Manuel Rebelo. Several minutes later, Haliburton opened the door once again in response to a knock, letting in Jalanda Harrison. Immediately behind her, Reams and Taylor entered. Both were holding handguns; Reams was wearing a lady's nylon stocking as a mask, but Taylor had no mask on. Haliburton subsequently identified Reams as "Gene," a friend of Yellen's who, at the time, was employed as a security agent at Neiman Marcus. Reams and Taylor ordered the employees who were still present (Croft and Rebelo had gone upstairs) into the security area and tied them up, using tape. Croft and Rebelo subsequently came downstairs when they were accosted by Reams and Taylor who pointed guns at them and ordered them also to go into the security office where they were tied up and blindfolded. As other employees arrived, each was threatened with a gun by Reams or by Taylor ordered into the security area, tied up and blindfolded. These employees were James Patterson, Rox Elisondo, Micahel Simmons, John Patton, Samuel Johnson, Betty Hopkins and Clarence Rutlaw.

While this was going on, Reams and Taylor took property from the victims as follows: $6 in cash from Haliburton's purse and a set of keys for the store; $100 in cash from Rebelo's wallet; $40 in cash and a $350 watch from Johnson. Reams asked Haliburton for the keys to the fur locker, which she gave to him. He also got the keys for the cash registers. Reams and Taylor used the handi-talkies ordinarily used by store security to communicate with each other while they were in the store. They also obtained handcuffs from the security department.

While in the security area, one of the victims, Betty Hopkins, was threatened by Reams after she took the tape off her face that Reams had put on. He told her that if she didn't "cool it," he was going to shoot her.

After about an hour, no noises indicating that Reams or Taylor were still in the store could be heard, and the victims were able to untie themselves and report the incident to police. Subsequent investigation showed that Reams and Taylor had taken three (3) pairs

of handcuffs, four (4) handi-talkee radios, five (5) men's fur-lined jackets, and
approximately $2,950 in cash which was taken from numerous cash registers throughout
the store. It was noted that several of the cash registers were in concealed places. The fur-
lined men's jackets were reported to have a value of between $2,000 and $3,000 a piece.
[San Diego Superior Court Information, Case #CR66202, pp 1-2; POR, pp 5, 7-10]

2.  **Prisoner's Version:**  Reams in an interview setting reviewed his Central
    File and stated that his version of these offenses remains substantially the
    same as reported in the 5/31/81 POR. In that report, he stated that he first
    became involved with vehicle theft when the Volkswagon van was taken.
    He, Burtrum, Taylor and Yellen were involved, and the van was taken for
    the stereo and speakers as well as for money that the van's owner, Marilyn
    Barnes, was reported to have secreted in it. Reams acted as a lookout
    while the van was being broken into, and drove it away since he had had
    experience in driving such a vehicle.

    In early September, Reams blew the engine in his Datsun 240Z, and he
    needed another engine to replace it. He was not working at that time and
    didn't have the money to make the repairs. He and Yellen decided to steal
    a car to replace the engine. They posed as buyers and on 9/11/83 went to
    look at a 240Z advertised for sale by Paul Gonya.
    They found it acceptable and returned that night to steal it. They replaced
    Ream's engine with Gonya's and then rolled the stolen 280Z down a hill
    behind Yellen's house and abandoned it. Soon after that, the engine in
    Yellen's 240X blew, and they decided to take another similar car in order
    to put its engine into Yellen's car. They again posed as buyers and found
    Michael Zancanella's 1974 260Z for sale. They returned at night and stole
    it. Later, they replaced Yellen's engine with the one from the stolen
    Datsun 260Z. Shortly thereafter, Yellen blew the replaced engine in his
    car, and on 10/20/83 they stole Kenneth Zammit's 1974 260Z. Once again,
    within a short while, Ream's replaced engine blew a gasket, and he and
    Yellen stole a 1976 280Z on 10/28/83 from European Sports Car
    Company.

