# EXHIBIT 6
# Part 1 of 4

Name     EUGENE ALVIN REAMS

Address     P.O. BOX 689 / C-307-U

Soledad, CA. 93960-0689

F I L E D
Clerk of the Superior Court

FEB 15 2006

By:_____ Deputy

CDC or ID Number     C-90508

IN THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

*(Court)*

WRIT GRANTED/DENIED
DATE 04-05-06

EUGENE ALVIN REAMS

Petitioner

vs.

A.P. KANE, WARDEN; A. SWARTZENNEGGER,

Respondent     GOVERNOR

**PETITION FOR WRIT OF HABEAS CORPUS**

No. HC 17095   2nd Petition

*(To be supplied by the Clerk of the Court)*

CR66202

## INSTRUCTIONS — READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

6.  GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See attached

_____

_____

_____

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

See attached

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

See attached

_____

_____

_____

8. Did you appeal from the conviction, sentence, or commitment? [X] Yes. [ ] No.    If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
**Court of Appeal, Fourth Appellate District**

b. Result: **Judgement affirmed**    c. Date of decision: **11-25-85**

d. Case number or citation of opinion, if known: D002092

e. Issues raised: (1) No evidence to support Kidnap for robbery.

(2) _____

(3) _____

f. Were you represented by counsel on appeal? [X] Yes. [ ] No.  If yes, state the attorney's name and address, if known:

Handy Horiye, Attorney at Law, 2420 University Avenue, San Diego, CA. 92104

9. Did you seek review in the California Supreme Court? [ ] Yes. [X] No.    If yes, give the following information:

a. Result: _____    b. Date of decision: _____

c. Case number or citation of opinion, if known: _____

d. Issues raised: (1) _____

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
This petition concerns legal claims that have occurred subsequent to the record

of appeal.

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
There are no administrative remedies.

_____

_____

_____

_____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available? [ ] Yes. [X] No.
*Attach documents that show you have exhausted your administrative remedies.*

IN THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

In re EUGENE ALVIN REAMS,          )    Case No. _____
                                   )
        Petitioner,                )
                                   )
On Habeas Corpus.                  )
_____)

**PETITION FOR WRIT OF HABEAS CORPUS**

EUGENE ALVIN REAMS
C-90508, C-307U
P.O. Box 689
Soledad, CA  93960-0689

In Propria Persona

- 1 -

### INTRODUCTION

Petitioner, with two codefendants, Harold Taylor and Michael Yellen, were convicted of various crimes occurring during a November 1983 crime spree, including conspiracy to rob Neiman Marcus, grand theft auto, kidnapping to commit robbery, robbery, assault with firearms, and burglary, with various findings of personally using and being armed with firearms.

Petitioner received a determinate term of 10 years and 8 months (determinate term was consecutive to the life term) plus two sentences of 7 years to life (concurrent) for all his offenses.

Petitioner completed his determinate term and began serving his term-to-life sentence in August 1989. His Minimum Eligible Parole Date (MEDP) was 8/12/96.

On 8/22/95, Petitioner appeared before the Board of Prison Terms (BPT) for his initial parole consideration hearing, pursuant to Penal Code §3041. Petitioner was denied parole for a period of 2 years.

On 8/19/97, Petitioner appeared for a subsequent parole hearing and was denied parole for 1 year.

On 9/16/98, Petitioner appeared for his 2nd subsequent parole hearing and was denied parole for a period of 2 years.

On 6/26/01, Petitioner appeared for his 3rd subsequent parole hearing and was denied parole for 1 year. [The 9 month delay was due to BPT understaffing.]

On 6/03/02, Petitioner appeared for his 4th subsequent parole hearing and was denied 1 year.

On 8/06/03, Petitioner appeared for his 5th subsequent parole hearing and was denied parole for 1 year.

On 5/13/05, Petitioner appeared for his 6th subsequent parole hearing and was denied parole for 1 year. [The 9 month delay was due to the need for a current psych report.]

It is this hearing that Petitioner now appeals.

FACTS

At about 6 p.m. on November 5, 1983, Reams answered an advertisement placed by Michael Terizbachian to sell his Porshe.  Terizabachian took Reams for a test drive.  At a parking lot, Reams got into the driver side, locked Terzibachian out of the car, and drove away.

Sometime the same evening, Yellow showed Terzibachian's Porshe to Thomas Burtrum.  Burtrum contacted Terzibachian at about 4 a.m. and told him where his car was.  When Terzibachian recovered his car, one small item was broken and it had a dead battery.

At about 3 p.m. on November 18, 1983, Reams and Yellen went to a Porshe dealership, took a yellow Porshce with a black top for a test drive, with the salesman, Alan Silverman.  At a freeway exit Yellen got into the driver's seat, locked Silverman out of the car, and drove away.

At about 2 a.m. on November 19, 1983, Calvin Nixon, and Chairds, security guards for ADT Security, [Reams, Taylor and Yellen were formerly employed by ADT] investigated a reported break-in at the Kelco building.  AT about 3.30 am.m, Chairds was in the back of the building and Nixon was in the front, waiting for a back-up security guard, harry Fournier.  A yellow Porsche parked near Nixon's car, Reams got out of the car with a handgun and told Nixon to freeze, and Taylor got out with a shotgun, put a shell in the chamber, and told Nixon to turn around.  They handcuffed Nixon, pushed him face down to the ground and took his flashlight and gun.  Nixon heard the defendants open the trunk of his car, and tamper with a box containing two to three hundred keys to builidings for which ADT provided security.  Nixon was placed face down in the back of his car, wedging his face between the back and front seats.  Reams and Taylor got in his car and drove away, followed by the yellow Porsche.  Fournier saw the two cars leaving.  Nixon was driven around recklessly for about 25 minutes.  His car was driven fast, taking a lot of

corners, causing Nixon to be bounced around.  The car stopped in the parking
lot of the Industrial Indemnity Building, about five to seven miles from
the Kelco Building.  The yellow Porsche was already there.  Nixon was
handcuffed to a gas meter pipe.  Nixon heard the men return to his car and
remove the key box.  Nixon's keybag with credit cards and keys to the units
belonging to ADT, which had been on the front seat, and the box of keys which
had been in the trunk, were missing from Nixon's car.  The keys in the keybox
were to deactivate the alarm systems of ADT's clients.  Although ADT had
a contract with neiman-Marcus, the keys to Neiman-Marcus were not included.

