# EXHIBIT 6
# Part 2 of 4

17

1   die.

2          INMATE REAMS:  I have no doubt that that's

3   probably what they thought.  They had no idea --

4          PRESIDING COMMISSIONER DALY:  Probably a

5   tremendous amount of fear.

6          INMATE REAMS:  -- how dangerous I was.  Yes.

7          PRESIDING COMMISSIONER DALY:  Okay, so

8   you've accepted full responsibility for all of

9   these crimes.

10         INMATE REAMS:  I've accepted full

11  responsibility for these crimes since the

12  probation report.

13         PRESIDING COMMISSIONER DALY:  I know.  Okay.

14         INMATE REAMS:  And in every hearing that's

15  been so far.  There's no -- There's no question as

16  to what my culpability was in any of these crimes.

17         PRESIDING COMMISSIONER DALY:  Okay, enough

18  said then.  Right?

19         INMATE REAMS:  Unless you have something

20  more you'd like to clarify.

21         PRESIDING COMMISSIONER DALY:  No, let's look

22  at your juvenile, your criminal record.  As a

23  juvenile, you had six Vehicle Code violations

24  between June of '81 and August of '83.  They were

25  all moving violations.  Three were for speeding.

26  And you had a misdemeanor conviction for carrying

27  a concealed weapon.  How old were you when you

18

1    started carrying a gun?

2         INMATE REAMS:  16.

3         PRESIDING COMMISSIONER DALY:  And why did

4    you start carrying a gun?

5         INMATE REAMS:  Because I was working for an

6    ADT security company.

7         PRESIDING COMMISSIONER DALY:  At 16?

8         INMATE REAMS:  Yes, Ma'am.

9         PRESIDING COMMISSIONER DALY:  And you were

10   armed?

11        INMATE REAMS:  Yes, Ma'am.

12        PRESIDING COMMISSIONER DALY:  Did you have

13   to qualify with it?

14        INMATE REAMS:  Yes, Ma'am.

15        PRESIDING COMMISSIONER DALY:  Okay, and so

16   you had a permit to carry it only while you were

17   working?

18        INMATE REAMS:  That's correct.

19        PRESIDING COMMISSIONER DALY:  And so what

20   gun did you use when you were committing these

21   crimes?

22        INMATE REAMS:  The same weapon.

23        PRESIDING COMMISSIONER DALY:  Okay, and were

24   you still an employee?

25        INMATE REAMS:  No, Ma'am.

26        PRESIDING COMMISSIONER DALY:  Okay, so you

27   kept the weapon.  Was it your own personal weapon?

19

1   **INMATE REAMS:**  It was my father's.

2   **PRESIDING COMMISSIONER DALY:**  Okay, and then

3 your criminal -- your adult criminal history is

4 the offenses that you're in prison for.

5   **INMATE REAMS:**  Yes, Ma'am.

6   **PRESIDING COMMISSIONER DALY:**  Okay, so they

7 all came lumped together.  Anything else that you

8 want to say about your criminal history?  Pretty

9 minor compared to everything that got you in here

10 in a lump together.

11   **INMATE REAMS:**  You mean the --

12   **PRESIDING COMMISSIONER DALY:**  Right.

13   **INMATE REAMS:**   -- juvenile record?

14   **PRESIDING COMMISSIONER DALY:**  Uh-hmm.

15   **INMATE REAMS:**  Yeah, there's -- there was no

16 juvenile record prior to the --

17   **PRESIDING COMMISSIONER DALY:**  Yeah.

18   **INMATE REAMS:**   -- prior to the commitment

19 other than the weapon offense.

20   **PRESIDING COMMISSIONER DALY:**  And your

21 speeding.

22   **INMATE REAMS:**  And the speeding.  Yes,

23 Ma'am.

24   **PRESIDING COMMISSIONER DALY:**  Okay.

25   **INMATE REAMS:**  I had a lead foot.

26   **PRESIDING COMMISSIONER DALY:**  Okay, your

27 social factors.  You were born in Florida; an only

20

1    child.

2         INMATE REAMS:  Yes, Ma'am.

3         PRESIDING COMMISSIONER DALY:  Said your

4    parents were barbers and you graduated from high

5    school at the age of 16.  So was it an accelerated

6    graduation?

7         INMATE REAMS:  Yes.

8         PRESIDING COMMISSIONER DALY:  Because of

9    your scholastics?

10        INMATE REAMS:  Yes.

11        PRESIDING COMMISSIONER DALY:  Okay, after

12   you finished high school, did you take any other

13   courses?

14        INMATE REAMS:  I went to Southwestern

15   College with the intention of getting an AA Degree

16   in criminal justice.

17        PRESIDING COMMISSIONER DALY:  Okay, and so

18   how much time did you put in there?

19        INMATE REAMS:  Three semesters.

20        PRESIDING COMMISSIONER DALY:  Okay, so why

21   didn't you finish out your schooling and be -- and

22   become an officer?

23        INMATE REAMS:  My parents ran out of --

24   Well, money became tight for my parents.  They

25   were funding me in going to college.

26        PRESIDING COMMISSIONER DALY:  Could you have

27   worked and paid your own way?

21

1    INMATE REAMS:  I was attempting to get a

2    job.  I was seeking a job since from employment --

3    Once the -- Once my parents informed me they could

4    no longer pay for me to go to college, I started

5    seeking employment.  And it was during the

6    recession of 1983, and I just could not find a

7    job.  I was 18 years old.  Even to work in a

8    convenience store, you had to be 19.  And I just

9    -- I finally did find a job part time working as

10   another security company in the north county.

