**EXHIBIT 6**
**Part 4 of 4**

for the
Eastern District of California
October 1, 2003

* * CERTIFICATE OF SERVICE * *

2:01-cv-02398

Yellen

v.

Butler

_____

, the undersigned, hereby certify that I am an employee in the Office of
he Clerk, U.S. District Court, Eastern District of California.

hat on  October 1, 2003, I SERVED a true and correct copy(ies) of
he attached, by placing said copy(ies) in a postage paid envelope
ddressed to the person(s) hereinafter listed, by depositing said
nvelope in the U.S. Mail, by placing said copy(ies) into an inter-office
elivery receptacle located in the Clerk's office, or, pursuant to prior
uthorization by counsel, via facsimile.

Mike Yellen                                  AS/MCE
C-90518
FSP
Folsom State Prison                          VC/GGH
P O Box 715071
Represa, CA  95671-5071

Beneth Anderson Browne
Attorney General's Office of the State of California
Department of Justice
300 South Spring Street
Fifth Floor
Los Angeles, CA  90013-1204

Jack L. Wagner, Clerk

BY: _____
Deputy Clerk

FILED

MAR 3 1 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ___ __ _ _____

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MIKE YELLEN,

   Petitioner,     No. CIV S-01-2398 MCE GGH P

  vs.

DIANE BUTLER, et al.,

   Respondents.    <u>ORDER</u>

_____/

  Petitioner, a state prisoner proceeding pro se, has filed this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

  On February 23, 2004, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within ten days. Both parties have filed objections to the findings and recommendations, and petitioner has filed a reply.

  In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-304, this court has conducted a <u>de novo</u> review of this case. Having carefully reviewed the entire file, the court finds the findings and recommendations to be supported by the record and by proper analysis.

1

1    Accordingly, IT IS HEREBY ORDERED that:

2        1. The findings and recommendations filed February 23, 2004, are adopted in

3    full; and

4        2. The judgment in this case is not stayed, and the stay entered February 4, 2004

5    is dissolved.

6    DATED: _____MAR 3 1 2004_____

7

8

9                              MORRISON C. ENGLAND JR.
                               UNITED STATES DISTRICT JUDGE

10   /yell2398.805

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Eastern District of California
March 31, 2004

## * * CERTIFICATE OF SERVICE * *

2:01-cv-02398

Yellen

v.

Butler

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on March 31, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

Mike Yellen
C-90518                                           AS/MCE
FSP
Folsom State Prison
P O Box 715071                                    VC/GGH
Represa, CA  95671-5071

Beneth Anderson Browne
Attorney General's Office of the State of California
Department of Justice
300 South Spring Street
Fifth Floor
Los Angeles, CA  90013-1204

Jack L. Wagner, Clerk

BY: _____
     Deputy Clerk

**FILED**

JUN - 9 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MIKE YELLEN,

      Petitioner,

    vs.

DIANE BUTLER, et al.,

      Respondents.

No. CIV S-01-2398 MCE GGH P

ORDER

    On June 7, 2004, petitioner filed a request to shorten time for hearing on his motion for immediate release. Good cause appearing, this request is granted.

    Accordingly, IT IS HEREBY ORDERED that petitioner's request to shorten time for hearing on his motion for immediate release is granted; respondent's response to petitioner's motion for immediate release is due on or before June 18, 2004; hearing regarding petitioner's motion is set before the undersigned on June 24, 2004, at 10:00 a.m.

DATED: June 8, 2004.

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

yel2398.ost

1

United States District Court
for the
Eastern District of California
June 9, 2004

* * CERTIFICATE OF SERVICE * *

2:01-cv-02398

Yellen

v.

Butler

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on June 9, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

Mike Yellen                                    VC/GGH
C-90518
FSP
Folsom State Prison
P O Box 715071
Represa, CA  95671-5071

Ann Catherine McClintock
Federal Defender
801 I Street
Third Floor
Sacramento, CA  95814

Beneth Anderson Browne
Attorney General's Office of the State of California
Department of Justice
300 South Spring Street
Fifth Floor
Los Angeles, CA  90013-1204

Jack L. Wagner, Clerk

by: Deputy Clerk

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**FILED**

AUG 2 0 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MIKE YELLEN,

          Petitioner,

    vs.

DIANE BUTLER, et al.,

          Respondents.

No. CIV S-01-2398 MCE GGH P

<u>ORDER AND</u>

<u>FINDINGS AND RECOMMENDATIONS</u>

I. <u>Introduction</u>

    Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges the 1999 decision of the Board of Prison Terms (BPT) finding him unsuitable for parole. Petitioner raises 12 claims. After carefully considering the record, the court recommends that the petition be granted on grounds that there was not sufficient evidence to support the 1999 decision. The court recommends that the petition be denied in all other respects.

II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

    The AEDPA applies to this petition for habeas corpus which was filed after the AEDPA became effective. <u>Neelley v. Nagle</u>, 138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus,"

28

1  establishing more deferential standards of review to be used by a federal habeas court in

2  assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

3  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

4          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

5  Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion

6  for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy

7  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

8  "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies

9  to two situations: (1) where the state court legal conclusion is opposite that of the Supreme

10  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

11  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

12          "Unreasonable application" of established law, on the other hand, applies to

13  mixed questions of law and fact, that is, the application of law to fact where there are no factually

14  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

15  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the

16  AEDPA standard of review which directs deference to be paid to state court decisions. While the

17  deference is not blindly automatic, "the most important point is that an *unreasonable* application

18  of federal law is different from an incorrect application of law....[A] federal habeas court may not

19  issue the writ simply because that court concludes in its independent judgment that the relevant

20  state-court decision applied clearly established federal law erroneously or incorrectly. Rather,

21  that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

22  1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the

23  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

24  authority. Woodford v. Viscotti, __U.S.__, 123 S. Ct. 357 (2002).

25          The state courts need not have cited to federal authority, or even have indicated

26  awareness of federal authority in arriving at their decision. Early v. Packer, __U.S.__, 123 S.

1  Ct.362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is

2  contrary to, or an unreasonable application of, established Supreme Court authority. Id. An

3  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

4  occurred. Lockyer v. Andrade, __ U.S. __, 123 S. Ct. 1166, 1175 (2003). Moreover, the

5  established Supreme Court authority reviewed must be a pronouncement on constitutional

6  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

7  binding only on federal courts. Early v. Packer, 123 S. Ct. at 366.

8          However, where the state courts have not addressed the constitutional issue in

9  dispute in any reasoned opinion, the federal court will independently review the record in

10  adjudication of that issue. "Independent review of the record is not de novo review of the

11  constitutional issue, but rather, the only method by which we can determine whether a silent state

12  court decision is objectively unreasonable." Himes v. Thompson, __ F.3d __, 2003 WL 21544120

13  (9th Cir. 2003).