    Up to this point, Reams and Yellen had been stealing cars simply to keep
    their own vehicles running. Each theft was proceeded with an inquiry as to
    whether the owner was covered by insurance, so that the victims would
    not personally have to take the loss. Reams reported that one potential
    victim was selling his car because his wife was pregnant, so they decided
    not to steal that vehicle. At this time, Reams was working only eight (8)
    hours a week at Assurance Security and he needed an operable vehicle to
    continue his search for full employment. To aggravate his already
    desperate financial situation, he got into a dispute with his parents and was
    kicked out of their house. He moved in with Michael Yellen and Yellen's

father during the last part of October, 1983. It was at this point that Reams, Yellen, Taylor and to an extent, Burtram began talking about ways to get money.

Reams states that the initial idea was to burglarize a Brink's Office where Burtrum had had occasion to see a room full of money. After some discussion, Burtrum pulled out, saying that he wanted no part of the plan. Reams, Yellen and Taylor pursued the conspiracy. One part of their plan called for using a fast car for an escape, so they looked through a magazine, "The Auto Trader," for a suitable vehicle. They picked out the Porche belonging to Michael Terzibachian. Reams and Yellen stole that car on 11/5/83. Yellen told Burtrum about the theft and took him to see the car which was parked at the Hotel Del Coronado's parking lot. Reams reports that Burtrum called Terzibachian and told him where his car was.

Since the Porche was recovered by its owner, the group still needed a fast car. This led to the thefts of 280ZX automobiles from Encinaitas Team Datsun on 11/13/83 and from Terry Allen Datsun on 11/14/83. Yellen drove Reams to the dealerships, and Reams committed these thefts himself. By way of further planning, the group stole a police scanner from a Radio Shack store and went to the Brink's Office, where they attempted to break a window to determine police response time. They were familiar with the methods of the ADT Security Service and wanted to check their response time also, so that they would know how much time they would have to get in, get the money, and leave.

When the police came to Yellen's house on 11/18/83 and removed the stolen 280Z's, the group realized that they had to get another fast car. Therefore, Reams and Yellen stole the 1977 black over Yellow Porche 911 Targa from Pioneer Porche later that afternoon. That night, shortly after midnight on 11/19/83, they kidnapped Calvin Nixon. Reams said that their intent was to get Nixon's keys to use on the Brink's building. However, after dropping Nixon off at the Industrial Indemnity office, they went to Brink's and discovered that Nixon keys did not fit those locks.
After being foiled in this attempt, the group decided that the next best way to get money would be to burglarize the Neiman Marcus Department Store where Yellen worked. To accomplish this new goal, they decided that they needed a large vehicle to carry off the goods. This led to the theft of the Chevrolet van and the associated kidnapping of Mario Castaneda on 11/19/83.

On 11/20/83, the group again attempted to get the Porche from Terzibachian. Reams stated that both he and Yellen were armed. The

attempt was foiled; whey they were confronted by Michael and Rebecca Terzibachian and by Joseph Deuer, they ran.

Reams stated that the offenses at Neiman Marcus took place as related in section E. pg 8. He said the jackets were taken primarily because Yellen liked them. They had hopes of getting more cash from the store, but could not since the cashier was not there. They drove to San Ysidro after this incident and at one point, were stopped by police. Reams said he was driving and was pulled over by a police officer because of a broken rear light. Loaded weapons and stolen merchandise were in the van at that time. As the officer was going back to his car, Reams drove off and after a chase through San Ysidro, he lost the officer. They went to the motel, emptied the van, and then abandoned it in a nearby parking lot. Rams stated that he ran from the police during his arrest because he was scared.

**3.)**    **Aggravating Circumstances:**  Remain the same as noted in Section I.C.3.

**4.)**    **Mitigating Circumstances:**  Remain the same as noted in Section I.A.4.

**F.**    **The Arrest:**  Interviews conducted by police pointed to Reams, Yellen and Taylor as the perpetrators of the offenses listed above in sections A, B, C and D.