At about 9 p.m. on November 19, Reams and Taylor went to an auto dealership
and took a blue van for a test drive, with salesman, Mario Castenada, driving.
Taylor took the wheel.  Castenada, suspicious of the men, brought a pager
to contact the dealership if there was trouble.  When Taylor began driving,
Reams took the pager.  Castenada told Taylor to go back to the dealership
because the van was low on gasoline.  Taylor turned in the opposite direction.
Reams pointed a gun at Castenada and ordered him to lie on the floor.
Castenada saw a light colored Porsche with a black top following them.  Reams,
at gunpoint, got $20 from Castenada for gas.  Later Reams asked Castenada
for more money, and Castenada gave him the rest of his $180 to $190 and his
diamond ring.  Castenada was left out on the center divider of Interstate 5,
6.1 miles from the dealership, after being with the men for a total of 20 to
30 minutes.  He saw the Porsche pull in front of the van and saw both vehicles
leave.  In the early morning hours of November 20, the police spotted and
unsuccessfully pursued the yellow Porsche in a high speed chase.

At about noon on November 20, Yellen and Taylor, driving the yellow Porsche
with a black roof, went to Terzibachian's residence to see the Porsche he
was again advertising for sale.  They asked Terzibachian how the alarm system
worked on the car.  They were unable to test drive the car because the battery

- 4 -

1  was dead.  At about 6 p.m. the same day, Yellen, Taylor and Reams returned
2  to Terzibachian's residence, which was an apartment complex protected by
3  a locked security gate.  Yellen had called Terzibachian and told him he was
4  back to see the car with his father, who would be paying for it.  Rebecca
5  Terzibachain, Michael Terzibachian's wife, went downstairs to the lobby area
6  and heard them enter the complex.  She followed them down the hallway until
7  they saw her.  She was suspicious, and told a neighbor, Joseph Deuer, to
8  call the police.  Deuer followed her out of the laundry room.  By this time,
9  Michael was also downstairs.  He recognized Reams as the man who had stolen
10 his car on November 5, and told the men he would not show them the car.
11 As the men turned to leave, Michael said. "Wait a minute, I want to talk
12 to you."  The three men immediately pulled out guns and pointed them at
13 Michael.  Deuer, who was behind Michael, saw the guns pointed in his direction
14 and stood still.  Rebecca did not yet see the guns.  Rebecca had her hands
15 on the security gate.  Yellen was beside her, and as he opened the gate she
16 slipped and fell.  Yellen pointed the gun at her head.  Reams and Taylor
17 were running sideways toward the security gate, looking back at Michael and
18 Deuer, holding their guns out.  Reams and Taylor never pointed their guns
19 directly at Rebecca.  All three men passed her, exiting through the doorway
20 size security gate.  The men drove away in a yellow porsche and an older
21 american car.  At about 7.30 p.m. on the same day, the yellow Porsche was
22 located on the second level parking lot in Fashion Valley shopping center.
23 There were not keys in the ignition and the car was towed to the police
24 station.

25     At about 7 a.m. on November 21, 1983, Taylor and reams entered and robbed
26 Neiman-Marcus and its employees at gunpoint.  Taylor pointed a gun at Kelly
27 Haliburton, assistant security manager at Neiman-Marcus.  The 13 employees
28 present or arriving during the course of the robbery were brought in to the

1  security office in the store, their eyes and mouths taped, their hands tied

2  behind their backs, and made to kneel, sit, or lie down. One employee

3  attempted to take the tape off her face, and was told by one of the appellants

4  that he would shoot her if she did not "cool it." Personal property was taken

5  from six employees.

6      The evening of the Neiman-Marcus heist, appellants rented a room in the

7  Best Western Motel in San Ysidro, in Taylor's name. That evening, at the

8  motel, Yellen, Reams, Taylor, and Taylor's girlfriend saw a television news

9  broadcast, and heard the police were linking a K-Mart robbery and the Neiman-

10  Marcus robbery together, which prompted Yellen to say they "had gotten away

11  with it." Earlier, Yellen, who had been employed as a security guard at

12  Neiman-Marcus but had not shown up for a few days, called a coworker, Albert

13  Arena. Yellen told Arena he had heard about the robbery on the news. He

14  told Arena he was at the motel, but would not say where. Arena told Yellen

15  he might be in trouble and he should get an attorney.

16      Between 8.30 and 9 p.m. that same evening, two of the appellants parked

17  the blue van in the parking lot of an apartment building about one-half mile

18  from the Best Western Motel. The apartment manager told them to move the

19  van, but they said they were visiting someone and would move it shortly.

20  They did not enter the apartment complex, but walked toward the street.

21  The next morning the van was still at the apartment building and the police

22  impounded it. They found fingerprints belonging to Reams and Yellen.

23      The police found Castenada's pager; Nixon's keys, gun, flashlight and

24  credit cards; two Porsche keys; the van registration papers; guns, bullets

25  and speed loaders; Neiman-Marcus' keys, large bag, power packs, fur jackets,

26  handcuffs, walkie talkies, and $2,100 in the motel room. At the police

27  station, Castenada's diamond ring was found on Taylor. A full description

28  of Petitioner's acts are described in Petitioner's Probation report.

- 6 -

## VERDICTS

All three defendants [Harold Taylor, Michael Yellen and Eugene Reams] were convicted as follows.  Count 1; conspiring to rob Neiman-Marcus (Penal Code § 182, subd. 1).  All statutory references are to the Penal Code.  The overt acts alleged in the conspiracy were stealing Silverman's Porsche, breaking in at Kelco Industries to lure ADT security personnel, kidnapping and robbing Nixon, stealing Castenada's van, posing as interested buyers of an attempting to steal Terzibachian's Porsche.  Counts 4 and 7; kidnappings to rob Nixon and Castenada (§ 209).  Counts 5 and 8; robbing Nixon and Castenada (§ 211).  Counts 6 and 9; unlawfully taking Nixon's and Castenada's vehicle (Veh. Code § 10851).  Count 10; attempted grand theft auto (Terzibachian's car, § 487, subd. 3 and 664).  Counts 11, 12, and 13; assault with firearms on Michael and Rebecca Terzibachian and Joseph Deuer (§ 245, subd. (a)(2)).  Counts 20 through 26; assaulting Neiman-Marcus employees (§ 245, subd. (a)(2).)  Count 27; burglarizing Neiman-Marcus (§ 450).  Reams and Yellen were convicted in Count 3 of grand theft of Silverman's Porsche (§ 487, subd. 3).  All three defendants were found to have personally used (§ 12022.5) and/or been armed with (§ 12022, subd. (a)) firearms during many of the crimes.  Also, Petitioner and Yellen pled guilty, in a separate case, to additional grand theft auto charges.  These additional auto thefts occurred prior to the five day crime spree.