11   PRESIDING COMMISSIONER DALY:  So you had

12   three semesters of criminal justice.

13   INMATE REAMS:  Yes, Ma'am.

14   PRESIDING COMMISSIONER DALY:  So did you

15   take enough classes to be familiar with the law

16   and to know what happens to people that violate

17   the law?

18   INMATE REAMS:  Yes, Ma'am, I sure did.

19   PRESIDING COMMISSIONER DALY:  You know it

20   just -- it's so astounding that you had that

21   background and then you chose to go this way,

22   because I have no doubt that you could have been a

23   very good officer.  So you quit school and when

24   your parents ran out of money.

25   INMATE REAMS:  I didn't quit.  I could no

26   longer continue to go.

27   PRESIDING COMMISSIONER DALY:  Okay.

22

1        INMATE REAMS:  It wasn't quitting.

2        PRESIDING COMMISSIONER DALY:  All right.

3        INMATE REAMS:  I mean you meant if I could

4   have --

5        PRESIDING COMMISSIONER DALY:  All right.

6        INMATE REAMS:  If I could have got a job

7   and --

8        PRESIDING COMMISSIONER DALY:  Okay.

9        INMATE REAMS:  -- had the funds, I would

10  have continued going, I'm just saying.

11       PRESIDING COMMISSIONER DALY:  Okay, you were

12  living at home until about a month before your

13  arrest and it says your father kicked you out of

14  the house because of disagreements.  What

15  happened?

16       INMATE REAMS:  After I worked for the ADT

17  Company, as I said before, the weapons belonged to

18  my father.  I took one of the weapons from him and

19  he discovered it, and that's what got me kicked

20  out of the house.

21       PRESIDING COMMISSIONER DALY:  Okay.

22       INMATE REAMS:  I had -- I had it in my

23  possession.  I had lost it and when he found about

24  it, he asked me what happened and I didn't tell

25  him that I had lost it, so he called the Sheriff's

26  Department to report the gun stolen and then due

27  to the -- due to the lack of trust that he felt

23

1   that he had with me, he kicked me out of the

2   house.

3        PRESIDING COMMISSIONER DALY:  So was that

4   the right thing to do?

5        INMATE REAMS:  Absolutely.

6        PRESIDING COMMISSIONER DALY:  Okay.

7        INMATE REAMS:  Well I don't know if it was

8   the absolutely right thing to do, but there was

9   some intervention that I needed at that point.

10       PRESIDING COMMISSIONER DALY:  Sure.

11       INMATE REAMS:  I don't know if it was being

12  kicked out of the house, but something needed to

13  be done.

14       PRESIDING COMMISSIONER DALY:  Do you

15  understand why he reported it stolen?

16       INMATE REAMS:  Oh, yes.

17       PRESIDING COMMISSIONER DALY:  Yeah.

18       INMATE REAMS:  Yes.

19       PRESIDING COMMISSIONER DALY:  Because he

20  didn't want to be responsible.

21       INMATE REAMS:  Right, right.

22       PRESIDING COMMISSIONER DALY:  Okay.

23       INMATE REAMS:  I don't blame him for that at

24  all.

25       PRESIDING COMMISSIONER DALY:  So what was

26  your relationship like with your parents?

27       INMATE REAMS:  It was very good up until

24

1   probably the last year.

2       PRESIDING COMMISSIONER DALY:  And that was

3   when you were misbehaving and committing crimes?

4       INMATE REAMS:  That's when.  Yeah.

5       PRESIDING COMMISSIONER DALY:  Okay.

6       INMATE REAMS:  It was very good up until

7   that point.

8       PRESIDING COMMISSIONER DALY:  It said that

9   you felt suicidal at one point.

10      INMATE REAMS:  At the point that the -- that

11  I realized how much trouble I was in.  Yeah.

12      PRESIDING COMMISSIONER DALY:  Okay, and so

13  how do you feel now?

14      INMATE REAMS:  How do I feel now?

15      PRESIDING COMMISSIONER DALY:  Uh-hmm.

16      INMATE REAMS:  Hopeful.  Hopeful as to have

17  a life.

18      PRESIDING COMMISSIONER DALY:  Okay, you were

19  not using alcohol or drugs?

20      INMATE REAMS:  No, Ma'am.

21      PRESIDING COMMISSIONER DALY:  You were sober

22  when you committed these crimes.

23      INMATE REAMS:  Absolutely.

24      PRESIDING COMMISSIONER DALY:  So you knew

25  what you were doing.

26      INMATE REAMS:  I knew exactly what I was

27  doing.

25

1          PRESIDING COMMISSIONER DALY:  Okay, you were

2   never married.

3          INMATE REAMS:  No, Ma'am.

4          PRESIDING COMMISSIONER DALY:  And you have

5   no children.

6          INMATE REAMS:  No, Ma'am.

7          PRESIDING COMMISSIONER DALY:  Who is your

8   social support on the outside?

9          INMATE REAMS:  My family.  I've got extended

10  family and I've got friends.

11         PRESIDING COMMISSIONER DALY:  Okay, and your

12  parents, are they still living?

13         INMATE REAMS:  Yes, both of them.  They're

14  separated.  My mom lives in LA and my dad lives in

15  Kansas.

16         PRESIDING COMMISSIONER DALY:  Okay, and you

17  have good support from them.

18         INMATE REAMS:  I have excellent support from

19  them.