14  III. Background

15          The opinion of the California Court of Appeal regarding the initial conviction

16  contains a factual summary of petitioner's offenses. The reporter's transcript has not been

17  submitted. However, because the factual background is not disputed, the court will adopt the

18  summary contained in the opinion of the state appellate court:

19          Appellants Michael Yellen [petitioner], Eugene Reams, and Harold Taylor
        [footnote omitted] were convicted of various crimes occurring during a November
20        1983 [footnote 2] crime spree, including conspiracy to rob Neiman Marcus,

21          [Footnote 2: All dates refer to 1983 unless otherwise specified.]

22          grand theft auto, kidnapping to commit robbery, robbery, assault with firearms,
        and burglary, with various findings of personally using and being armed with
23        firearms.

24          *****

25  \\\\\

26  \\\\\

3

## FACTS

At about 6 p.m. on November 5, 1983, Reams answered an advertisement placed by Michael Terzibachian to sell his Porsche. Terzibachian took Reams for a test drive. At a parking lot, Reams got into the driver side, locked Terzibachian out of the car, and drove away.

Sometime that same evening, Yellen showed Terzibachian's Porsche to Thomas Burtrum. Burtrum contacted Terzibachian at about 4 a.m. and told him where his car was. When Terzibachian recovered his car, one small item was broken and it had a dead battery.

At about 3 p.m. on November 18, 1983, Reams and Yellen went to a Porsche dealership, took a yellow Porsche with a black top for a test drive, with the salesman, Alan Silverman. At a freeway exit Yellen got into the driver's seat, locked Silverman out of the car, and drove away.

At about 2 a.m., November 19, 1983, Calvin Nixon, and Chairds, security guards for ADT Security, [Footnote 4] investigated a reported break-in at the Kelco

[Footnote 4: Reams, Taylor and Yellen were formerly employed by ADT.]

building. At about 3:30 a.m., Chairds was in the back of the building and Nixon was in the front, waiting for a back-up security guard, Harry Fournier. A yellow Porsche parked near Nixon's car, Reams got out of the car with a handgun and told Nixon to freeze, and Taylor got out with a shotgun, put a shell in the chamber, and told Nixon to turn around. They handcuffed Nixon, pushed him face down to the ground and took his flashlight and gun. Nixon heard the defendants open the trunk of his car, and tamper with a box containing two to three hundred keys to buildings for which ADT provided security. Nixon was placed face down in the back of his car, wedging his face between the back and front seats. Reams and Taylor got in his car and drove away, followed by the yellow Porsche. Fournier saw the two cars leaving.

Nixon was driven around recklessly for about 25 minutes. His car was driven fast, taking a lot of corners, causing Nixon to be bounced around. The car stopped in the parking lot of the Industrial Indemnity Building, about five to seven miles from the Kelco Building. [Footnote 5] The yellow Porsche was already there.

[Footnote 5: An investigator measured the route to take about 7 ½ to 11 minutes to drive.]

Nixon was handcuffed to a gas meter pipe. Nixon heard the men return to his car and remove the key box.

Nixon's keybag with credit cards and keys to the units belonging to ADT, which had been on the front seat, and the box of keys which had been in the trunk, were missing from Nixon's car. They keys in the keybox were to deactivate the alarm systems of ADT's clients. Although ADT had a contract with Neiman-Marcus, the keys to Neiman-Marcus were not included.

4

At about 9 p.m. on November 19, Reams and Taylor went to an auto dealership and took a blue van for a test drive, with the salesman, Mario Castenada, driving. Taylor took the wheel. Castenada, suspicious of the men, brought a pager to contact the dealership if there was trouble. When Taylor began driving, Reams took the pager. Castenada told Taylor to go back to the dealership because the van was low on gasoline. Taylor turned in the opposite direction. Reams pointed a gun at Castenada and ordered him to lie on the floor. Castenada saw a light colored Porsche with a black top following them. Reams, at gunpoint, got $20 from Castenada for gas. Later Reams asked Castenada for more money, and Castenada gave him the rest of his $180 to $190 and his diamond ring.

Castenada was left out on the center divider of Interstate 5, 6.1 miles from the dealership, after being with the men for a total of 20 to 30 minutes. [Footnote 6]

> [Footnote 6: An investigator estimated the route from the dealership to the drop-off point to take about 12 minutes and 45 seconds.]

He saw the Porsche pull in front of the van and saw both vehicles leave.

In the early morning hours of November 20, the police spotted and unsuccessfully pursued the yellow Porsche in a high-speed chase.

At about noon on November 20, Yellen and Taylor, driving the yellow Porsche with the black roof, went to Terzibachian's residence to see the Porsche he was again advertising for sale. They asked Terzibachian how the alarm system worked on the car. They were unable to test drive the car because the battery was dead.

At about 6 p.m. the same day, Yellen, Taylor and Reams returned to Terzibachian's residence, which was an apartment complex protected by a locked security gate. Yellen had called Terzibachian and told him he was back to see the car with his father, who would be paying for it. Rebecca Terzibachian, Michael Terzibachian's wife, went downstairs to the lobby area and heard them enter the complex. She followed them down the hallway until they saw her. She was suspicious, and told a neighbor, Joseph Deuer, to call the police. Deuer followed her out of the laundry room. By this time, Michael was also downstairs. He recognized Reams as the man who had stolen his car on November 5, and told the men he would not show them the car. As the men turned to leave, Michael said: "Wait a minute, I want to talk to you." The three men immediately pulled out guns and pointed them at Michael. Deuer, who was behind Michael, saw the guns pointed in his direction and stood still. Rebecca did not yet see the guns. Rebecca had her hands on the security gate. Yellen was beside her, and as he opened the gate she slipped and fell. Yellen pointed the gun at her head. Reams and Taylor were running sideways toward the security gate, looking back at Michael and Deuer, holding their guns out. Reams and Taylor never pointed their guns directly at Rebecca. All three men passed her, exiting through the doorway-size security gate. The men drove away in a yellow Porsche and an older American car.

At about 7:30 p.m. on the same day, the yellow Porsche was located on the second level parking lot in Fashion Valley shopping center. There were no keys in the ignition and the car was towed to the police station.

5

At about 7 a.m. on November 21, 1983, Taylor and Reams entered and robbed Neiman-Marcus and its employees at gunpoint. Taylor pointed a gun at Kelly Haliburton, assistant security manager at Neiman-Marcus.

The 13 employees present or arriving during the course of the robbery were brought in to the security office in the store, their eyes and mouths taped, their hands tied behind their backs, and made to kneel, sit, or lie down. One employee attempted to take the tape off her face, and was told by one of the appellants that he would shoot her if she did not "cool it." Personal property was taken from six employees.

The evening of the Neiman-Narcus heist, appellants rented a room in the Best Western Motel in San Ysidro, in Taylor's name. That evening, at the motel, Yellen, Reams, Taylor, and Taylor's girlfriend saw a television news broadcast, and heard the police were linking a K-Mart robbery and the Neiman-Marcus robbery together, which prompted Yellen to say they "had gotten away with it." Earlier, Yellen, who had been employed as a security guard at Neiman-Marcus but had not shown up for a few days, called a coworker, Albert Arena. Yellen told Arena he had heard about the robbery on the news. He told Arena he was at a motel, but would not say where. Arena told Yellen he might be in trouble and he should get an attorney.