On 11/22/83, the police ascertained that these three were staying in room one-twenty-three (123) at the Best Western Motel on San Ysidro Boulevard. A surveillance was established, including placing an officer in the room next door. Raylor and Reams were both seen to step outside of the room, smoke cigarettes and make a phone call at about 10:42 A.M. At 11:07 A.M., a Yellow Cab taxi arrived, let the occupants of room one-twenty-three (123) know he was there, and then went to a nearby gas station. When he returned, Reams and Taylor got in. The taxi was subsequently stopped, and the occupants were ordered to exit with their hands on their heads. Reams, instead, ran out across a nearby field with detectives in pursuit. As he was attempting to jump a fence, he was shot at twice, with one round hitting him in the leg. After initially failing to comply with further orders, he eventually acquiesced and was taken into custody. Shortly afterwards, Yellen left the motel and room. He was taken into custody without incident notwithstanding the .357 Magnum revolver found in his possession.

A search warrant for the motel room was obtained and executed. Recovered from the room were the handcuffs, four handi-talkee radios, keys for the cash registers and for the same and four of the five jackets taken from the Neiman Marcus store; the revolver, keys and flashlight taken from Calvin Nixon; a security guard uniform and gun belt; a pager taken from Mario Castaneda; registration slip for the stolen 1978 Chevrolet van; a loaded Remington 12 gauge shotgun, a loaded .38 revolver, speed loaders and a box of ammunition; a bag containing $2,369.94; and other items of clothing and keys.

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2002 CALENDAR


## II.   PRECONVICTION FACTORS:

A.   **Juvenile Record:**  POR notes six Vehicle Code violations between June, 1981 and August, 1983. All were moving violations; three were for speeding. Reams acknowledged a misdemeanor conviction for carrying a concealed weapon in 1982, claiming that it was a weapon he used in conjunction with a security guard job he held at the time. The misdemeanor conviction is not listed on the CI&I.

B.   **Adult Convictions:**  Commitment offense only.

C.   **Personal Factors:**  Eugene Alvin Reams was born 1/22/65 in Orlando, Florida. The only child of Eugene and Dorothy Reams. His parents both worked as barbers. He graduated from high school in 1980 at the age 16. After graduation, he moved with his parents to San Diego, where he secured employment at ADT Security in April, 1981. He worked "patrol" for about a year at ADT while attending South Western Junior College, taking courses in Criminology. He quit his job at ADT in order to go to school full time when his parents agreed to help support him. After a year in school full time, his parents ran out of money, and he was forced to return to work. However, he could only find an eight (8) hour a week part time job working for Assurance Security. He was living at home until about a month before his arrest, he was kicked out of the house by his father as a result of disagreements between them. As reported in the 6/8/92, Psychiatric Evaluation, shortly before his arrest, Reams had become very depressed about the hopelessness of his activities as well as the possibility of not pleasing his father, no matter how much money he made. At this point, he felt quite suicidal and decided that he would get the police to kill him; in the process of running away from his arrest. Reams has not been married and has no children. He never served in the military. He denies the use or abuse of drugs or alcohol. He claims good physical health and, with the exception of the period of depression around the date of arrest, has experienced no mental or emotional disorders.


## III.   POSTCONVICTION FACTORS:

A.   **Special Accommodations/Disability:**  None.

B.   **Custody History:** Documents from the previous hearings have been considered and that information remains valid. During the period of the time since the last hearing Reams behavior has been commendable. He has remained disciplinary free, participated in self-help activities and has programmed well in both housing unit and his work assignments. A synopsis of his institutional adjustment indicates that he has consistently displayed an above average effort towards

programming. Reams is currently enrolled with in the Information Technologies, Computer Refurbishing Program, receiving exceptional ratings on his performance reports. Reams appeared before the Board of Prison Terms on 6/26/01 for a Subsequent Parole Consideration Hearing. He was denied parole for one year. In preparation for his next hearing the Board recommended that he remain disciplinary free, upgrade vocationally and participate in self-help and therapy programming. Reams has complied with all of the BPT recommendations. (See Postconviction Progress Report for details.)