## SENTENCE

Petitioner, and his codefendants, were sentenced to concurrent life terms with the possibility of parole on counts 4 and 7, the kidnapping to commit robbery.  Yellen was given a one-year consecutive enhancement for being armed with a firearm on the life term.  The life term and enhancement were ordered to run consecutive to the following determinate terms; Petitioner, and his codefendants were given three years plus a two-year enhancement for personally using a firearm on count 11, the principal term (the assault with firearms

- 7 -

1  on Michael Terzibachian).  Petitioner and Yellen were given 8 months on count

2  3 (grand theft of Silverman's auto).  All defendants were given one year on

3  count 1 (conspiracy to rob Neiman-Marcus).  The total determinate term for

4  Yellen was 8 years, 8 months, for Taylor, 9 years, 8 months, and for Petitioner,

5  10 years, 8 months.  For the remaining counts, concurrent terms or stayed

6  sentences were imposed pursuant to section 654.

### May 13, 2005, Board Hearing

8  Petitioner has appeared before the Board of Prison Terms [hereinafter BPT]

9  a total of seven times.  His latest hearing was on May 13, 2005, at which

10  time he was **again** denied parole, for one year.  (Exh. A, p. 74, ln 6-7)  The

11  BPT panel concluded that Petitioner "... would pose an unreasonable risk of

12  danger to society or a threat to public safety if released from prison."

13  (Exh. A, p. 71, p. 15-17)  The BPT panel supported their conclusion by stating,

14  "The offenses were carried out with a great amount of callous disregard for

15  what the victims were going through.  There were about 19 victims who were

16  attacked.  There were 27 counts of offenses.  And 14 of the victims were bound

17  and gagged.  These crimes were carried out in a very calculated manner in

18  that they were all pre-planned.  And the victims were abused by being bound

19  and gagged and the offenses were carried out in a manner that showed a total

20  disregard for the fear of the victims at the time.  And the motive for the

21  crimes were very trivial in relation to the offenses in that these were strictly

22  for material gains and selfish reasons.  These conclusions are drawn from

23  a Statement of Facts, that the prisoner and his crime partner were responsible

24  for multiple car thefts, robberies and assaults of 27 counts with 19 victims.

25  (Exh. A. p. 71, ln 17 through p. 72, ln 9)  The panel also concluded that

26  Petitioner had a minimal criminal history (Exh. A. p. 72, ln 11-12), a stable

27  social history (Exh. A. p. 72, ln 17-19); the psychiatric/psychological report

28  dated 7/15/04, by Dr. Stack appeared to be supportive and is a very adequate

- 8 -

1  report (Exh. A. p. 72, ln 26 through p. 73, ln 1-2); and that Petitioner's

2  parole plans appear to be in order and he has good support from his family.

3  (Exh. A. p. 73, ln 2-4)

### THE BOARD VIOLATED PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS AND ACTED ARBITRARILY AND CAPRICIOUSLY BY DENYING PETITIONER PAROLE WITHOUT ANY SUPPORTING EVIDENCE

7      It is now a well-established principle that constitutional protections

8  attach to an inmate's interest in parole. "California's parole scheme gives

9  rise to a cognizable liberty interest in release on parole. The scheme

10  'creates a presumption that parole release will be granted' unless the

11  statutorily defined determinations are made." McQuillion v Duncan, 306 F.3d

12  896, 902.

13      The Board's decision must be based on some "evidence" and that "evidence"

14  can not be merely evidence that Petitioner committed a crime, but must indicate

15  that Petitioner would be an unreasonable threat of future dangerousness if

16  released in order to support a Board's decision to deny parole. (In re

17  Ramirez, 94 Cal.App.4th 549; cited with approval in In re Rosenkrantz, 29

18  Cal.4th 616). The California Supreme Court in In re Rosenkrantz, Supra,

19  at 658, stated that the "some evidence" review means that;

20      [T]he judicial branch is authorized to review the factual basis
        of a decision of the Board denying parole in order to ensure
21      that the decision comports with the requirements of due process
        of law, but that in conducting such a review, the court may
22      inquire only whether some evidence in the record before the
        Board supports the decision to deny parole, based upon the
23      factors specified by statute and regulation.

24      Petitioner asserts that there was no evidence to support the BPT panel's

25  finding that Petitioner poses an unreasonable risk of danger to society or

26  a threat to public safety if released from prison. The BPT panel's primary

27  support for their finding was Petitioner's commitment offense. (Exh. A.

28  p. 71, ln 15 through P. 72, ln 9).

1    Petitioner's commitment offense <u>can</u> <u>not</u> be considered "some evidence" to

2   support the BPT's Conclusion that Petitioner is an unreasonable risk for the

3   following reason;

4   **A.  Positive Psychological Evaluations**

5       All of Petitioner's psych evaluations have rated his level of threat to

6   society as average or below average.  These psych reports are authored by

7   accredited professionals.  Petitioner's latest psych evaluation was read into

8   the record, and addressed Petitioner's level of threat to society; "In the area

9   of assessment of dangerousness, the Doctor writes, in part, inmate Reams'

10  violence potential within a controlled setting is considered to be well below

11  average relative to this Level Two inmate population and if released to the

12  community, his violence potential is estimated to be no greater than that of

13  the average citizen in the community." (Exh. A. p. 45, ln 15-22)

14      The BPT panel made a finding in direct contradiction to Petitioner's

15  numerous positive psych evaluation(s), even though the panel acknowledged

16  Petitioner's latest psych evaluation as supportive and very adequate. (Exh. A.

17  p. 72, ln 25 through p. 73, ln 2). The panel never gave a reason for rejecting

18  the numerous psych evaluation(s) rating Petitioner as a low risk.  The BPT

19  panel, during the hearing, did not have 'good cause' in determining Petitioner

20  is a current danger to society, based on the commitment offense.  The

21  definition of "good cause" is, "A finding by the Board based upon a

22  <u>preponderance</u> <u>of</u> <u>the</u> <u>evidence</u> that there is a factual basis and good reason for

23  the decision made." [Underline added for emphasis] (California Code of

24  Regulations, Title 15, Division 2, Board of Prison Terms, Chapter 1, General,

25  Article 1, Rules of Construction and definitions, §2000 (b)(50).) Here, the

26  BPT panel lacks <u>factual</u> basis or good reason for their decision, in clear

27  violation of their own administrative regulations.