20         PRESIDING COMMISSIONER DALY:  Okay, so you

21  talk to them on the phone and --

22         INMATE REAMS:  Talk to them.  They visit

23  whenever they can.

24         PRESIDING COMMISSIONER DALY:  Okay.

25         INMATE REAMS:  About two or three times a

26  year.

27         PRESIDING COMMISSIONER DALY:  Good.  So

26

1   what's changed on you?

2            INMATE REAMS:  Everything.

3            PRESIDING COMMISSIONER DALY:  So like what

4    do you mean by everything?

5            INMATE REAMS:  Everything has changed.

6    There's no -- The person that you're reading about

7    there no longer exists.  I'm a totally different

8    person.  The things that were important to me back

9    then are no longer important to me.  The maturity

10   that I've gained.  I'm no longer influenced by

11   other people.  I do what I believe is right.  I

12   try to do the right thing and I'm more than

13   willing to do without.

14           PRESIDING COMMISSIONER DALY:  So what and

15   that would --

16           INMATE REAMS:  Whatever my needs are.

17           PRESIDING COMMISSIONER DALY:  That would be

18   my question.  What would happen when you get out

19   and you see what everybody else has?

20           INMATE REAMS:  It doesn't -- It doesn't

21   affect me.  It's what I have, and I've got peace.

22           PRESIDING COMMISSIONER DALY:  Okay, so how

23   did you get that peace?

24           INMATE REAMS:  Maturity, I guess.  Maturity

25   and involving myself in helping other people and

26   realizing that life is about other people and not

27   about myself.

27

1    PRESIDING COMMISSIONER DALY:   Okay, you've

2    been very fortunate to have good family support.

3        INMATE REAMS:   I've been very fortunate.

4    There's a lot of people in here that do not have

5    any help whatsoever.

6        PRESIDING COMMISSIONER DALY:   That have no

7    one.   Right.

8        INMATE REAMS:   I'm very lucky.

9        PRESIDING COMMISSIONER DALY:   Okay, anything

10   else you want to say about your background, about

11   the commitment offense or anything?

12       INMATE REAMS:   The only thing I have to say

13   is that I am 100 percent sorry.

14       PRESIDING COMMISSIONER DALY:   Okay.

15       INMATE REAMS:   That any of this ever

16   happened.

17       PRESIDING COMMISSIONER DALY:   All right.

18   When you first came in, you were reluctant to say

19   whether or not you had any objection to this Panel

20   and I sensed a little bit of reluctance.   Do I

21   want to call it hostility?

22       INMATE REAMS:   No, no hostility.

23       PRESIDING COMMISSIONER DALY:   Okay.

24       INMATE REAMS:   But I was aware that you were

25   on the Panel that found one of my co-defendants

26   suitable for parole.   So I didn't -- I didn't know

27   how that would affect our relationship, but I'm

28

1    sure that you -- that it's not a factor.

2         PRESIDING COMMISSIONER DALY:  Okay, we do 21

3    hearings a week and you times that by four years.

4    I don't remember all of the hearings.

5         INMATE REAMS:  Oh, I didn't expect you to

6    remember.  I was just saying from my point of view

7    and looking at you, I could see that you'll do

8    what you believe is right.

9         PRESIDING COMMISSIONER DALY:  Okay, I -- and

10   the reason I was asking when you were so hesitant

11   to say whether or not you objected to me being on

12   the Panel, because I did sign off in denying your

13   appeal.  Do you remember?  Do you remember that?

14        INMATE REAMS:  No.

15        PRESIDING COMMISSIONER DALY:  And that was

16   back in August of '03, and I signed -- No, it was

17   I signed off in May of '02.  And those are routine

18   when they come, you know, to the Board of Prison

19   Terms and they're signed off.  I didn't remember

20   it until I just looked at it, because we sign off

21   on hundreds of them.

22        INMATE REAMS:  Yeah, yeah, I'm sure that --

23        PRESIDING COMMISSIONER DALY:  Okay, I just

24   wanted -- I just wanted to clarify and make sure

25   that you were comfortable and that there weren't

26   any issues.  Okay.

27        INMATE REAMS:  Yes, Ma'am.

29

1          PRESIDING COMMISSIONER DALY:  All right.
2  Commissioner Harmon.

3          DEPUTY COMMISSIONER HARMON:  Okay, thank
4  you.  Good afternoon, Mr. Reams.

5          INMATE REAMS:  Good afternoon, Mr. Harmon.

6          DEPUTY COMMISSIONER HARMON:  Listen very
7  carefully.  If the information I'm providing is
8  inaccurate, then we need to clear it up for the
9  record.  I'm going to start off by showing that or
10 stating that the last hearing was September 11th of
11 '03.  At that time you had a one year denial.  And
12 then after that on 12/6/04, your hearing was
13 postponed.  You were received at CTF February 23rd,
14 1993, from Corcoran State Prison.  Custody Level
15 today is Medium A with a revised Classification
16 Score of 19.  Does that all sound right to you?