Between 8:30 and 9 p.m. that same evening, two of the appellants parked the blue van in the parking lot of an apartment building about one-half mile from the Best Western Motel. The apartment manager told them to move the van, but they said they were visiting someone and would move it shortly. They did not enter the apartment complex, but walked toward the street. The next morning the van was still at the apartment building and the police impounded it. They found fingerprints belonging to Reams and Yellen.

The police found Castenada's page; Nixon's keys, gun, flashlight and credit cards; two Porsche keys; the van registration papers; guns, bullets and speed loaders; Neiman-Marcus' keys, large bag, power packs, fur jackets, handcuffs, walkie talkies, and $2,100 in the hotel room. At the police station, Castenada's diamond ring was found on Taylor.

Verdicts:

All three appellants were convicted as follows. Count 1: conspiring to rob Neiman-Marcus (Pen. Code, [footnote 7] § 182, subd. 1). The overt acts alleged

    [Footnote 7: All statutory references are to the Penal Code unless otherwise specified.]

in the conspiracy were stealing Silverman's Porsche, breaking in at Kelco Industries to lure ADT security personnel, kidnapping and robbing Nixon, stealing Castenada's van, posing as interested buyers of and attempting to steal Terzibachian's Porsche. Counts 4 and 7: kidnappings to rob Nixon and Castenada (§ 209). Counts 5 and 8: robbing Nixon and Castenada (§ 211). Counts 6 and 9: unlawfully taking Nixon's and Castenada's vehicles (Veh. Code, § 10851). Count 10: attempted grand theft auto (Terzibachian's car, § 487, subd. 3 and 664).

1    Counts 11, 12, and 13: assault with firearms on Michael and Rebecca
     Terzibachian and Joseph Deuer (§ 245, subd. (a)(2)).  Counts 20 through 26:
2    assaulting Neiman-Marcus employees ( 245, subd. (a)(2).)  Count 27:
     burglarizing Neiman-Marcus (§ 450).
3
     ...Reams and Yellen were convicted in count 3 of grand theft of Silverman's
4    Porsche (§ 487, subd. 3);...

5    Appellants were found to have personally used (§ 12022.5) and/or been armed
     with (§ 12022, subd. (a)) firearms during many of the crimes.
6
     <u>Sentence:</u>
7
     Appellants were sentenced to prison for concurrent life terms with the possibility
8    of parole on counts 4 and 7, the kidnaping to commit robbery.  [A]nd Yellen was
     given a one-year consecutive enhancement for being armed with a firearm on the
9    life term.  The life term and enhancement were ordered to run consecutive to the
     following determinate terms: All three were given three years plus a two-year
10   enhancement for personally using a firearm on count 11, the principal term (the
     assault with firearms on Michael Terzibachian).  All three were given one year on
11   count 1 (conspiracy to rob Neiman-Marcus).  Yellen and Reams were given 8
     months on count 3 (grand theft of Silverman's auto).  Yellen was given 1 year for
12   count 20 (assault on employee Tarin)....The total determinate terms for Yellen and
     Taylor were 7 years and 8 months...For the remaining counts, concurrent terms or
13   stayed sentences were imposed pursuant to section 654.

14   Respondent's Answer, Exhibit L, pp. 1-10.

15   IV. <u>Discussion</u>

16          A.  <u>Claims 1, 3, 6 and 9</u>

17          In claim 1, petitioner argues that pursuant to the regulations set forth in Cal. Code

18   Regs. Title 15, he met the criteria for release on parole.  In claim 3, petitioner argues that he has a

19   constitutional right to have the BPT consider all of the facts at his parole suitability hearing.  In

20   this claim, petitioner argues that he should have been found eligible for parole because he is no

21   longer a threat to society.  In claim 6 petitioner argues that he has a protected liberty interest in

22   parole as he has met all of the criteria for being granted parole.  In claim 9, petitioner argues that

23   the BPT had an unconstitutional basis for finding him unsuitable for parole.

24          In claims 1, 3, 6 and 9 petitioner is, in essence, arguing that there was not

25   sufficient evidence to find him unsuitable for parole.  California's parole scheme gives rise to a

26   cognizable liberty interest in release on parole.  <u>Biggs v. Terhune</u>, 334 F.3d 910, 914 (9th Cir.

1    2003). "In the parole context, the requirements of due process are met if 'some evidence'

2    supports the decision." Id.  The evidence underlying the board's decision must have some

3    indicia of reliability.  Id.

4              In Biggs, the Ninth Circuit indicated that a continued reliance on an unchanging

5    factor such as the circumstances of the offense could result in a due process violation.  Biggs was

6    serving a sentence of 25 years to life following a 1985 first degree murder conviction.  In the case

7    before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable

8    for parole despite his record as a model prisoner.  334 F.3d at 913.  While the Ninth Circuit

9    rejected several of the reasons given by the BPT for finding Biggs suitable, it upheld three: 1)

10   petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out

11   in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could

12   benefit from therapy.  334 F.3d at 913.

13             The Ninth Circuit cautioned the BPT regarding its continued reliance on the

14   gravity of the offense and petitioner's conduct prior to the offense:

15             As in the present instance, the parole board's sole supportable reliance on the
             gravity of the offense and conduct prior to imprisonment to justify denial of parole
16           can be initially justified as fulfilling the requirements set forth by state law.  Over
             time, however, should Biggs continue to demonstrate exemplary behavior and
17           evidence of rehabilitation, denying him a parole date simply because of the nature
             of his offense would raise serious questions involving his liberty interest.
18

19   334 F.3d at 916.

20             The Ninth Circuit stated that "[a] continued reliance in the future on an

21   unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

22   contrary to the rehabilitative goals espoused by the prison system and could result in a due

23   process violation."  334 F.3d at 917.

24             The court now considers whether there was some evidence to support the finding

25   of the 1999 panel that petitioner was not eligible for parole.  The relevant regulations provide as

26   follows.

8

1          Cal. Code Regs. tit. 15 § 2402 sets forth the criteria for determining whether an

2    inmate is suitable for release on parole. Circumstances tending to show unsuitability include, in

3    relevant part,

4          (1) Commitment Offense. The prisoner committed the offense in an especially
     heinous, atrocious or cruel manner. The factors to be considered include:

5          *****

6          (A) Multiple victims were attacked, injured, or killed in the same or separate
     incidents.

7

8          (E) The motive for the crime is inexplicable or very trivial in relation to the
     offense.

9    Cal. Code Regs. tit. 15 § 2402 (c)(1)(E).

10         Circumstances tending to indicate suitability for parole include:

11         (1) No Juvenile Record: The prisoner does not have a record of assaulting others
     as a juvenile or committing crimes with a potential of personal harm to the

12   victims.