C.    **Work, Education, Vocation, Therapy & Self-Help Activities:**  Documents from the previous hearing have been considered and that information remains valid. During the period of time since the last hearing Reams has participated in the twelve step program, Alcoholics/Narcotics Anonymous groups. Additionally Reams is an active member in the Men's Advisory Council. See CDC 128B dated 12/10/01. (See Postconviction Progress Report for details.)

D.    **Disciplinary History:**  Reams has remained disciplinary free since 1997. His entire disciplinary history consist of two CDC 115's which are noted on the disciplinary sheet of this Board Report.

## IV.    FUTURE PLANS:

A.    **Residence:**  Should Reams be given a parole date, he plans on seeking out-of-state placement in Kansas to live with his father and step-mother, Eugene and Leana Reams, at 524 North Chestnut, Iola, Kansas 66749; Telephone (316) 365-0051. Reams last legal county of residence is San Diego County. If he should be granted parole to San Diego, he will have to seek out his old friends and relatives and try to get residence with them.

B.    **Employment:**  Reams stated that his father and his stepmother offered him moral and financial support and will hire him for their business as an administrative clerk. The business has two branches in California and in Kansas. Should he not be allowed the out of state transfer, he could also secure employment in the Los Angeles branch if granted a transfer to that county. Reams stated that he feels confident that with skills he has acquired during incarceration, he would be able to gain employment in computer and clerical position. If granted parole to San Diego, he plans on seeking employment in anything available to support his life. Reams plans appear to be viable and he seems to have the support of family and friends necessary to maintain a successful transition to the community.

## V.    USINS STATUS:  N/A.

REAMS, EUGENE              C90508                    CTF-Soledad              June/2002

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2002 CALENDAR

## VI. SUMMARY:

A.   Considering the commitment offense, prior record, and prison adjustment, this writer believes Reams would probably pose a low degree of threat to the public at this time, if released from prison. This recommendation is based on Reams lack of prior criminal history and marked progress toward maintaining an overall positive programming. Also noted is the extensive family/community support and that he has developed a marketable skill with several lucrative option for secured employment. It appears that Reams has matured significantly over the last eighteen years of incarceration. In the absence of external control he is likely to maintain his gain and continue on his personal growth path. Reams regrets the poor judgement and expressed remorse in conspiring to commit the crime.

B.   Prior to release Reams could benefit from maintaining disciplinary-free behavior, maintaining a positive and stable work record and participating in available self-help program.

C.   This Board Report is based upon a thorough review of Central File, numerous contact through normal counseling duties and personal interview with Reams.

D.   Reams reviewed his Central File on 8/7/02 in preparation for his upcoming Subsequent Parole Consideration Hearing.

REAMS, EUGENE          C90508          CTF-Soledad          June/2002

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2002 CALENDAR


_____
H. Farbakhsh
Correctional Counselor I


_____
S. Hill
Correctional Counselor II


_____
L. Schwimmer
Facility Captain


_____
D.S. Levorse
Classification and Parole Representative


REAMS, EUGENE          C90508          CTF-Soledad          June/2002

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6/01 to Present | | | **PLACEMENT:** Correctional Training Facility. **CUSTODY:** Medium A Custody. **CLASSIFICATION SCORE:** 0 points. **ACADEMIC:** Noted in Vocation. **WORK:** Noted in vocation. **VOCATION:** Assigned to the Vocational Computer Refurbishing Program as CPU Technician during this period. Received exceptional rating on CDC 101 work supervisor's report dated 7/5/01. **GROUP ACTIVITIES:** Reams participated in Alcoholic/Narcotics Anonymous Program. See 128B's dated 7/26/01 and 11/15/01. Participated in Men's Advisory Council, see 128B dated 12/10/01. **PSYCH TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** Remained disciplinary free during this period. |

CORRECTIONAL COUNSELOR'S SIGNATURE _Fairbark Keel_      C C I      DATE 5-15-02

REAMS, EUGENE      C90508      CTF-SOLEDAD      JUNE/2002

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

BPT 1004 (REV 7/86)      Page _1_