28      The Psychologist(s) authoring the pysch evaluation(s) also reviewed the

- 10 -

1  commitment offense but found Petitioner to be a <u>low</u> <u>risk</u>.  The BPT panel
2  (layman in regards to threat assessment) <u>can</u> <u>not</u> overrule an accredited
3  professional opinion(s)/finding(s) without some <u>factual</u> evidence supporting
4  their decision.  This is arbitrary and capricious, and a violation of
5  Petitioner's State and Federal Due Process Rights.

6  **B.  Continued Denials**

7      This hearing was Petitioner's 7th hearing and the 7th time the BPT panel
8  has used Petitioner's commitment offense as the primary reason for denial.  In
9  <u>Biggs v. Terhune</u>, 334 F.3d 910, 917, "A continued reliance in the future of an
10 unchanging factor, the circumstances of the offense and conduct prior to
11 imprisonment runs contrary to the rehabilitative goals espoused by the prison
12 system and could result in a due process violation."

13     This very issue was raised by Petitioner's codefendant.  Petitioner
14 respectfully requests this court to take judicial notice of <u>Yellen v Butler</u>
15 Case No. CIV S-01-2398 MCE GGH P, (Exhibit C).  Yellen was released by the
16 United States Eastern District Court on this very issue.  Judicial notice is
17 properly taken of orders and decisions made by other courts or administrative
18 agencies, see <u>Papai v. Harbor Tug and Barge Co.</u>, 67 F.3d 203, and also Federal
19 Rules of Evidence §201 (a) - (f).  The Eastern District found that continued
20 reliance on unchanging circumstance transforms an offense for which California
21 law provides eligibility for parole into a de facto life imprisonment without
22 the possibility of parole.  The Court concluded, "Under these circumstances,
23 the continued reliance on unchanging factors at the 1999 hearing violated due
24 process." (Exh. C., p. 13, ln 4-5)

25     Petitioner's commitment offense and Yellen's commitment offense are
26 indistinguishable.  In Yellen's case, he was challenging his 3rd suitability
27 hearing, even though he had been denied three (3) additional times.  The Court
28 found that reliance on unchanging factors, **at his 3rd hearing** violated his due

1  process rights. In Petitioner's case, he has been denied seven (7) times, for

2  the <u>exact</u> same reasons (specifically, the commitment offense). Therefore,

3  Petitioner asserts his due process rights have been violated.

4

5  ### THE BOARD VIOLATED PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL EQUAL PROTECTION RIGHTS BY BASING THEIR DENIAL OF PAROLE ON THE COMMITMENT OFFENSE

6

7       Petitioner denial of parole was based primarily on the commitment

8  offense. (Exh. A. p. 71-72) Petitioner asserts that it is a violation of his

9  Equal Protection Rights to continue using the commitment offense when

10  Petitioner's codefendants have been found suitable for the same commitment

11  offense. The Board stated reason for denial of parole was;

12       "The offenses were carried out with a great amount of callous
         disregard for what the victims were going through. There were
13       about 19 victims who were attacked. There were 27 counts of
         offenses. And 14 of the victims were bound and gagged. These
14       crimes were carried out in a very calculated manner in that
         they were all pre-planned. And the victims were abused by
15       being bound and gagged and the offenses were carried out in
         a manner that showed a total disregard for the fear of the
16       victims at the time. And the motive for the crimes were
         very trivial in relation to the offenses in that these were
17       strictly for material gains and selfish reasons. These
         conclusions are drawn from a Statement of Facts, that the
18       prisoner and his crime partner were responsible for multiple
         car thefts, robberies and assaults of 27 counts with 19
19       victims. And they resulted in the accumulation of the
         commitment offense and the current arrest and incarceration.

20

21       Petitioner, along with his two codefendants (Mike Yellen and Harold

22  Taylor) committed these same exact offenses listed in Petitioner's denial.

23  Yet, Mike Yellen and Harold Taylor have both been found suitable for these

24  same exact set of circumstance; and both have been released. Harold Taylor

25  was found suitable by the Board on May 18, 2004, (Exh. B) and released on

26  September 15, 2004. Mike Yellen was released in July of 2004, as a result

27  of the decision attached hereto as Exhibit C.

28       Petitioner <u>is not</u> asserting that he should be released from prison,

1  because his two codefendant's have been released.  Petitioner is asserting that

2  using the commitment offense as the basis for denial violates Equal Protection.

3       The Equal Protection Clause essentially requires that all persons

4  similarly situated be treated alike, and an Equal Protection violation occurs

5  when the government treats someone differently than another who is similarly

6  situated.  <u>Jacobs, Visonsi & Jacobs Co. v City of Lawrence, KS</u>, 927 F-2d 1111

7  (10th Cir. 1991); <u>City of Cleburne v Cleburne Living Center</u>, 473 U.S. 432, 87

8  L.Ed.2d 313, 105 S.Ct. 3249 (1985).

9       Petitioner asserts that it is a violation of Equal Protection to use the

10  same <u>exact</u> set of circumstances (commitment offense) to find one inmate to be a

11  danger to society (and thereby unsuitable), and two other similarly (in this

12  case - <u>exactly</u>) situated inmates to no longer be a threat to society (and

13  thereby suitable).