17         INMATE REAMS:  Yeah, you mean received here
18 at Soledad or into the CDC system?

19         DEPUTY COMMISSIONER HARMON:  Soledad.

20         INMATE REAMS:  Okay, that's correct.

21         DEPUTY COMMISSIONER HARMON:  We're going to
22 -- We're going to focus on your counselor's
23 report.  We're going to look at the period of time
24 since your last hearing primarily.  And the
25 counselor writes here in part, from 6/03 to 6/04.
26 Says you remained at CTF in the general
27 population, Medium A Custody.  It says inmate

30

1    Reams took the test of Adult Basic Education on

2    8/5/96, resulting in a total score of 12.9, based

3    on a chrono.  It says you remain assigned as a

4    production coordinator in the computer repair

5    program until August 16th of '03.  And then in

6    parentheses, it says (due to a closure of the said

7    program.)  End of parentheses.  Receiving average

8    grades.  Then it says you were assigned to the

9    culinary as a dockworker on 9/6/03 to date.  Talks

10   about group activities.  A laudatory for AA

11   participation.  Also for your volunteer

12   participation in the 2003 Children's Holiday

13   Festival.  There was no psychiatric treatment and

14   no negative discipline.  And then they submitted

15   an update, an addendum here, and it shows that

16   from 6/15 of '04 to 4/11/05, you remained at CTF

17   in the general population, Medium A Custody.  You

18   continued to be assigned to the culinary back

19   dock.  There's no supervisor report available at

20   the time of the writing.  It says that you

21   completed the 13 week Impact Program Workshop

22   based on a chrono.  You continue to attend the

23   Twelve Step Program, based on a chrono.  And in

24   '04, you got recognition for your participation in

25   the Annual Children's Holiday Festival.  No

26   psychiatric treatment, no negative discipline.

27   And that's pretty much, it brings it up to date

31

1    other than the postponement was due to not having
2    a psychological evaluation report ready.  The
3    report on file at the time of your hearing.
4         INMATE REAMS:  That's correct.
5         DEPUTY COMMISSIONER HARMON:  So is that all
6    up to date?  Are you still doing the same job?
7    Are you still in the same assignment?
8         INMATE REAMS:  All correct.  Yes, Sir.
9         DEPUTY COMMISSIONER HARMON:  Okay.
10        PRESIDING COMMISSIONER DALY:  And that's
11   culinary on the dock?
12        INMATE REAMS:  Yes, Ma'am.
13        PRESIDING COMMISSIONER DALY:  Okay.
14        DEPUTY COMMISSIONER HARMON:  I went through
15   your file.  Needless to say, you've got hundreds
16   of pages.  What I've been able to decipher at this
17   point anyway is that in the area of vocational
18   programs, let's see.  You completed the vocational
19   information technologies program in 1996.  In
20   2004, you completed the vocational computer
21   refurbishing program.  You also received a
22   certificate of completion for business
23   applications in 1997, through the Valley Adult
24   School and a certificate of completion for
25   Business Principles and Management.  I noted at
26   one time in there you had worked as a teacher's
27   aide in vocational landscape, but I didn't see you

32

1    actually --

2        INMATE REAMS:  In vocational landscape?

3        DEPUTY COMMISSIONER HARMON:  Yeah, unless

4    maybe it's somebody else's.  That's what I was

5    going to ask you.  Is that somebody else's chrono?

6        INMATE REAMS:  It would have to be.  I've

7    never been in vocational landscaping.

8        DEPUTY COMMISSIONER HARMON:  Yeah, I didn't

9    see it in there, but there's a -- there is a

10   chrono in there talking about you as a teacher's

11   aide.  At least I think it's you and I'll double

12   check.  That's what I wanted to --

13       INMATE REAMS:  I was a teacher's aide while

14   I was in the computer class, which was the

15   information technologies.

16       DEPUTY COMMISSIONER HARMON:  Yeah.

17       INMATE REAMS:  After completing the course,

18   I became a teacher's aide in there.

19       DEPUTY COMMISSIONER HARMON:  Yeah, this

20   would be in '92.

21       INMATE REAMS:  No.  No, definitely not.

22   Definitely not.

23       DEPUTY COMMISSIONER HARMON:  Because of

24   these, besides all the vocational programs that

25   you've been involved in, you've done -- we've

26   talked about as kitchen work.  You've been in --

27   You've held various clerical positions and of

33

1    course, the vocational programs.  All indications

2    are is that you have a high school diploma and you

3    indicated that you have some college.  However, I

4    didn't find a copy of your college transcript in

5    there or a copy of your high school diploma.

6          INMATE REAMS:  I submitted a copy on

7    previous occasions, so if it's -- if it's not in

8    there, I --

9          DEPUTY COMMISSIONER HARMON:  Well did you do

10   an Olson Review?

11         INMATE REAMS:  Yes.

12         DEPUTY COMMISSIONER HARMON:  Did you -- Did

13   you see them in there?

14         INMATE REAMS:  No, I wasn't looking for that

15   document.

16         DEPUTY COMMISSIONER HARMON:  Okay, I

17   couldn't find it.  But then again, I could have

18   missed it, you know.

19         INMATE REAMS:  It's only three semesters

20   anyway.

21         DEPUTY COMMISSIONER HARMON:  Well that's,

22   you know that's --

23         INMATE REAMS:  And it was in 1983 or '82, I

24   mean, so --

25         DEPUTY COMMISSIONER HARMON:  That's fine.

26         INMATE REAMS:  Okay, I'm just --

27         DEPUTY COMMISSIONER HARMON:  It's better

34

1    than somebody with a high school diploma.

2         ATTORNEY TARDIFF:  But you need to make sure

3    that the documents are in your C-File.

4         DEPUTY COMMISSIONER HARMON:  Yeah.

5         ATTORNEY TARDIFF:  Because that's what they

6    look at.  If it's not in there and you submitted

7    it at a hearing, they can't put anything in your

8    C-File.

9         INMATE REAMS:  Okay, I understand.

10        DEPUTY COMMISSIONER HARMON:  Yeah, we don't

11   put anything in there or take it out.