13         (2) Stable Social History. The prisoner has experienced reasonably stable
     relationships with others.

14

15         (3) Signs of Remorse. The prisoner performed acts which tend to indicate the
     presence of remorse, such as attempting to repair the damage, seeking help for or

16   relieving suffering of the victim, or indicating that he understands the nature and
     magnitude of the offense.

17         (4) Motivation for the Crime. The prisoner committed his crime as the result of
     significant stress in his life, especially if the stress has built over a long period of

18   time.

19         (5) Battered Woman Syndrome...

20         (6) Lack of Criminal History. The prisoner lacks any significant history of violent
     crime.

21

22         (7) Age. The prisoner's present age reduces the probability of recidivism.

23         (8) Understanding and Plans for Future. The prisoner has made realistic plans for
     release or has developed marketable skills that can be put to use upon release.

24
           (9) Institutional Behavior. Institutional activities indicate an enhanced ability to
25   function within the law upon release.

26   Cal. Code Regs. tit. 15 § 2402(d).

1    In finding petitioner unsuitable for parole, the panel found as follows:

2    Mr. Yellen, the Panel has reviewed all the information received from the public
     and relied on the following circumstances in concluding that you are not yet
3    suitable for parole and would pose an unreasonable risk of danger to society and a
     threat to public safety if released from prison. First of all is the commitment
4    offense. It was carried out in an especially cruel and callous manner. Multiple
     victims were attacked in separate incidents, and the offense was carried out in a
5    dispassionate and calculated manner. And the motive for the crime was
     inexplicable or very trivial in relation to the offense. These conclusions are drawn
6    from the Statement of Facts wherein the prisoner and his crime partners really
     went on a robbery spree. There were some auto thefts and robberies and a couple,
7    in fact one security officer was kidnapped, and quite a few victims attacked in the
     crime spree. The prisoner had programmed very well while incarcerated. His
8    institutional behavior, I think, has been laudatory. He did have one 115 for
     participating in the work strike while at DVI that was reduced. The Hearing Panel
9    notes that responses to PC 3042 notices that were sent out indicated opposition of
     a finding of parole suitability by the District Attorney of the County of San Diego.
10   The Panel makes the following findings, that the prisoner needs therapy in order
     to face, discuss, understand and cope with stress in a nondestructive manner. And
11   until progress is made, the prisoner continues to be unpredictable and a threat to
     others. Therapy in a controlled setting is needed but motivation and amenability
12   are questionable. Nevertheless, the prisoner should be commended for his
     vocations, all your certificates, working hard, for your volunteer work in helping
13   other inmates get their GED, I think that's exemplary, for your laudatory chronos
     and your work habits. However, these positive aspects of his behavior do not yet
14   outweigh the factors of unsuitability. We're going to deny your parole for one
     year, twelve months, we're going to reduce you down to twelve months. In that
15   period of time, you need to stay disciplinary-free, as you know.

16   Petitioner: Yes, sir.

17   Presiding Commissioner Bordonaro: Get in any type of, I know that you're
     volunteering which is helping out, but it might help to get into some self-help and
18   therapy programming as you can to try to gain a little bit more insight, I think, as
     to what caused you to go on this crime. Like I said, I see two different people.
19   One is like a Dr. Jekyll and Mr. Hyde and you need to be able to kind of convey
     that to the Panel. And strengthen your parole plans in San Diego County. I know
20   it's not easy, you're doing the right thing. The Panel thinks you're coming around
     the corner but you've got a little bit more time to do. You're doing all the right
21   things. Continue on that path and stay clean and I do wish you the best of luck...

22   Respondent's Answer, Exhibit C, pp. 38-40.

23          In finding petitioner unsuitable for parole the BPT relied on the circumstances of

24   the commitment offense. In particular, the BPT emphasized that the motive for the crime was

25   inexplicable or very trivial in relation to the offense and that the crimes involved multiple

26   victims.

1          All other factors weighed in favor of finding petitioner suitable for parole.

2  Petitioner had no juvenile record and lacked any criminal history other than some vehicle code

3  violations. Id., p. 13. Petitioner had a classification score of zero. Id., p. 18. Petitioner was

4  virtually disciplinary free. Id., p. 18. Petitioner also had obtained substantial vocational training

5  since being imprisoned and completed his GED as well as participated in college programs. Id.,

6  pp. 19-20. Petitioner participated in the Straight Life Program and the Parole Recidivism

7  Program, volunteered as a tutor in the Literacy Program, and completed the Anger Management

8  Program. Id., p. 20. Petitioner had psychological reports stating that his violence potential upon

9  release was average or lower than average. Id., p. 23. At the hearing, petitioner expressed

10  remorse for his crimes. Id. at 36. A psychological report stated,

11          There is no evidence of psychopathology or mental or emotional problems of any
             kind that would preclude routine release planning in this case. There is no
12          evidence of emotional problems that would require further diagnosis or
             participation in psychotherapy. The prognosis of successful adjustment in this
13          case is very good.

14  Id., pp. 24-25.

15          In evaluating the instant claim, it is important to observe that petitioner was

16  required to serve his determinate term of 7 years and 8 months before commencing his life

17  sentence. Petitioner's life sentence began on August 24, 1988. Respondent's June 30, 2003,

18  further briefing, Exhibit A, p. 2. Therefore, at the time of the 1999 hearing at issue, petitioner

19  had served approximately 11 years of two concurrent terms of 7 years to life. The at-issue

20  hearing was his third parole suitability hearing. He has apparently had three additional hearings

21  since that time, at which he was again found unsuitable. See Petitioner's June 30, 2003, further

22  briefing. The court has no information regarding these other hearings.

23          While petitioner has not served as much of his life sentence as the Biggs

24  petitioner, they have been imprisoned for the same length of time. Petitioner is serving two

25  concurrent sentences of 7 years to life for a variety of serious offenses, which do not include

26  homicide. The Biggs petitioner is serving a sentence of 25 years to life for first degree murder.

1   Petitioner is challenging the results of his *third* parole suitability hearing. The <u>Biggs</u> petitioner

2   challenged the results of his first parole suitability hearing. <u>See</u> CIV S-00-1686 WBS GGH P,

3   findings and recommendations filed March 13, 2002, p. 1. In both cases, the BPT relied on

4   unchanging factors, i.e. the circumstances of the offenses, to find the petitioners unsuitable for

5   parole.

6          In <u>Biggs</u>, the Ninth Circuit stated that the BPT was "*initially* justified" in finding

7   Mr. Biggs unsuitable based on the circumstances of the offense and his conduct prior to

8   imprisonment. 334 F.3d at 916 (emphasis added). However, the Ninth Circuit was not specific

9   as to when reliance on the circumstances of the offense and conduct prior to imprisonment would

10   "run contrary to the rehabilitative goals espoused by the prison system" and result in a due

11   process violation. 334 F.3d at 917.