14       Futhermore, it is clearly established law that, "[T]he gravity of the

15  commitment offense or offense alone may be a sufficient basis for denying a

16  parole application, so long as the Board does not fail to consider all other

17  relevant factors."  (<u>In re Ramirez</u>, supra, 94 Cal.App.4th at p. 569, 114

18  Cal.Rptr.2d 381; accord <u>Rosenkrantsz</u>, supra, 29 Call.4th at p. 660, 677, 128

19  Cal.Rptr.2d 104, <u>Scott I</u>, (2001) 119 Cal.App.4th 871, at p. 891.)  In this

20  case, failure to consider that Petitioner's codefendants had been found

21  suitable for the same commitment offense proves the BPT panel <u>failed</u> to

22  consider all other relevant factors.

CONCLUSION

24       A comparison of Petitioner's denial (Exh. A. p. 71-72) and his

25  codefendant's (Yellen) denial (Exh. C. p. 10, ln 2-8) shows <u>both</u> denials were

26  based on the same basis, i.e., commitment offense.  The Eastern Federal Court

27  found Yellen's denial, based on unchanging factors (at his 3rd hearing)

28  violated his due process rights.  (Exh. C. p. 13, ln 4-5)  The State of

- 13 -

1  California denied Yellen's petition at all levels, disregarding the precedent

2  set in Biggs.  Here, the court has the benefit of a case, already decided,

3  showing that a violation of due process, and a violation of equal protection

4  has occurred.

5       Further exacerbating Petitioner's situation [violation of due process

6  and equal protection] is the fact Petitioner is more than five (5) years

7  beyond his release date.  Codefendant Taylor was found suitable and had his

8  term set.  Taylor began his life sentence in January of 1989 and Petitioner

9  began his life sentence in August of 1989, a difference of only six months.

10  Taylor's term was set at 186 months, and his post-conviction credits of sixty

11  (60) months reduced his 'total period of confinement' to 126 months (Exh. B).

12  Taylor's release date should have been July of 1999.  Taylor was nearly five

13  years (four years, 10 months) beyond his release date.  Petitioner is in the

14  same exact situation in the calculation of his term, with the addition of six

15  months.  Petitioner release date would have been January of 2000, making the

16  violation(s) of his rights especially egregious.

17       Petitioner has served beyond his applicable matrix term of 9-11-13 year(s)

18  [California Code of Regulations, Title 15, Section § 2282 (c)], having been in

19  custody for twenty-two (22) years, well beyond his maximum term, without any

20  basis for a determination that he presents an unreasonable risk of danger to

21  society or a threat to public safety.

22       As shown above, the Board violated Petitioner's Federal and State

23  Constitutional rights, under the 5th and 14th Amendments, specifically violating

24  Petitioner's due process and equal protection rights.

25  ///

26  ///

27  ///

28

- 14 -

WHEREFORE, Petitioner prays this Court to do the following;

1.  Issue a writ of habeas corpus compelling Respondent Board to hold a new hearing within 60 days and comport with due process, and establish that a denial based primarily on the commitment offense violates equal protection, in this case.

2.  Issue an Order to Show Cause compelling respondent Board to answer the claims set forth herein by Petitioner.

3.  Grant any other relief this Court may deem fair and just.

Dated;   January 17, 2006                          Respectfully Submitted,

                                                   *Eugene Alvin Reams*
                                                   EUGENE ALVIN REAMS

                                                   Petitioner in Pro Per

**EXHIBIT A**

# SUBSEQUENT PAROLE CONSIDERATION HEARING

## STATE OF CALIFORNIA

### BOARD OF PRISON TERMS

In the matter of the Life    )
Term Parole Consideration    )
Hearing of:                  )
                             )
EUGENE REAMS                 )
_____    )

CDC Number C-90508



COPY

INMATE

## CORRECTIONAL TRAINING FACILITY

### SOLEDAD, CALIFORNIA

#### MAY 13, 2005

#### 12:05 P.M.

PANEL PRESENT:

CAROL DALY, Presiding Commissioner
ROBERT HARMON, Deputy Commissioner

OTHERS PRESENT:

EUGENE REAMS, Inmate
MARY ANN TARDIFF, Attorney for Inmate
RICHARD SACHS, Deputy District Attorney
        Via Videoconference

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No          See Review of Hearing
_____    Yes         Transcript Memorandum

**Sandra Triplett**          **Capitol Electronic Reporting**

RECEIVED
JUN 1 4 2005
BY: CTF

ii

## INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 13 |
| Pre-Commitment Factors | 17 |
| Post-Commitment Factors | 29 |
| Parole Plans | 48 |
| Closing Statements | 67 |
| Recess | 70 |
| Decision | 71 |
| Adjournment | 78 |
| Transcriber Certification | 79 |

--oOo--

1

## P R O C E E D I N G S

1
2      **DEPUTY COMMISSIONER HARMON:**  On record.

3      **PRESIDING COMMISSIONER DALY:**  Okay, this is

4 a Subsequent Parole Consideration Hearing on

5 Eugene Reams, CDC number C-90508.  Date of the

6 hearing is 5/13 of '05, and it is 1205 hours.  We

7 are located at Correctional Training Facility at

8 Soledad.  Date received was August 8th of 1984.

9 Life term starts August 11th of 1989, out of the

10 County of San Diego, and the offense is kidnap for

11 robbery with use of a firearm.  Case number

12 CR66202.  Count number four, 209(b) and 12022.5.

13 And the terms are seven years to life with -- plus

14 10 years, four months.  Minimum Eligible Parole

15 Date is August 11th of 1996.  We have an additional

16 offense, robbery, 182/211 out of San Diego.  This

17 is the same case number, count number one.

18 Actually there are multiple offenses and victims

19 in this arrest and I'm going to show all of them

20 as being the same case number out of the County of

21 San Diego.  And so I'll just proceed from there.

22 Grand theft auto, 487.3, count number three.

23 Assault with a deadly weapon, 245(a) (2), count

24 number 11.  Use of a firearm, 12022.5, count

25 number 11 consecutive.  Robbery, 211, count number

26 15 consecutive.  Use of a firearm, 12022.5, count

27 number 15.  Grand theft auto, 10851 of the Vehicle

2

1    Code, count number two. Stayed offense of

2    robbery, 211, out of count number five. Grand

3    theft auto, stayed offense, Vehicle Code 10851,

4    count number six. And kidnap robbery, 209, which

5    was stayed, count number seven. Use of a firearm,

6    12022.5, count number seven. Robbery, stayed

7    offense, 211, count number eight. Grand theft

8    auto, 10851, count number nine was a stayed

9    offense. Attempt grand theft auto with use of a

10   firearm, 664/487 and 12022.5, counts number ten.