12        INMATE REAMS:  Right.

13        DEPUTY COMMISSIONER HARMON:  Yeah.  So

14   anyway, you might want to -- you might want to

15   clear that up, but the other information seems to

16   be clear that there is definitely education -- an

17   education background.  Self-help group activities,

18   some of the programs that you've participated in

19   your incarceration period include, but not limited

20   to Life Skills in '94, American in '92.  From July

21   through September of '02, you were participating

22   in the Distance Learning Program.  In '97, with

23   Doctor Bakeman, you did some individual therapy.

24   You took an 18 hour program in '02, Creative

25   Conflict Resolution.  You were part of the Men's

26   Advisory Council in '01.  In 1997, you

27   participated in the Science of Mind Treatment and

35

1    Meditation.  That was an 11 week program.

2         INMATE REAMS:  Yes, it was.

3         DEPUTY COMMISSIONER HARMON:  And you also

4    took the various Hepatitis, STD's, TB educational

5    programs.  You did the Impact Program.  You've

6    watched the Destinos (phonetic) video, which I

7    guess you were trying to learn a second language.

8         INMATE REAMS:  I was just seeing what it --

9    what the program was about.

10         DEPUTY COMMISSIONER HARMON:  Did you ever

11    learn a second language?

12         INMATE REAMS:  The very beginning.  I mean

13    I never got any in-depth involvement in it.

14         DEPUTY COMMISSIONER HARMON:  Okay.  Now one

15    thing I -- Let's see, before I do that.  In '97,

16    you took a real estate principles course.

17         INMATE REAMS:  Yes.

18         DEPUTY COMMISSIONER HARMON:  And I noted

19    that also.  Is that something you did on your own?

20         INMATE REAMS:  Yes, they were offering all

21    different kinds of programs.  That's where I took

22    the business management also, at the same place.

23         DEPUTY COMMISSIONER HARMON:  Okay, now a

24    chrono that I found in there is back in '99, you

25    were recognized for your assistance in the

26    development for the curriculum for the Project

27    Change Program.  Is that right?

36

1          INMATE REAMS:  Yes.

2          DEPUTY COMMISSIONER HARMON:  Did you ever

3    take the program?

4          INMATE REAMS:  The Project Change?

5          DEPUTY COMMISSIONER HARMON:  Yeah.

6          INMATE REAMS:  No, we only -- I was only

7    able to support it.  It was the work that was

8    being done was being done out of the information

9    technologies area and then we were assisting with

10   any documents or anything they needed.

11         DEPUTY COMMISSIONER HARMON:  Why didn't you

12   take the program?  A lot of the guys here have

13   been bringing it forward.

14         INMATE REAMS:  I'm not sure.  When was it,

15   the program?

16         DEPUTY COMMISSIONER HARMON:  Well it says

17   that you assisted in the development of the

18   curriculum back in '99.  And I'm simply asking

19   you, did you participate in the program once it

20   was put together?  Because your fellow inmates in

21   here have come forward over the last week with

22   certificates of completion in that program.

23         INMATE REAMS:  Project Change?

24         DEPUTY COMMISSIONER HARMON:  Yeah.

25         INMATE REAMS:  I didn't -- I had no idea it

26   was running.  I know at one point.  Who was

27   running that program?  Do you know who runs that

37

1   program?

2           DEPUTY COMMISSIONER HARMON:  I asked you

3   first.  I don't know.

4           INMATE REAMS:  I'm not -- I'm not sure

5   either.

6           DEPUTY COMMISSIONER HARMON:  It's a 44 week

7   program and it's -- and the last I heard it was

8   offered in the Central Facility.

9           INMATE REAMS:  Didn't know it was available.

10          DEPUTY COMMISSIONER HARMON:  Are you in

11  Central?

12          INMATE REAMS:  Yes, Sir.

13          DEPUTY COMMISSIONER HARMON:  And you didn't

14  know?

15          ATTORNEY TARDIFF:  It's been available for

16  quite a while.

17          DEPUTY COMMISSIONER HARMON:  Yeah.

18          INMATE REAMS:  Project Change?

19          ATTORNEY TARDIFF:  Yeah.

20          INMATE REAMS:  That's new to me.

21          DEPUTY COMMISSIONER HARMON:  Okay.

22          INMATE REAMS:  Does the Friends Outside run

23  that?

24          ATTORNEY TARDIFF:  No, it's run here.

25          INMATE REAMS:  Okay, I'm unaware that it was

26  continuing.

27          DEPUTY COMMISSIONER HARMON:  Well you've got

1  -- you've received recognition for your efforts in

2  putting the program together, so.

3      **INMATE REAMS:**  I've received recognition

4  during that time for several projects that I

5  worked on.  That was just one of them.

6      **DEPUTY COMMISSIONER HARMON:**  Yeah, I guess

7  it was graphics in that or something, if I

8  remember reading it right.

9      **INMATE REAMS:**  Right.

10      **DEPUTY COMMISSIONER HARMON:**  I also noted

11  that, you know, the Annual Children's Holiday

12  Festival in one form or another for a number of

13  years.  You've received recognition for that and

14  also you did some volunteer work.  I guess you

15  were part of several guys that were cataloging

16  books for the Protestant Chapel.

17      **INMATE REAMS:**  Yes.

18      **DEPUTY COMMISSIONER HARMON:**  Do you remember

19  that?

20      **INMATE REAMS:**  That was another project I

21  worked on.