12          More important to the undersigned in assessing any due process violation is the

13   fact that continuous reliance on unchanging circumstances transforms an offense for which

14   California law provides eligibility for parole into a de facto life imprisonment without the

15   possibility of parole. The court asks rhetorically—what is it about the circumstances of

16   petitioner's crime or motivation which are going to change? The answer is nothing. The

17   circumstances of the crimes will always be what they were, and petitioner's motive for

18   committing them will always be trivial. Petitioner has no hope for ever obtaining parole except

19   perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious

20   or the motive was more than trivial. Given that *no one* seriously contends lack of seriousness or

21   lack of triviality at the present time, the potential for parole in this case is remote to the point of

22   non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote

23   possibility.[1]

24   _____

25        [1]To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after

26   fifteen or so years in the caldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison,

1    In the instant case, the BPT has apparently relied on these unchanging factors at

2    least three times, and probably more assuming petitioner's exemplary record has remained

3    unchanged, in finding petitioner unsuitable for parole. Petitioner has "continue[d] to

4    "demonstrate exemplary behavior and evidence of rehabilitation." 334 F.3d at 916. Under these

5    circumstances, the continued reliance on these factors at the 1999 hearing violated due process.

6    Finally, the one other reason given by the BPT for parole denial– the need for

7    more therapy such that petitioner can gain greater insight into his crimes, and until such time he

8    is a risk to society if released, is devoid of *any* medical or other evidence in support. The

9    conclusion appears to be simply one repeated often in order to add another factor to the non-

10   suitability conclusion. It is especially out of place here given that one Commissioner read into

11   the hearing record the medical evidence directly contradicting the finding:

12   > Let's go to the psychiatric report. This is the one prepared by Dr.
13   > Macomber and it's dated January 16th of 1999 and it's a number of
     > pages long. I want to begin by looking at page 2 where they give a
     > historical summary of the previous psychiatric diagnoses and then
14   > you can build a pattern. On April 29th of '92, you were seen at DVI
     > by Janice Thomas, Ph.D. a Psychologist. The diagnostic
15   > impression was, no mental disorder. You denied any involvement
     > with drugs or alcohol abuse. On 11/7/94, you were at DVI and
16   > were evaluated by Dr. Cotila....Your positive adjustment in the
     > institution was noted. You had a certificate in Welding, Drafting
17   > and a Machinist. Diagnostic impression was no mental disorder.
     > On October 16th of '96, you were seen at DVI by E.
18   > Nelson....Diagnostic impression was no mental disorder. Your
     > positive prison adjustment was noted, violence potential was seen
19   > as average or lower than average if released to parole. The doctor
     > under this particular evaluation, under his diagnostic impressions
20   > in the current medical status have it as; no mental disorder, with a
     > Global Assessment of Functioning of 95, which is quite high,
21   > which would indicate that you have an ability to relate to other
     > people in an acceptable manner. Under this assessment of
22   > dangerousness, the doctor, this particular doctor, uses a format
     > where he begins to look at some historical tendencies to either be a
23   > risk factor and he concludes after evaluating you that, this is about
     > the second line down under assessment of dangerousness: The only

24

25   this petitioner does not possess those attributes, the predictive ability of the circumstances of the
     crime is near zero. Indeed, as seen infra, the medical evidence demonstrates as well as anything
26   can, that no such attributes describe petitioner at the time of his 1999 parole eligibility hearing.

1   risk factors that I can identify in this case are that Mr. Yellen had a
father with alcohol abuse problems and there was a parental

2   separation before the age of 16." Then he talks about risk factors
that indicate a lower risk potential are that you had no juvenile

3   history of crime, no history of probation failure, no history of
mental disorder that would contribute to an antisocial personality

4   behavior.

5   "He has completed extensive vocational training and has good
adjustment while in the institution. All these factors would

6   indicate that he does not present a risk for re-offense in the future.
Assessment of dangerousness within the controlled setting is seen

7   as below average in comparison to other inmates. There are no
significant risk factors in this case. He does not have a history of

8   drug or alcohol abuse."

9   According to his doctor. Under observations, the statement is:

10   "There is no evidence of psychopathology or mental or emotional
problems of *any* kind *that would preclude routine release planning*

11   *in this case.* There is no evidence of emotional problems *that*
*would require further diagnosis or participation in psychotherapy.*

12   The prognosis of successful adjustment in this case is very good."

13   Answer, Exhibit C at 69-72 (emphasis added).

14   Clearly, a conclusion by lay BPT commissioners that petitioner has not yet achieved required

15   therapy for insight or other reasons is not reasonably sustainable, and a state court's conclusion to

16   the contrary is patently unreasonable.

17        Accordingly, the court finds that the denial of this claim by the California

18   Supreme Court was an unreasonable application of clearly established Supreme Court authority.

19   The court recommends that the petition be granted on this ground.

20        B. <u>Remaining Claims</u>

21        In claim 2, petitioner argues that he has a constitutional right to a non-biased BPT

22   hearing panel. Due process requires the state decision makers to be unbiased. See <u>Edward v.</u>

23   <u>Balisok</u>, 520 U.S. 641, 647, 117 S. Ct. 1584, 1588 (1997).

24        Petitioner argues that the panel members are inherently biased because they are

25   afraid that if they grant parole to any inmate they will lose their appointed positions on the BPT.

26   \\\\\

1    Other than conclusory speculation, this claim is unsupported.  Moreover, while petitioner has a

2    due process right to an unbiased panel, this does not equate to a right to a non-politically

3    appointed panel to determine his suitability.  A panel composed of members who are elected

4    rather than appointed may have the same job security interests as appointed members.

5         Petitioner cites the following statement by Presiding Commissioner Bordonaro as

6    an example of bias: "You know, one of the things that you should remember is that the Judge, the

7    last thing the Judge said when he sentenced you was, life.  And I see a lot of inmates that are

8    going to do life but I think you are not one of those.  I think you've got a light at the end of the

9    tunnel, you're doing the right job, just keep it up, okay?"  Answer, Exhibit C, p. 40.  This

10   statement does not demonstrate that the panel was biased against petitioner.  Rather, this was a

11   favorable statement regarding petitioner and indicated that the panel believed that petitioner

12   would be found suitable one day.  For the reasons discussed above, the court finds that

13   petitioner's claim that the panel was biased against him is without merit.

14        In claim 4, petitioner argues that the BPT has converted his sentence to life

15   without the possibility of parole by failing to find him suitable for parole.  In related claim 5, he

16   argues that the BPT violated Cal. Penal Code §§ 12 and 13.  Cal. Penal Code § 12 provides,

17   The several sections of this Code which declare certain crimes to be punishable as
     therein mentioned, devolve a duty upon the Court authorized to pass sentence, to

18   determine and impose the punishment imposed.

19   Cal. Penal Code § 13 provides,

20   Whenever in this Code the punishment for a crime is left undetermined between
     certain limits, the punishment to be inflicted in a particular case must be

21   determined by the Court authorized to pass sentence, within such limits as may be
     prescribed by this Code.