11   And assault with a firearm, 245(a)(2), count

12   number 12. Another stayed offense, use of a

13   firearm and assault with a firearm, 12022.5 and

14   245(a)(2), count numbers 12 and 13. And a stayed

15   offense, use of a firearm, 12022.5, count number

16   13. We have robbery, 211, count number 14, armed

17   with a firearm, 12022(a), count number 14. We

18   have robbery and armed with a firearm, 211 and

19   12022(a), counts 16 and 17. Robbery, 211, count

20   number 17. Use of a firearm on a robbery was a

21   stayed offense, 12022.5, 211, counts number 18.

22   Use of a firearm, a stayed count, 12022.5. It is

23   count number 19. Robbery, 211, count number 19.

24   Use of a firearm, 12022.5, count number 20. And

25   then we have a stayed offense, assault with a

26   firearm, two assaults with a firearm, counts

27   number 21 and 22, 245(a)(2), stayed offense,

3

1   assault with a firearm, count number 23.   That's a

2   245.   A stayed offense, assault with a firearm,

3   245(a)(2), counts number 24.   Assault with a

4   firearm, 245(a)(2), count number 25.   And assault

5   with a firearm, 245(a), count number 13.   It is

6   noted that all of these are the same case number

7   out of San Diego.   Stayed offense, assault with a

8   firearm, 245(a)(2), out of San Diego, count number

9   26.   Stayed offense, a burglary, 459 of the Penal

10  Code, count number 27.   Okay, now we have a new

11  case number out of San Diego.   Auto theft, 10851

12  out of San Diego.   Case number CR66967.   Count

13  number two.   Auto theft, 10851, same case number,

14  66967, count number 17 and auto theft, 10851, same

15  case number of 66967, count number 20.   Okay,

16  Mr. Reams, this hearing is going to be tape-

17  recorded.   And so for the purposes of voice

18  identification, we're going to go around the room

19  to my left.   Each person is going to state a name,

20  spell a last name.   And then after you have

21  spelled your last name, give your CDC number.

22  Okay.

23          INMATE REAMS:  Yes, Ma'am.

24          PRESIDING COMMISSIONER DALY:  And also, this

25  hearing is being conducted by videoconference

26  between Soledad State Prison and the San Diego

27  County District Attorney's Office, and it is being

4

1    done by videoconference, pursuant to Penal Code

2    Sections 3043.25.   The District Attorney is going

3    to appear by means of videoconferencing, which

4    means that his testimony and participation will be

5    by means of live audio and video transmission from

6    San Diego to our hearing room here at Soledad.

7    And simultaneously, the District Attorney in San

8    Diego will be receiving live audio and video

9    transmission from the facility here at Soledad.

10    And the hearing is going to be conducted as though

11    all parties are in the same room and following the

12    same rules and procedures that are followed at all

13    such Parole Consideration Hearings.   Now this

14    hearing is also being audio taped and the record

15    of the hearing will be a transcript of that

16    audiotape, pursuant to Penal Code Section 3042(b).

17    Okay.

18         **INMATE REAMS:**  Yes, Ma'am.

19         **PRESIDING COMMISSIONER DALY:**  Now we're

20    going to go around the room here and identify

21    everyone.   Carol Daly, D-A-L-Y, Commissioner,

22    Board of Prison Terms.

23         **DEPUTY COMMISSIONER HARMON:**   Robert Harmon,

24    H-A-R-M-O-N, Deputy Commissioner.

25         **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

26    T-A-R-D-I, double F, Attorney for Mr. Reams.

27         **INMATE REAMS:**  Eugene Reams, R-E-A-M-S,

5

1    Charlie 90508.

2        **PRESIDING COMMISSIONER DALY:**  Okay, and let

3    the record reflect we have two correctional peace

4    officers in the room for security purposes only

5    and we'll now go to San Diego.

6        **DEPUTY DISTRICT ATTORNEY SACHS:**  Yes, it's

7    Richard Sachs, S-A-C-H-S, Deputy District

8    Attorney, San Diego County.

9        **PRESIDING COMMISSIONER DALY:**  Okay,

10    Mr. Reams, in front of you is an ADA Statement on

11    the table.  Could you read that out loud into the

12    record, please?

13        **INMATE REAMS:**  The Americans with

14    Disabilities Act, ADA, is a law to help people

15    with disabilities.  Disabilities are problems that

16    make it harder for some people to see, hear,

17    breathe, talk, walk, learn, think, work or take

18    care of themselves than it is for others.  Nobody

19    can be kept out of the public places or activities

20    because of a disability.  If you have a

21    disability, you have a right to ask for help to

22    get ready for your BPT Hearing, get to the

23    hearing, talk, read forms and papers and

24    understand the hearing process.  BPT will look at

25    what you asked for to make sure that you have a

26    disability that is covered by the ADA, and that

27    you have asked for the right kind of help.  If you

6

1   do not get help or if you don't think you got the

2   kind of help you need, ask for a BPT Form 1074

3   Grievance Form.  You can also get help to fill it

4   out.

5           PRESIDING COMMISSIONER DALY:  Okay,

6   Mr. Reams, do you understand what the Americans

7   with Disabilities Act is all about?

8           INMATE REAMS:  Yes, Ma'am.

9           PRESIDING COMMISSIONER DALY:  Okay, and you

10   signed BPT Form 1073 on June 2nd of '04; almost a

11   year ago.  And that was a form asking you if you

12   had a disability as defined under ADA, and you

13   indicated that you did not have.  Is that a true

14   statement?

15           INMATE REAMS:  Yes, Ma'am.

16           PRESIDING COMMISSIONER DALY:  Okay, and

17   since June of '04 and the current date, has there

18   been any change in your medical status?

19           INMATE REAMS:  No, Ma'am.

20           PRESIDING COMMISSIONER DALY:  Okay, so let

21   me ask you some questions.  Do you have any

22   difficulties walking up and down stairs or for

23   distances of more than 100 yards?

24           INMATE REAMS:  No, Ma'am.

25           PRESIDING COMMISSIONER DALY:  And do you

26   wear glasses at all?