22      **DEPUTY COMMISSIONER HARMON:**  Right, I found

23  that in there.

24      **INMATE REAMS:**  They needed a library system

25  for a book checkout.

26      **DEPUTY COMMISSIONER HARMON:**  Okay, I think

27  I've got most of the self-help group programs.

39

1    Have I missed anything?

2            INMATE REAMS:  Not that I'm aware of.

3            DEPUTY COMMISSIONER HARMON:  And of course,

4    the laudatory chronos in AA and then you've been

5    participating in AA.  What is your background with

6    alcohol and drugs?

7            INMATE REAMS:  Non-existent.

8            DEPUTY COMMISSIONER HARMON:  That's what I

9    thought.  Well what is your -- what is your

10   purpose with the AA?

11           INMATE REAMS:  Self-help.

12           DEPUTY COMMISSIONER HARMON:  Okay, do you

13   know the Twelve Steps?

14           INMATE REAMS:  I know -- Yeah, pretty well.

15   I'm not -- I don't know if I know them by memory,

16   but I know a lot of the Steps.  Yes.

17           DEPUTY COMMISSIONER HARMON:  Okay, well I'm

18   not here to trick you.  What have you done in the

19   areas of the Eighth and Ninth Steps?

20           INMATE REAMS:  Eighth and Ninth.  You're

21   talking about the victims and the reconciliation

22   with the victims.  What I've done was the Impact

23   Program was probably the most that I've done with

24   the victims in hearing -- They have a story, the

25   victim comes in related to whatever crime that

26   they're doing that particular week.

27           DEPUTY COMMISSIONER HARMON:  Right.

40

1    INMATE REAMS:  Tells their story and that is

2    probably the most benefit that I've had concerning

3    the victims.

4    DEPUTY COMMISSIONER HARMON:  Well have you

5    been able to make amends in any way with any of

6    your victims?

7    INMATE REAMS:  I've not made direct amends

8    to them.  No.

9    DEPUTY COMMISSIONER HARMON:  Okay, what have

10   you done in the area of the Fourth Step?

11   INMATE REAMS:  I made a fearless and

12   searching moral inventory of myself.  I continue

13   to do that daily; every day.  That's a part of my

14   meditation process to review what's happened the

15   day before and to -- if you've done any -- if I've

16   done anything that I feel that's not right, to go

17   and make amends for it.  And that's a -- I do that

18   once a day and I do it once a week.  If anything

19   I've said to somebody that I felt was wrong, I'll

20   let them know.

21   DEPUTY COMMISSIONER HARMON:  Okay, you've

22   had two 115's.  You've had no 128's.  Now your

23   115's don't reflect violence or weapons, but each

24   in them self -- each by itself are significant in

25   the sense that the most recent, 12/9 of '97, was

26   for gambling, in parentheses, (bookmaking).  You

27   were found guilty.

41

1    INMATE REAMS:  Well they always attach

2   bookmaking to that charge.  Yeah.

3    DEPUTY COMMISSIONER HARMON:  Right, right, I

4   think it was the stuff that was found in the desk.

5   Wasn't it?

6    INMATE REAMS:  Yeah, that was my folder.  I

7   admitted to it as soon as they found it.

8    DEPUTY COMMISSIONER HARMON:  And then in

9   11/13/86, conspiracy to escape, falsification of

10   records or documents.

11    INMATE REAMS:  Conspiracy to escape out of

12   Tracy.  Yes.

13    PRESIDING COMMISSIONER DALY:  What date was

14   that?

15    DEPUTY COMMISSIONER HARMON:  That was in

16   1986.

17    PRESIDING COMMISSIONER DALY:  Okay.

18    DEPUTY COMMISSIONER HARMON:  Yeah, November.

19   I guess my question with this bookmaking, what's

20   the situation with that?  I mean do you want to

21   explain?

22    INMATE REAMS:  Well the situation with that

23   was I was -- I was participating in picking

24   football and who would win and they have a ticket

25   that was going around and that's the -- that's the

26   -- what I had in my folder.  And yeah, I was

27   participating in it and it was wrong and I've no

42

1    longer participated in it.

2            DEPUTY COMMISSIONER HARMON:  And the

3    conspiracy to escape?

4            INMATE REAMS:  The conspiracy to escape,

5    I've always said that I knew it was going on.  I

6    didn't have any direct involvement in it.  It was

7    -- It was behind a confidential informant was the

8    information that was based against me, but I

9    accept full responsibility in that I had knowledge

10   of what was going on and didn't say anything.

11           DEPUTY COMMISSIONER HARMON:  Okay, I think

12   we've covered all that pretty well.  I don't think

13   we've missed too much.  Let me ask you this.  Do

14   you believe you pose a risk to the people outside

15   of the prison walls today?

16           INMATE REAMS:  No, I do not.

17           DEPUTY COMMISSIONER HARMON:  So the follow

18   up question would be, what do you believe makes

19   you a different man today than the man that came

20   into prison?

21           INMATE REAMS:  The maturity would probably

22   be the best reason is the maturity level.  And

23   because with maturity comes an understanding of

24   the self and an understanding of what your goals

25   and what your desires are and without being

26   influenced by anybody else.  I make my decisions

27   based on my belief of what's wrong, right and

43

1   wrong, rather than what somebody else says is

2   right and wrong and then going with that, which is

3   what my failing grace was when I committed this

4   crime.  I had somebody that I ultimately

5   respected.  I thought he was a great man.  I

6   really did; and that's where I had him.  And

7   whatever he said, I thought was justified at that

8   time in my life.