22

23        Petitioner argues that because the BPT has failed to grant him a parole date, his

24   sentence is undetermined.  Therefore, petitioner argues, jurisdiction to determine his sentence is

25   returned to the court.  Although the court would agree with petitioner from a due process

26   standpoint that his sentence has de facto been transformed into one without the possibility of

15

1  parole, a violation of due process is not what is at issue here. Rather, the question is whether

2  there was a de jure resentencing.

3      Petitioner's arguments regarding claims 4 and 5 are based on a misunderstanding

4  of state law, as found by the Superior Court:

> This claim is premised on old case law that arose under the Indeterminate
> Sentencing Law (ISL), that of In re Rodriguez (1975) 14 Cal.3d 639, 651-653, and
> People v. Wingo (1975) 14 Cal.3d 169, 183.
>
> Under the old ISL, most crimes carried indeterminate terms with life maximums.
> It was up to the correctional authorities, rather than the courts, to determine the
> appropriate punishment for each individual. Thus, it became necessary for the
> courts to step in and determine if the maximum punishment that the correctional
> authorities had determined an individual prisoner should face was so excessive as
> to be cruel and/or unusual punishment. In Rodriguez and Wingo, the California
> Supreme Court made such a determination. In so doing, the Court noted that if
> the correctional authorities failed to fix a primary term of punishment, that that
> term would be deemed to be the maximum punishment available under the law
> (which was life for most sentences), and that the courts should then decide
> whether that maximum is cruel and/or unusual. (In re Rodriguez (1975) 14 Cal.3d
> 639, 651-653, and People v. Wingo (1975) 14 Cal.3d 169, 183).
>
> Although California has adopted the Determinate Sentencing Law (DSL), since
> the time of Rodriguez and Wingo, many offenses carry what has since been
> referred to as an "indeterminate life sentence" (see People v. Yates (1983) 34
> Cal.3d 664, 646-647). At first, after the adoption of DSL, this was limited to a
> very few crimes, including noncapital murder. The Legislature, however, has
> since widened the number of crimes carrying such a term, including for recidivist
> behavior even when the current crime is not a serious crime (see e.g., Penal Code
> §§ 667(b)-(i), 1170.12 [the "Three Strikes" law]).
>
> Thus, "indeterminate life sentences" are now "back in vogue," with a great
> number of prisoners whose current offenses cross a wide range of offenses, from
> petty theft with a prior (when a "Three Striker") to noncapital murder. In each
> instance, however, the sentence remains subject to attack as being cruel and/or
> unusual, under the federal and state Constitutions, and indeed in many appellate
> cases in recent years, most particularly "Three Strikes" sentences, the courts have
> been determining whether individual sentences are cruel and/or unusual.
>
> Thus, the basic gist of Rodriguez and Wingo appear to remain good law, despite
> the change to a determine sentencing system. It appears, then, that petitioner is
> partially correct, that they apply. However, this Court can do nothing more than
> to (1) deem his maximum punishment as being that of the maximum of his
> sentence, life imprisonment, since the Board of Prison Terms has not fixed a
> maximum punishment at this time, and (2) find that for his crime, kidnap for
> robbery, that life is not cruel and/or unusual punishment.

\\\\\\

1    Petitioner misses the mark in his argument. He is under the mistaken impression
     that by failing to set a parole date, the BPT, at least insofar as this point in time,
2    has essentially set the "maximum" of his term at the <u>minimum</u> of his
     indeterminate life sentence. Not so. The "maximum" of his term is <u>life</u>. Thus, he
3    is <u>not</u> entitled to be released on parole, under the theory he is espousing. Rather,
     if the BPT is to be deemed to have essentially set his "maximum" at life, by not
4    yet setting a parole release date for him, this court need only undertake a
     determination of whether setting life as the maximum is cruel and/or unusual in
5    his case.

6    Answer, Exhibit E, pp. 1-3.

7        Based on the reasoning of the Superior Court, this court finds that petitioner's

8    claims that the BPT converted his sentence to a sentence of life without the possibility of parole

9    by failing to set a parole date and violated Cal. Penal Code §12 and § 13 are based on a

10   misunderstanding of state law. The Superior Court correctly found that no state law violation

11   occurred. Accordingly, these claims are without merit. <u>Middleton v. Cupp,</u> 768 F.2d 1083,

12   1085 (9th Cir. 1985); <u>Gutierrez v. Griggs,</u> 695 F.2d 1195, 1197 (9th Cir. 1983) (a writ of habeas

13   corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal

14   law binding on the state courts). As indicated by the Superior Court, petitioner's "real" claim is

15   whether a life sentence for kidnapping for robbery violates the Eighth Amendment. Claim 12 of

16   the instant petition raises this claim. Accordingly, the court will now consider that claim.

17       Petitioner was sentenced to two concurrent life terms for his convictions for

18   kidnap for robbery. "The Eighth Amendment, which prohibits cruel and unusual punishments,

19   contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" <u>Ewing v.</u>

20   <u>California,</u> __ U.S. __, 123 S. Ct. 1179, 1183 (2003). The court considers four principles of

21   proportionality review when evaluating an Eighth Amendment claim: the primacy of the

22   legislature, the variety of legitimate penological schemes, the nature of our federal system, and

23   the requirement that proportionality review be guided by objective factors that inform the final

24   one: "The Eighth Amendment does not require strict proportionality between crime and

25   sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the

26   \\\\\

1    crime." 123 S. Ct. at 1187, quoting Harmelin v. Michigan, 501 U.S. 957, 1001, 111 S. Ct. 2680

2    (1991) (Kennedy, J., concurring in part and concurring in judgment).

3              Applying these principles, the Supreme Court in Ewing upheld the sentence of a

4    defendant sentenced under the California Three Strikes Law. The petitioner was convicted of

5    felony grand theft with four prior burglary convictions and a robbery conviction. Id., at 1184.

6    He was sentenced to 25 years to life. Id. at 1185.

7              The Supreme Court noted that the felony grand theft offense was a serious

8    offense. Id., at 1189. In weighing the gravity of this offense, the Court considered Ewing's long

9    history of felony recidivism. Id., at 1190. Ewing's sentence was justified by California's public-

10   safety interest in incapacitating and deterring recidivist felons, and supported by his own long,

11   serious criminal record. Id., at 1190.

12              Ewing had been convicted of numerous misdemeanor and felony
               offenses, serving nine separate terms of incarceration, and
13             committed most of his crimes while on probation or parole. His
               prior "strikes" were serious felonies including robbery and three
14             residential burglaries. To be sure, Ewing's sentence is a long one.
               But it reflects a rational legislative judgment, entitled to deference,
15             that offenders who have committed serious or violent felonies and
               who continue to commit felonies must be incapacitated. The State
16             of California "was entitled to place upon [Ewing] the onus of one
               who is simply unable to bring his conduct within the social norms
17             prescribed by the criminal law of the State. Rummel, supra, at 284,
               100 S. Ct. 1133. Ewing's is not "the rare case in which a threshold
18             comparison of the crime committed and the sentence imposed
               leads to an inference of gross disproportionality."