27           INMATE REAMS:  No, Ma'am.

7

1              PRESIDING COMMISSIONER DALY:  Okay, so you

2    were able to read today without your glasses.  Do

3    you have any hearing impairments?

4              INMATE REAMS:  No, Ma'am.

5              PRESIDING COMMISSIONER DALY:  Have you ever

6    been included in a Triple CMS or EOP Program since

7    you've been in prison?

8              INMATE REAMS:  No, Ma'am.

9              PRESIDING COMMISSIONER DALY:  And you know

10   what those programs are?

11             INMATE REAMS:  I am --

12             PRESIDING COMMISSIONER DALY:  They're the

13   Mental Health Programs.

14             INMATE REAMS:  Yes.

15             PRESIDING COMMISSIONER DALY:  All right, and

16   have you ever been prescribed any psychotropic

17   medication either in prison or on the streets?

18             INMATE REAMS:  No, Ma'am.

19             PRESIDING COMMISSIONER DALY:  Okay, and how

20   far did you get in school before coming to prison?

21             INMATE REAMS:  Graduated.

22             PRESIDING COMMISSIONER DALY:  And did you,

23   when you were going to school, did you have to

24   take any special education classes?

25             INMATE REAMS:  No, Ma'am.

26             PRESIDING COMMISSIONER DALY:  All right, and

27   sir, do you suffer from any disability that would

8

1    prevent you from going forward with this hearing

2    today?

3            **INMATE REAMS:**  No, Ma'am, I do not.

4            **PRESIDING COMMISSIONER DALY:**  Okay, this

5    hearing is being conducted pursuant to Penal Code

6    Sections 3041, 3042, and the rules and regulations

7    of the Board of Prison Terms governing Parole

8    Consideration Hearings for life inmates.  Now the

9    purpose of today's hearing is to once again

10   consider your suitability for parole.  In doing

11   so, we will consider the number and the nature of

12   the crimes that you were committed for.  We're

13   going to look at your prior criminal history, your

14   social history as well as your behavior and your

15   programming since your commitment to prison.  We

16   have had an opportunity to review your Central

17   File.  Your prior transcripts are available here.

18   I've just read a couple of them.  And you will be

19   given an opportunity to correct or clarify the

20   record.  Now we will consider your progress since

21   your last hearing, your psychological report and

22   any other information that has a bearing on your

23   suitability for parole.  And if there are any

24   change in parole plans, it needs to be brought to

25   our attention.  Now we will reach a decision today

26   and inform you whether we find you suitable for

27   parole or not and the reasons for our decision.

9

1    And if you are found suitable for parole, the

2    length of your confinement will be explained to

3    you.  Now before we recess for deliberations

4    today, the District Attorney, your attorney and

5    then you will be given an opportunity to make a

6    statement regarding your parole suitability.  Your

7    statement will be limited to why you feel you are

8    suitable for parole at this time.  The California

9    Code of Regulations or actually then after that,

10   then we're going to recess, clear the room and do

11   our deliberations.  And then once we have arrived

12   at a decision, we will resume the hearing and

13   announce that decision.  Now the California Code

14   of Regulations state that regardless of the amount

15   of time served, a life inmate shall be found

16   unsuitable for and denied parole if in the

17   judgment of the Panel, releasing the prisoner

18   would pose an unreasonable risk of danger to

19   society.  Now you have certain rights and those

20   rights include the right to a timely notice of

21   this hearing, the right to review your Central

22   File and the right to present relevant documents.

23   Counsel, do you feel your client's rights have

24   been met thus far regarding this hearing?

25           **ATTORNEY TARDIFF:**  I do.

26           **PRESIDING COMMISSIONER DALY:**  And you have

27   an additional right to be heard by an impartial

10

1    Panel.  Looking at the Panel seated before you

2    today, do you have any objection to either Member

3    of this Panel?

4          INMATE REAMS:  No, I do not.

5          PRESIDING COMMISSIONER DALY:  Okay, and

6    Counsel, do you have any objection?

7          ATTORNEY TARDIFF:  No, I don't.

8          PRESIDING COMMISSIONER DALY:  Now you will

9    receive a copy of our written tentative decision

10   today.  The decision becomes effective within 120

11   days.  During that 120 days, you will receive

12   another copy of the decision as well as a

13   transcript of this hearing.  Now as of May 1st,

14   2004, there are major changes in your former right

15   to appeal Board of Prison Terms' decisions

16   directly back to the Board.  The old Board

17   regulations have been repealed and the current

18   policy is entitled Administrative Appeals,

19   Correspondence and Grievances Concerning Board of

20   Prison Terms Decisions.  And you can find that

21   policy in the prison law library.  Now you are not

22   required to admit to your offense nor are you

23   required to discuss your offenses here today.

24   However, the Panel does accept as true the

25   findings of the court.  Do you understand what

26   that means?

27         INMATE REAMS:  Yes, Ma'am, I do.

11

1      **PRESIDING COMMISSIONER DALY:**  Okay, and do

2  we have any confidential material to be used here

3  today?

4      **DEPUTY COMMISSIONER HARMON:**  No, we don't.

5      **PRESIDING COMMISSIONER DALY:**  Okay, and I've

6  passed a hearing checklist and I've marked it

7  Exhibit Number One.  Counsel, do you have all

8  those documents?

9      **ATTORNEY TARDIFF:**  I do.

10      **PRESIDING COMMISSIONER DALY:**  And District

11  Attorney, do you have all those documents?

12      **DEPUTY DISTRICT ATTORNEY SACHS:**  Yes, I will

13  stipulate that I have all those documents,

14  Commissioner.

15      **PRESIDING COMMISSIONER DALY:**  Okay, and do

16  you have any additional documents to be submitted,

17  Counsel, other than the two letters that you've

18  already given me?

19      **ATTORNEY TARDIFF:**  No.

20      **PRESIDING COMMISSIONER DALY:**  And do you

21  have any preliminary objections?

22      **ATTORNEY TARDIFF:**  No.

23      **PRESIDING COMMISSIONER DALY:**  Okay, and is

24  Mr. Reams going to be speaking with us?

25      **ATTORNEY TARDIFF:**  Yes.

26      **PRESIDING COMMISSIONER DALY:**  Okay,

27  Mr. Reams, raise your right hand so I can swear

12

1  you in.  Do you solemnly swear or affirm testimony

2  you give at the hearing today will be the truth,

3  the whole truth and nothing but the truth?