9       **DEPUTY COMMISSIONER HARMON:**  Are you

10  speaking of Yellen?

11      **INMATE REAMS:**  Yes.

12      **DEPUTY COMMISSIONER HARMON:**  Sir, go ahead.

13  I'm just trying to keep the picture together here.

14      **INMATE REAMS:**  He essentially talked me into

15  it and made it -- and somehow made it right in my

16  mind that it was okay.  And with the way I looked

17  up to him and the way that I -- the way that I was

18  thinking and the way that I was raised and it just

19  -- it just fit and that's the path that I took

20  with him.  If I would have been my mind -- on my

21  own or by myself, this would have never happened.

22  I was not that kind of individual innately by

23  myself. But when I was mixed within a different

24  environment, I became what I thought he wanted.

25  That's what's changed.  I do what I believe is

26  right in my heart, regardless of -- regardless.

27  If it's right to me, if it's the right thing, if

44

1  it's good for everybody that's there, then that's

2  the right course of action to take.  And if it

3  isn't, I'm not going to do it.  I would rather not

4  do something than do something that's wrong.

5       DEPUTY COMMISSIONER HARMON:  Did you

6  complete a thought?  I don't want to interrupt

7  you.  Did you complete a thought?

8       INMATE REAMS:  Yes, Sir.  I was --

9       DEPUTY COMMISSIONER HARMON:  Because I'm

10  going to move --

11       INMATE REAMS:  Did I expound too much?

12       DEPUTY COMMISSIONER HARMON:  No, no.  I'm

13  going to move on to the Doctors' reports and when

14  you pause, I'm not quite sure if you're done or

15  thought or if you're thinking or what.

16       INMATE REAMS:  I apologize.

17       DEPUTY COMMISSIONER HARMON:  No, it's not --

18  No, no, no.  Okay, Doctors' reports.  November

19  '04, you have a report from Stack, Doctor Stack,

20  S-T-A-C-K, for the transcriber.  I'm going to take

21  just parts of that report and you're more than

22  welcome to add to that if you wish.  A lot of it

23  is repetitive.  I'm not going to go over that.

24  But it is the psychosocial assessment.  And Doctor

25  Stack, in the area of clinical assessment writes

26  here in part, during the November 19th, 2004,

27  psychological evaluation, inmate Reams was alert

1    and oriented in the four spheres.  His speech was

2    articulate and contextually meaningful.  He

3    presented as an individual with above average

4    intelligence.  There was no evidence of a thought

5    or a mood disorder and, in fact, he demonstrated

6    significant flexibility in his affect.  As during

7    the 2000 evaluation, he was able to discuss the

8    instant offenses with insight, empathy for the

9    victims and their families and what appeared to be

10   sincere remorse for his misdeeds.  He demonstrated

11   insight, appropriate judgment and his impulse

12   control appeared to be intact and appropriate.

13   Under current diagnostic impressions, under Axis

14   I, II, and III:  No Diagnosis.  Axis IV:

15   Incarceration.  Axis V:  A GAF of 90.  In the area

16   of assessment of dangerousness, the Doctor writes

17   in part, inmate Reams' violence potential within a

18   controlled setting is considered to be well below

19   average relative to this Level Two inmate

20   population and if released to the community, his

21   violence potential is estimated to be no greater

22   than that of the average citizen in the community.

23   Alcohol and/or drug abuse do not appear to be risk

24   factors.  Under clinical observations, comments or

25   recommendations, in part, this inmate does not

26   have a mental health disorder that would

27   necessitate treatment, either during his

1    incarceration period or following upon parole.

2    That is signed by Doctor Stack.  The report that

3    was completed prior to that was from R.S. Coates,

4    C-O-A-T-E-S, Clinical Psychologist. And that's for

5    the transcriber.  In Doctor Coates' report, under

6    the area of clinical assessment, she wrote --

7    Excuse me just a second.

8          **[Thereupon, the tape was turned over.]**

9          **DEPUTY COMMISSIONER HARMON:**  And we're going

10   to the clinical assessment on Doctor Coates'

11   report.

12         **INMATE REAMS:**  Okay.

13         **DEPUTY COMMISSIONER HARMON:**  Okay, and it

14   says in part here, current mental status and

15   treatment needs.  It says during the clinical

16   interview, inmate Reams was alert and oriented.

17   There was no evidence of a mood or a thought

18   disorder.  His insight, judgment and impulsivity

19   all appear to be intact and appropriate.  Under

20   current diagnostic impressions, under Axis I, II,

21   III:  No Diagnosis.  Axis IV [sic] at the time was

22   a GAF of 90.  Prior evaluations conducted on

23   inmate Reams suggested that he has Adult Anti

24   Social Behavior and Sociopathic Traits.  This

25   examiner has not found that to be the case at this

26   point in his incarceration.  Under assessment of

27   dangerousness, in part, Inmate Reams' violence

47

1    potential within a controlled setting is

2    considered to be well below average relative to

3    the Level Two inmate population, and if released

4    to the community, violence potential is estimated

5    to be no more than the average citizen in the

6    community.  There are no significant risk factors,

7    which could be precursors to violence for this

8    inmate.  Under clinical observations, comments and

9    recommendations, in part the Doctor writes, this

10   inmate does not have a mental health disorder

11   which would necessitate treatment either during

12   his incarceration period or following upon parole.