19

20   Id., at 1190.

21              In the instant case, petitioner is serving two concurrent terms of 7 years to life

22   after being convicted of two counts of kidnap for robbery.[2] The reiterated, emphasized point

23   after Andrade, supra, (sentence of 50 years to life for a Three Strikes sentence upheld where

24   underlying crime was petty theft) is that the result of the state court decision must be even more

25   _____

26   [2] Petitioner must serve his determinate term of 7 years 8 months before commencing the
       life sentence.

18

1    incorrect than "clear error," in order to be subject to a granting of the writ of habeas corpus. As

2    the result in <u>Andrade</u> was not an unreasonable application of Supreme Court authority given the

3    facts there, petitioner cannot possibly prevail here. <u>See also</u> <u>Eckert v. Tansy</u>, 936 F.2d 444, 457-

4    450 (9th Cir. 1991) (two consecutive life sentences for kidnap for robbery convictions did not

5    violate Eighth Amendment). Accordingly, this claim is without merit.

6            In claim 7, petitioner argues that he has a liberty interest in not having his parole

7    hearing predetermined. Petitioner states that his 1999 hearing lasted approximately 40 minutes.

8    Petitioner contends that there is no way that the panel could have actually considered all relevant

9    facts, documents and reports within that time. Therefore, petitioner contends, the panel made

10   their decision prior to petitioner' parole hearing.

11           In denying this claim the Superior Court stated,

12           Petitioner, however, fails to recognize that the BPT panel members may have
             simply prepared for their hearings by reviewing the materials before the hearing
13           itself. This does not mean that the panel members had "predetermined" the case
             in an unconstitutional manner. Indeed, even courts prepare for hearings by
14           reviewing the materials before a hearing, and may even have reached a tentative
             conclusion. This, however, does not deny a prisoner due process. The final
15           decision has not been made until the hearing. Furthermore, the opposite would be
             more arguable than petitioner's argument, that the failure to come prepared to a
16           hearing such as a parole hearing might, in some case, deny due process.

17   Respondent's Answer, Exhibit E, p. 9.

18           Due process requires a review of all of the records pertinent to the parole

19   considerations to be relied upon by the Board. <u>Greenholtz v. Inmates of Nebraska</u>, 442 U.S. 1,

20   14-16, 99 S. Ct. 2100, 2108-07 (1979). After reviewing the record, the court does not find that

21   the BPT failed to review the pertinent records. The court agrees with the reasoning of the

22   Superior Court that the panel most likely reviewed the record prior to the hearing. The transcript

23   from the hearing indicates that the panel was familiar with petitioner's case. Petitioner's claim

24   that the panel's decision was predetermined as a result of their failure to consider the record is

25   without merit.

26   \\\\\

1    In claim 8, petitioner argues that the failure to find him suitable for parole violated

2    the Equal Protection Clause. Petitioner argues that other prisoners convicted of kidnaping and

3    more serious offenses who received life sentences have been released on parole. On June 2,

4    2003, the court granted petitioner's request to expand the record to include a list of prisoners who

5    were granted parole during several periods of time. Supplemental Exhibit A, February 12, 2003,

6    motion for discovery and to expand the record.

7    According to this document, in 2001 the BPT found 59 inmates suitable for parole

8    including 10 prisoners convicted of first degree murder, 28 prisoners convicted of second degree

9    murder and 13 prisoners convicted of kidnaping. In 2000, the BPT found 26 inmates suitable for

10   parole including 16 prisoners convicted of second degree murder and 9 prisoners convicted of

11   kidnaping. In 1999, the BPT found 13 inmates suitable for parole including 9 convicted of

12   second degree murder and 2 convicted of kidnaping.

13   On June 12, 2003, petitioner filed another motion to expand the record and for

14   reconsideration of the June 2, 2003, order. Petitioner moves to expand the record to include an

15   exhibit which the court previously found to be not authenticated. Petitioner's current Exhibit A

16   is his proposed authenticated version of his previous Exhibit A attached to his February 3, 2003

17   motion (docket #19), which the court found was not properly authenticated.[3] Petitioner has now

18   submitted the exhibit with a declaration of Barbara Fargo, Deputy Public Defender, who declares

19   that a Mr. Sessa, the Public Information Officer and Legislative Representative for the Board of

20   Prison Terms, provided her with the lists by e-mail, which copies are attached to her declaration.

21   Because there is no declaration by the person in the position to state that the data is what the

22   proponent claims, Mr. Sessa, petitioner's request is denied as to this exhibit. Fed. R. Evid. 901.

23   \\\\\

24

25        [3] On June 2, 2003, the court granted petitioner's request to expand the record to include

26   his *supplemental* exhibit A attached to the request, but denied his request to expand the record to
     include exhibit A.

1        Petitioner's Exhibit B attached to the instant motion is an updated version of his

2    previous Exhibit A, which was attached to his supplemental motion, filed February 12, 2003

3    (docket #20).  That exhibit was found to be relevant by order of June 2, 2003, but only

4    marginally so.  The current exhibit, by including inmates' names and parole suitability decisions

5    for the additional period from April 30, 2002 to September 30, 2002, does not render the exhibit

6    relevant.  No value judgment can be made based on an inmate's conviction and a parole

7    determination in a particular case.  Many factors go into the parole determination.  The basis for

8    the conviction is only one of many considerations.  Petitioner's request is denied as to this

9    exhibit.

10        Petitioner finally requests that the court reconsider its previous decision denying

11    discovery.  Petitioner has submitted a copy of Governor Davis' executive report on parole review

12    decisions which contains case-by-case analyses of parole review decisions in individual cases.

13    Exhibit C.  He has also included an indeterminate sentence parole release review in one case.

14    Exhibit D.  Petitioner's equal protection claim cannot be proved by comparison to other prisoners

15    in this manner.  For the same reasons given in response to petitioner's previous request for

16    discovery, his current request is denied.

17        Accordingly, the court now considers the merits of petitioner's Equal Protection

18    claim.  "The Constitution permits qualitative differences in meting out punishments and there is

19    no requirement that two persons convicted of the same offense receive identical sentences."

20    Williams v. Illinois, 399 U.S. 235, 243, 90 S. Ct. 2018, 2023 (1970).  Parole considerations

21    require only a rational relationship to legitimate state interests.  McGinnis v. Royster, 410 U.S.

22    263, 270, 93 S. Ct. 1055, 1059-60 (1973).