4      INMATE REAMS:  Yes, I do.

5      PRESIDING COMMISSIONER DALY:  Okay,

6  Mr. Reams, I don't think -- I've read your Board

7  report.  You're familiar with your Board report?

8      INMATE REAMS:  Yes, Ma'am.

9      PRESIDING COMMISSIONER DALY:  And it spells

10 out all of the details of all of the crimes that

11 you were involved in.  But I don't think you've

12 ever really had a hearing where everybody went

13 through each crime, per se.  Did they?  Did they

14 just kind of incorporate them?

15     INMATE REAMS:  I've been -- I've been

16 through the crime extensively in numerous

17 hearings.  As to --

18     PRESIDING COMMISSIONER DALY:  Right.

19     INMATE REAMS:  -- who did what and when, I

20 have no idea.

21     PRESIDING COMMISSIONER DALY:  Yeah.

22     INMATE REAMS:  You have the records before

23 you, I'm sure you --

24     PRESIDING COMMISSIONER DALY:  I know.

25     INMATE REAMS:  -- can review that and --

26     PRESIDING COMMISSIONER DALY:  It is.  It is

27 before us.  So I just want to indicate for the

13

1    record, I'm going to talk about the initial crime.

2    And this occurred after midnight on November of

3    '83.   And an alarm company received a phone call

4    from someone identifying himself as John

5    Stevenson, who was an employee of Kelco Research

6    Company on Aero, A-E-R-O, Court in San Diego, to

7    report suspicious activity around the business and

8    to ask that someone from the alarm security check

9    the area.   And the personnel checked their files

10   and they could not identify a John Stevenson as an

11   employee, so as a consequence, no one from ADT was

12   sent to check on the business.   And then about

13   2:04 a.m., on the same date, police responded to

14   an attempted burglary at the Kelco Research

15   Company.   An alarm had been set off by a rock that

16   had been thrown through a glass door.   A nearby

17   window had also been kicked out.   Two ADT security

18   officers, Calvin Nixon and Allen Childs, also

19   responded.   They remained at the building to

20   maintain security because of the broken windows.

21   Nixon subsequently returned to his office to check

22   on an on-call guard who could be notified to

23   replace him and Childs.   Nixon then returned to

24   the Kelco building and about ten minutes after

25   returning to the business, Nixon observed a yellow

26   Porsche driving east on Aero Drive.   It slowed and

27   turned around at the next intersection and

14

1    returned to the site.  It stopped just beyond

2    Nixon's car and Eugene Reams got out of the

3    passenger side and pointed a gun at Nixon.  Nixon

4    recognized Reams as being an ex-ADT employee.

5    After Reams ordered Nixon to freeze, the driver of

6    the Porsche, Harold Taylor, got out, pointed a

7    shotgun at Nixon, chambered a round and ordered

8    him to turn around and raise his hands.  One of

9    these two men then removed Nixon's .38 revolver

10   from his holster and handcuffed him with his own

11   handcuffs before ordering him to lie face down on

12   the ground.  One of the robbers then went to

13   Nixon's ADT vehicle and got the keys from the

14   ignition.  The trunk was open and a box containing

15   a large number of keys was moved around.  Both men

16   picked up Nixon by the arms and walked him over to

17   his vehicle.  He was placed in the rear seat area

18   and ordered to lie down on the rear floorboard.

19   At least two people got in the front seat of the

20   vehicle and started driving away.  Nixon heard the

21   Porsche start up and follow them.  He recognized

22   the voice of Reams, who he said was in the front

23   seat.  Nixon was driven to the Industrial

24   Indemnity Corporation on Camino del Rio South,

25   where he was told to get out of the car.  Reams

26   and Taylor walked Nixon across a lawn to some gas

27   meters, where he was handcuffed to the meters with

15

1    another set of handcuffs.  The two returned to the

2    car and removed the box of keys from the trunk.

3    One of the two came back to gag Nixon with a sock

4    and told him he would be released in about three

5    hours.  Nixon subsequently un-cuffed himself with

6    a spare key and went for help.  Nixon was able to

7    identify Reams and provided a description of one

8    of the other two accomplices and he identified the

9    weapon with which Reams was armed as being either

10   a .38 caliber or a .357 magnum revolver.  Is that

11   what happened?

12         INMATE REAMS:  Yes, Ma'am.

13         PRESIDING COMMISSIONER DALY:  Okay, as can

14   be determined from all of the offenses that were

15   written down in the Board report dated June of

16   2002, all of these offenses are broken down with

17   the multiple crimes.  And all of these -- Many of

18   them involved handguns.  And not going into detail

19   a lot about it, what was the reason for this crime

20   spree?  I think Commissioner Moore said at your

21   last hearing this was a five day long crime spree,

22   19 victims, 14 of which were bound and gagged and

23   tied and some 27 total counts.  What was your

24   reason for going on this crime spree?

25         INMATE REAMS:  I've explained the reasons in

26   every hearing prior to this one.

27         PRESIDING COMMISSIONER DALY:  Okay, so do

16

1    you will -- do you just prefer not to talk about

2    it at this point?

3        INMATE REAMS:  If you have anything that's a

4    discrepancy or anything that's in question, I'd be

5    more than happy to clarify it for you.

6        PRESIDING COMMISSIONER DALY:  So my question

7    to you at this hearing is why did you commit all

8    these crimes?

9        INMATE REAMS:  My contention has always been

10   that my reasoning for committing the crimes has no

11   validity or no justification whatsoever.  And I've

12   explained the facts of the reason why the crimes

13   happened and I'm not sure why we're going into

14   this.

15       PRESIDING COMMISSIONER DALY:  Because this

16   is a new Parole Consideration Hearing with a new

17   Panel and I've read the record and I'm familiar

18   with it and I just wanted to see what your reasons

19   for and do you accept responsibility for all these

20   crimes?

21       INMATE REAMS:  I accept full responsibility.

22   None of my actions were justified whatsoever.

23       PRESIDING COMMISSIONER DALY:  Do you think

24   there was a lot of fear on the part of all these

25   women or these women.  I was looking at the Crisis

26   Center laudatory that you had.  On the part of all

27   these victims, that they thought maybe they might