13   And that is signed by Doctor Coates.  Now what

14   I've done there, Mr. Reams, is I've taken parts of

15   your two most recent Doctors' reports and I've

16   taken parts of your counselor's report and I've

17   taken parts of your institutional adjustment.  Now

18   I may have inadvertently left out areas that are

19   very important to you.  I'm going to return to the

20   Chair here to discuss your parole plans.  But

21   before I do, is there anything that you wish to

22   add in any of those areas?

23           INMATE REAMS:  I feel you've covered it

24   fully.

25           DEPUTY COMMISSIONER HARMON:  Okay, thank

26   you.  I'll return to the Chair.

27           PRESIDING COMMISSIONER DALY:  Okay, what are

48

1    you going to do?  Where are you going to live?

2    What are your parole plans?

3            INMATE REAMS:  Parole plans are to parole to

4    Los Angeles.  My parents have a business there.

5            PRESIDING COMMISSIONER DALY:  Is that your

6    mother and stepfather?

7            INMATE REAMS:  That's my father and

8    stepmother.

9            PRESIDING COMMISSIONER DALY:  Your father

10   and stepmother.

11           INMATE REAMS:  That's correct.

12           PRESIDING COMMISSIONER DALY:  Okay, I

13   thought your father was living in Kansas.

14           INMATE REAMS:  They do.  They own two

15   businesses.  One there and one in Kansas.

16           PRESIDING COMMISSIONER DALY:  Okay, all

17   right.  And who are you going to live with?

18           INMATE REAMS:  I'm going to live with

19   myself.

20           PRESIDING COMMISSIONER DALY:  And where?

21           INMATE REAMS:  At the business.  The

22   business has a studio apartment there.

23           PRESIDING COMMISSIONER DALY:  A studio

24   apartment at the business.  Okay, let me look at

25   the letters here that you have.  Harmony Health on

26   Tweedy Boulevard, Southgate, California.  Is that

27   right?

49

1          INMATE REAMS:  That's correct.

2          PRESIDING COMMISSIONER DALY:  Eugene Alvin

3   Reams will be employed at the above address.  His

4   job will be an unarmed night watchman.  Job

5   description may include other duties.  Gene and

6   Leona Reams.  So I think he -- we just have two

7   letters; one for both of us, I believe.  Okay,

8   it's not totally specific, but it's owned by your

9   parents.

10          INMATE REAMS:  That's correct.

11          PRESIDING COMMISSIONER DALY:  So, Harmony

12   Health.  Tell me -- Tell me about this business.

13          INMATE REAMS:  I have a couple of -- It's a

14   vitamin business.  It's owned by my parents.  I

15   have a couple of pictures if you would like to see

16   them of the -- of the business in Kansas.  I was

17   unable to obtain the business in -- a picture of

18   the business in LA.

19          PRESIDING COMMISSIONER DALY:  So is it mail

20   order?

21          INMATE REAMS:  It's mail order and also they

22   have a store there where the people can come in

23   there.

24          PRESIDING COMMISSIONER DALY:  Walk in.

25          INMATE REAMS:  Yeah, walk in.

26          PRESIDING COMMISSIONER DALY:  With a

27   storefront.

50

1    INMATE REAMS:  I do have a picture of the --
2    of the inside of the one at Harmony Health at the
3    store.

4    PRESIDING COMMISSIONER DALY:  In Kansas?

5    INMATE REAMS:  No, the one in Los Angeles.

6    PRESIDING COMMISSIONER DALY:  Okay, in LA?

7    INMATE REAMS:  Yes, this is the one in Los
8    Angeles.

9    PRESIDING COMMISSIONER DALY:  Okay, all
10   right.  So it has a studio apartment and that's
11   where you're going to be staying and they're going
12   to be working for you.

13   INMATE REAMS:  I'll be working for them.

14   PRESIDING COMMISSIONER DALY:  I meant for
15   them.  It doesn't say what your salary is going to
16   be or anything.  Do you know?

17   INMATE REAMS:  No, I don't.

18   PRESIDING COMMISSIONER DALY:  Okay.

19   INMATE REAMS:  I'm sure -- I'm sure --

20   PRESIDING COMMISSIONER DALY:  Well at least
21   you'll have a roof over your head.

22   INMATE REAMS:  Well I believe last time that
23   I had a letter from them, it was like $8.00 an
24   hour.

25   PRESIDING COMMISSIONER DALY:  Okay, so
26   that's where you're going to live and that's where
27   you're going to work.  What do you -- Is there

51

1   anything that you think that you need on -- as

2   follows -- as far as follow up on self-help

3   programs or therapy or anything when you're

4   released?

5       INMATE REAMS:  I don't know if I need any

6   follow up, but I would like to involve myself in

7   the community in some way or form.  I would like

8   to donate some of my time, if I have any, to

9   whatever projects are available.  The thing that

10  immediately comes to concern is helping the

11  homeless, because I've got great experience in

12  culinary, so I can handle all facets of that.  I

13  mean if they need somebody, I'd be more than --

14  more than happy to donate some of my time to help

15  with that.

16      PRESIDING COMMISSIONER DALY:  Okay, anything

17  else about your parole plans then that I don't

18  have?

19      INMATE REAMS:  What letters do you have for

20  parole plans?  Do you have the one from my parents

21  for the --

22      PRESIDING COMMISSIONER DALY:  I don't.  Do

23  we have any letters in the file that didn't come

24  in since I got my packet ahead of time?  I have a

25  letter of opposition, but I don't have any other

26  letters of support.

27      INMATE REAMS:  I have three letters of