23        In order to prevail on this claim, petitioner must demonstrate that similarly

24    situated prisoners have been released on parole sooner than him.  See McQueary v. Blodgett, 924

25    F.2d 829, 835 (9th Cir. 1991).  In other words, petitioner must demonstrate that prisoners

26    convicted of two counts of kidnaping for robbery based on similar circumstances have been

1  released on parole.  Petitioner has not done this.  As stated in the June 2, 2003, order denying

2  petitioner's request for discovery regarding this claim, given the variety of parole suitability

3  criteria to be utilized for someone who is serving a non-murder life term, every decision

4  concerning parole suitability is necessarily performed on a case-by-case basis.[4]  No two prisoners

5  will have the same factors considered; indeed, in most cases some factors will be non-existent

6  and in others those same factors might be dispositively present.  While the evidence submitted by

7  petitioner indicates that prisoners convicted of kidnaping and murder have been released on

8  parole, petitioner has not demonstrated that other prisoners with records substantially similar to

9  his own have been granted parole.

10            An equal protection argument based on petitioner's race, ethnicity, sex, religion,

11  etc. may well be sustainable if a decision had been made on one of those prohibited criteria.

12  However, a decision on the merits of parole eligibility should be reviewed, if at all, under the due

13  process rubric, and not on a comparison of crimes and criminals.  No meaningful standards can

14  be developed, i.e., kidnaping is "better" than murder, petitioner's kidnaping was "worse" than

15  another, petitioner is "more rehabilitated" than another.  Rather, relief must be based on the facts

16  of petitioner's own case—was there "some evidence" to support the denial of parole?  The

17  undersigned has determined that there was not.  Nothing is gained by attempting impossibly

18  standardless comparisons in addition to that finding.  Accordingly, this claim is without merit.

19  \\\\\

---

21  [4]  Criteria include the severity of the offense and risk to society if the prisoner is released.
Factors in this equation would include review of a prisoner's psychological condition, or a
22  "failure to demonstrate evidence of substantial change for the better." Cal. Code Regs. tit. 15, §
2316.  In fixing a parole date, one would consider the extent of the victim's injury, psychological
23  harm caused, sophistication of the crime, etc. Cal. Code Regs. tit. 15, § 2317.  If murder lifers
are added to the discussion, the potential divergence in parole considerations is even more
24  striking.  In general, one is never found suitable for parole if his release would be deemed to pose
an unreasonable risk to society.  In determining suitability, the parole commissioners review "all
25  relevant, reliable information which includes social history, past and present mental state, past
criminal history, the base and other commitment offenses, past and present attitude towards the
26  crime, conditions of treatment and control if released, and any other information which bears on
the prisoner's suitability for release.  Cal. Code Regs. tit. 15, § 2402.

1    In claim 11, petitioner argues that he has a constitutional right to a non-biased fact

2  finder on appeal. Petitioner claims that the two BPT commissioners who responded to his

3  administrative appeal of the findings of the 1999 panel also participated in parole consideration

4  hearings and are under instructions not to give parole dates to prisoners.

5    In denying this claim the Superior Court stated,

6  > In any event, even if other commissioners, who did not decide his initial denial
7  > but do sit on initial panels at parole hearing, decided his appeal, petitioner fails to
>  show that this is improper in any way. In sitting on an appeal, a commissioner is
8  > sitting in a different capacity than the commissioner does at an initial parole
>  hearing, just as a superior court judge who sits on an appellate panel in the
9  > appellate department of the superior court may also hear cases at the superior
>  court level without involving any impropriety. Similarly, superior court judges
10 > may be specially assigned to sit on a case in the Court of Appeal, and still
>  continue to hear other cases in the capacity as a superior court judge. It is only
>  when the person sits on both the initial decision and the appeal in the same case
11 > that any issue of impropriety is raised.

12  Answer, Exhibit E, p. 11.

13    For the reasons stated by the Superior Court, this court finds this claim to be

14  without merit. Simply because the commissioners who denied petitioner's appeal also sit on

15  initial panels at parole hearings does not make them biased in considering petitioner's appeal.

16  Petitioner's claim that these commissioners are under instructions not to give parole dates is

17  speculative and unsupported. This claim is without merit.

18    In claim 10, petitioner argues that he did not receive a new parole hearing within

19  12 months, as ordered by the May 1999 panel. On June 20, 2003, the court ordered the parties to

20  inform the court whether petitioner had received a parole suitability hearing following the 1999

21  hearing. On June 30, 2003, petitioner and respondent filed responses to this order. According to

22  both parties, petitioner had another suitability hearing in November 2000.

23    The April 1999 decision finding petitioner unsuitable for parole became final on

24  May 12, 1999. Respondent's Answer, Exhibit C, p. 89. Therefore, the November 2000

25  suitability hearing occurred approximately six months late. However, petitioner has not

26  demonstrated that he suffered any prejudice as a result of this delay. Cf. Vargas v. U.S. Parole

1   Com'n, 865 F.2d 191, 194 (9th Cir. 1988) (due process violation occurs when delay in parole

2   revocation hearing is unreasonable and prejudicial). Accordingly, this claim is without merit.

3             For the reasons discussed above, the court finds that the denial of the claims

4   discussed in this section by the California Supreme Court was not an unreasonable application of

5   clearly established Supreme Court authority. Accordingly, these claims should be denied.

6             Accordingly, IT IS HEREBY ORDERED that petitioner's June 12, 2003, motion

7   for expansion of the record and reconsideration of the court's June 2, 2003, order is denied;

8             IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

9   habeas corpus be granted as to petitioner's due process claim that there was not sufficient

10   evidence to support the 1999 decision finding him unsuitable for parole; petitioner be given a

11   parole date within thirty days of adoption of these findings and recommendations, assuming his

12   record remains substantially unchanged from the time of the 1999 hearing; the petition be denied

13   in all other respects.

14             These findings and recommendations are submitted to the United States District

15   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty

16   days after being served with these findings and recommendations, any party may file written

17   objections with the court and serve a copy on all parties. Such a document should be captioned

18   "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

19   shall be served and filed within ten days after service of the objections. The parties are advised

20   that failure to file objections within the specified time may waive the right to appeal the District

21   Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22   DATED: August 20, 2003.

23

24

25                        GREGORY G. HOLLOWS
                          UNITED STATES MAGISTRATE JUDGE

26   yellen.157

## PROOF OF SERVICE BY MAIL

### (C.C.P. §§1013A, 2015.5)

F I L E D
Clerk of the Superior Court

FEB 1 5 2006

By: _____ Deputy

WRIT GRANTED/DENIED
DATE_____

**STATE OF CALIFORNIA** )
                    ) SS.
**COUNTY OF MONTEREY** )

I,    Eugene Alvin Reams                , am a resident of the State of California, County

of Monterey. I am over the age of 18 years and (I am)/am not    a party to the within action.

My    business/residence    address is P.O. Box 689, Soledad, California 93960-0689.

On    January 26              , 20 05      I served the foregoing:

Petition for Writ of Habeas Corpus

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with

postage fully prepaid in the United States mail at Soledad, California, addressed as follows:

Department of Justice
Office of the Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, CA. 92186-5266

There is regular delivery service by the U.S. Postal Service between the place of mailing

and the places so addressed.

I declare under the penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

Executed this    26th    day of      January         , 20 05     , at

Soledad, California.

/S/ Eugene Alvin Reams