# EXHIBIT 8
# Part 2 of 5

10

1    Panel.  Looking at the Panel seated before you

2    today, do you have any objection to either Member

3    of this Panel?

4             INMATE REAMS:  No, I do not.

5             PRESIDING COMMISSIONER DALY:  Okay, and

6    Counsel, do you have any objection?

7             ATTORNEY TARDIFF:  No, I don't.

8             PRESIDING COMMISSIONER DALY:  Now you will

9    receive a copy of our written tentative decision

10   today.  The decision becomes effective within 120

11   days.  During that 120 days, you will receive

12   another copy of the decision as well as a

13   transcript of this hearing.  Now as of May 1st,

14   2004, there are major changes in your former right

15   to appeal Board of Prison Terms' decisions

16   directly back to the Board.  The old Board

17   regulations have been repealed and the current

18   policy is entitled Administrative Appeals,

19   Correspondence and Grievances Concerning Board of

20   Prison Terms Decisions.  And you can find that

21   policy in the prison law library.  Now you are not

22   required to admit to your offense nor are you

23   required to discuss your offenses here today.

24   However, the Panel does accept as true the

25   findings of the court.  Do you understand what

26   that means?

27            INMATE REAMS:  Yes, Ma'am, I do.

11

1      **PRESIDING COMMISSIONER DALY:**  Okay, and do

2   we have any confidential material to be used here

3   today?

4      **DEPUTY COMMISSIONER HARMON:**  No, we don't.

5      **PRESIDING COMMISSIONER DALY:**  Okay, and I've

6   passed a hearing checklist and I've marked it

7   Exhibit Number One.  Counsel, do you have all

8   those documents?

9      **ATTORNEY TARDIFF:**  I do.

10      **PRESIDING COMMISSIONER DALY:**  And District

11   Attorney, do you have all those documents?

12      **DEPUTY DISTRICT ATTORNEY SACHS:**  Yes, I will

13   stipulate that I have all those documents,

14   Commissioner.

15      **PRESIDING COMMISSIONER DALY:**  Okay, and do

16   you have any additional documents to be submitted,

17   Counsel, other than the two letters that you've

18   already given me?

19      **ATTORNEY TARDIFF:**  No.

20      **PRESIDING COMMISSIONER DALY:**  And do you

21   have any preliminary objections?

22      **ATTORNEY TARDIFF:**  No.

23      **PRESIDING COMMISSIONER DALY:**  Okay, and is

24   Mr. Reams going to be speaking with us?

25      **ATTORNEY TARDIFF:**  Yes.

26      **PRESIDING COMMISSIONER DALY:**  Okay,

27   Mr. Reams, raise your right hand so I can swear

12

1    you in.  Do you solemnly swear or affirm testimony

2    you give at the hearing today will be the truth,

3    the whole truth and nothing but the truth?

4         INMATE REAMS:  Yes, I do.

5         PRESIDING COMMISSIONER DALY:  Okay,

6    Mr. Reams, I don't think -- I've read your Board

7    report.  You're familiar with your Board report?

8         INMATE REAMS:  Yes, Ma'am.

9         PRESIDING COMMISSIONER DALY:  And it spells

10   out all of the details of all of the crimes that

11   you were involved in.  But I don't think you've

12   ever really had a hearing where everybody went

13   through each crime, per se.  Did they?  Did they

14   just kind of incorporate them?

15        INMATE REAMS:  I've been -- I've been

16   through the crime extensively in numerous

17   hearings.  As to --

18        PRESIDING COMMISSIONER DALY:  Right.

19        INMATE REAMS:  -- who did what and when, I

20   have no idea.

21        PRESIDING COMMISSIONER DALY:  Yeah.

22        INMATE REAMS:  You have the records before

23   you, I'm sure you --

24        PRESIDING COMMISSIONER DALY:  I know.

25        INMATE REAMS:  -- can review that and --

26        PRESIDING COMMISSIONER DALY:  It is.  It is

27   before us.  So I just want to indicate for the

13

1   record, I'm going to talk about the initial crime.

2   And this occurred after midnight on November of

3   '83.  And an alarm company received a phone call

4   from someone identifying himself as John

5   Stevenson, who was an employee of Kelco Research

6   Company on Aero, A-E-R-O, Court in San Diego, to

7   report suspicious activity around the business and

8   to ask that someone from the alarm security check

9   the area.  And the personnel checked their files

10  and they could not identify a John Stevenson as an

11  employee, so as a consequence, no one from ADT was

12  sent to check on the business.  And then about

13  2:04 a.m., on the same date, police responded to

14  an attempted burglary at the Kelco Research

15  Company.  An alarm had been set off by a rock that

16  had been thrown through a glass door.  A nearby

17  window had also been kicked out.  Two ADT security

18  officers, Calvin Nixon and Allen Childs, also

19  responded.  They remained at the building to

20  maintain security because of the broken windows.

21  Nixon subsequently returned to his office to check

22  on an on-call guard who could be notified to

23  replace him and Childs.  Nixon then returned to

24  the Kelco building and about ten minutes after

25  returning to the business, Nixon observed a yellow

26  Porsche driving east on Aero Drive.  It slowed and

27  turned around at the next intersection and

14

1  returned to the site.  It stopped just beyond

2  Nixon's car and Eugene Reams got out of the

3  passenger side and pointed a gun at Nixon.  Nixon

4  recognized Reams as being an ex-ADT employee.

5  After Reams ordered Nixon to freeze, the driver of

6  the Porsche, Harold Taylor, got out, pointed a

7  shotgun at Nixon, chambered a round and ordered

8  him to turn around and raise his hands.  One of

9  these two men then removed Nixon's .38 revolver

10  from his holster and handcuffed him with his own

11  handcuffs before ordering him to lie face down on

12  the ground.  One of the robbers then went to

13  Nixon's ADT vehicle and got the keys from the

14  ignition.  The trunk was open and a box containing

15  a large number of keys was moved around.  Both men

16  picked up Nixon by the arms and walked him over to

17  his vehicle.  He was placed in the rear seat area

18  and ordered to lie down on the rear floorboard.

19  At least two people got in the front seat of the

20  vehicle and started driving away.  Nixon heard the

21  Porsche start up and follow them.  He recognized

22  the voice of Reams, who he said was in the front

23  seat.  Nixon was driven to the Industrial

24  Indemnity Corporation on Camino del Rio South,

25  where he was told to get out of the car.  Reams

26  and Taylor walked Nixon across a lawn to some gas

27  meters, where he was handcuffed to the meters with

1    another set of handcuffs.  The two returned to the
2    car and removed the box of keys from the trunk.
3    One of the two came back to gag Nixon with a sock
4    and told him he would be released in about three
5    hours.  Nixon subsequently un-cuffed himself with
6    a spare key and went for help.  Nixon was able to
7    identify Reams and provided a description of one
8    of the other two accomplices and he identified the
9    weapon with which Reams was armed as being either
10   a .38 caliber or a .357 magnum revolver.  Is that
11   what happened?
12        INMATE REAMS:  Yes, Ma'am.
13        PRESIDING COMMISSIONER DALY:  Okay, as can
14   be determined from all of the offenses that were
15   written down in the Board report dated June of
16   2002, all of these offenses are broken down with
17   the multiple crimes.  And all of these -- Many of
18   them involved handguns.  And not going into detail
19   a lot about it, what was the reason for this crime
20   spree?  I think Commissioner Moore said at your
21   last hearing this was a five day long crime spree,
22   19 victims, 14 of which were bound and gagged and
23   tied and some 27 total counts.  What was your
24   reason for going on this crime spree?
25        INMATE REAMS:  I've explained the reasons in
26   every hearing prior to this one.
27        PRESIDING COMMISSIONER DALY:  Okay, so do

16

1   you will -- do you just prefer not to talk about

2   it at this point?

3         INMATE REAMS:  If you have anything that's a

4   discrepancy or anything that's in question, I'd be

5   more than happy to clarify it for you.

6         PRESIDING COMMISSIONER DALY:  So my question

7   to you at this hearing is why did you commit all

8   these crimes?

9         INMATE REAMS:  My contention has always been

10  that my reasoning for committing the crimes has no

11  validity or no justification whatsoever.  And I've

12  explained the facts of the reason why the crimes

13  happened and I'm not sure why we're going into

14  this.

15        PRESIDING COMMISSIONER DALY:  Because this

16  is a new Parole Consideration Hearing with a new

17  Panel and I've read the record and I'm familiar

18  with it and I just wanted to see what your reasons

19  for and do you accept responsibility for all these

20  crimes?

21        INMATE REAMS:  I accept full responsibility.

22  None of my actions were justified whatsoever.

23        PRESIDING COMMISSIONER DALY:  Do you think

24  there was a lot of fear on the part of all these

25  women or these women.  I was looking at the Crisis

26  Center laudatory that you had.  On the part of all

27  these victims, that they thought maybe they might

17

1    die.

2          INMATE REAMS:   I have no doubt that that's

3    probably what they thought.   They had no idea --

4          PRESIDING COMMISSIONER DALY:   Probably a

5    tremendous amount of fear.

6          INMATE REAMS:   -- how dangerous I was.   Yes.

7          PRESIDING COMMISSIONER DALY:   Okay, so

8    you've accepted full responsibility for all of

9    these crimes.

10          INMATE REAMS:   I've accepted full

11    responsibility for these crimes since the

12    probation report.

13          PRESIDING COMMISSIONER DALY:   I know.   Okay.

14          INMATE REAMS:   And in every hearing that's

15    been so far.   There's no -- There's no question as

16    to what my culpability was in any of these crimes.

17          PRESIDING COMMISSIONER DALY:   Okay, enough

18    said then.   Right?

19          INMATE REAMS:   Unless you have something

20    more you'd like to clarify.

21          PRESIDING COMMISSIONER DALY:   No, let's look

22    at your juvenile, your criminal record.   As a

23    juvenile, you had six Vehicle Code violations

24    between June of '81 and August of '83.   They were

25    all moving violations.   Three were for speeding.

26    And you had a misdemeanor conviction for carrying

27    a concealed weapon.   How old were you when you

18

1    started carrying a gun?

2         INMATE REAMS:   16.

3         PRESIDING COMMISSIONER DALY:   And why did

4    you start carrying a gun?

5         INMATE REAMS:   Because I was working for an

6    ADT security company.

7         PRESIDING COMMISSIONER DALY:   At 16?

8         INMATE REAMS:   Yes, Ma'am.

9         PRESIDING COMMISSIONER DALY:   And you were

10   armed?

11        INMATE REAMS:   Yes, Ma'am.

12        PRESIDING COMMISSIONER DALY:   Did you have

13   to qualify with it?

14        INMATE REAMS:   Yes, Ma'am.

15        PRESIDING COMMISSIONER DALY:   Okay, and so

16   you had a permit to carry it only while you were

17   working?

18        INMATE REAMS:   That's correct.

19        PRESIDING COMMISSIONER DALY:   And so what

20   gun did you use when you were committing these

21   crimes?

22        INMATE REAMS:   The same weapon.

23        PRESIDING COMMISSIONER DALY:   Okay, and were

24   you still an employee?

25        INMATE REAMS:   No, Ma'am.

26        PRESIDING COMMISSIONER DALY:   Okay, so you

27   kept the weapon.  Was it your own personal weapon?

19

1          INMATE REAMS:  It was my father's.

2          PRESIDING COMMISSIONER DALY:  Okay, and then

3   your criminal -- your adult criminal history is

4   the offenses that you're in prison for.

5          INMATE REAMS:  Yes, Ma'am.

6          PRESIDING COMMISSIONER DALY:  Okay, so they

7   all came lumped together.  Anything else that you

8   want to say about your criminal history?  Pretty

9   minor compared to everything that got you in here

10  in a lump together.

11         INMATE REAMS:  You mean the --

12         PRESIDING COMMISSIONER DALY:  Right.

13         INMATE REAMS:  -- juvenile record?

14         PRESIDING COMMISSIONER DALY:  Uh-hmm.

15         INMATE REAMS:  Yeah, there's -- there was no

16  juvenile record prior to the --

17         PRESIDING COMMISSIONER DALY:  Yeah.

18         INMATE REAMS:  -- prior to the commitment

19  other than the weapon offense.

20         PRESIDING COMMISSIONER DALY:  And your

21  speeding.

22         INMATE REAMS:  And the speeding.  Yes,

23  Ma'am.

24         PRESIDING COMMISSIONER DALY:  Okay.

25         INMATE REAMS:  I had a lead foot.

26         PRESIDING COMMISSIONER DALY:  Okay, your

27  social factors.  You were born in Florida; an only

20

1    child.

2          INMATE REAMS:  Yes, Ma'am.

3          PRESIDING COMMISSIONER DALY:  Said your

4    parents were barbers and you graduated from high

5    school at the age of 16.  So was it an accelerated

6    graduation?

7          INMATE REAMS:  Yes.

8          PRESIDING COMMISSIONER DALY:  Because of

9    your scholastics?

10          INMATE REAMS:  Yes.

11          PRESIDING COMMISSIONER DALY:  Okay, after

12    you finished high school, did you take any other

13    courses?

14          INMATE REAMS:  I went to Southwestern

15    College with the intention of getting an AA Degree

16    in criminal justice.

17          PRESIDING COMMISSIONER DALY:  Okay, and so

18    how much time did you put in there?

19          INMATE REAMS:  Three semesters.

20          PRESIDING COMMISSIONER DALY:  Okay, so why

21    didn't you finish out your schooling and be -- and

22    become an officer?

23          INMATE REAMS:  My parents ran out of --

24    Well, money became tight for my parents.  They

25    were funding me in going to college.

26          PRESIDING COMMISSIONER DALY:  Could you have

27    worked and paid your own way?

21

1        INMATE REAMS:  I was attempting to get a

2    job.  I was seeking a job since from employment --

3    Once the -- Once my parents informed me they could

4    no longer pay for me to go to college, I started

5    seeking employment.  And it was during the

6    recession of 1983, and I just could not find a

7    job.  I was 18 years old.  Even to work in a

8    convenience store, you had to be 19.  And I just

9    -- I finally did find a job part time working as

10   another security company in the north county.

11        PRESIDING COMMISSIONER DALY:  So you had

12   three semesters of criminal justice.

13        INMATE REAMS:  Yes, Ma'am.

14        PRESIDING COMMISSIONER DALY:  So did you

15   take enough classes to be familiar with the law

16   and to know what happens to people that violate

17   the law?

18        INMATE REAMS:  Yes, Ma'am, I sure did.

19        PRESIDING COMMISSIONER DALY:  You know it

20   just -- it's so astounding that you had that

21   background and then you chose to go this way,

22   because I have no doubt that you could have been a

23   very good officer.  So you quit school and when

24   your parents ran out of money.

25        INMATE REAMS:  I didn't quit.  I could no

26   longer continue to go.

27        PRESIDING COMMISSIONER DALY:  Okay.

22

1       INMATE REAMS:  It wasn't quitting.

2       PRESIDING COMMISSIONER DALY:  All right.

3       INMATE REAMS:  I mean you meant if I could

4   have --

5       PRESIDING COMMISSIONER DALY:  All right.

6       INMATE REAMS:  If I could have got a job

7   and --

8       PRESIDING COMMISSIONER DALY:  Okay.

9       INMATE REAMS:  -- had the funds, I would

10  have continued going, I'm just saying.

11      PRESIDING COMMISSIONER DALY:  Okay, you were

12  living at home until about a month before your

13  arrest and it says your father kicked you out of

14  the house because of disagreements.  What

15  happened?

16      INMATE REAMS:  After I worked for the ADT

17  Company, as I said before, the weapons belonged to

18  my father.  I took one of the weapons from him and

19  he discovered it, and that's what got me kicked

20  out of the house.

21      PRESIDING COMMISSIONER DALY:  Okay.

22      INMATE REAMS:  I had -- I had it in my

23  possession.  I had lost it and when he found about

24  it, he asked me what happened and I didn't tell

25  him that I had lost it, so he called the Sheriff's

26  Department to report the gun stolen and then due

27  to the -- due to the lack of trust that he felt

23

1    that he had with me, he kicked me out of the

2    house.

3            PRESIDING COMMISSIONER DALY:  So was that

4    the right thing to do?

5            INMATE REAMS:  Absolutely.

6            PRESIDING COMMISSIONER DALY:  Okay.

7            INMATE REAMS:  Well I don't know if it was

8    the absolutely right thing to do, but there was

9    some intervention that I needed at that point.

10            PRESIDING COMMISSIONER DALY:  Sure.

11            INMATE REAMS:  I don't know if it was being

12    kicked out of the house, but something needed to

13    be done.

14            PRESIDING COMMISSIONER DALY:  Do you

15    understand why he reported it stolen?

16            INMATE REAMS:  Oh, yes.

17            PRESIDING COMMISSIONER DALY:  Yeah.

18            INMATE REAMS:  Yes.

19            PRESIDING COMMISSIONER DALY:  Because he

20    didn't want to be responsible.

21            INMATE REAMS:  Right, right.

22            PRESIDING COMMISSIONER DALY:  Okay.

23            INMATE REAMS:  I don't blame him for that at

24    all.

25            PRESIDING COMMISSIONER DALY:  So what was

26    your relationship like with your parents?

27            INMATE REAMS:  It was very good up until

24

1   probably the last year.

2          PRESIDING COMMISSIONER DALY:  And that was

3   when you were misbehaving and committing crimes?

4          INMATE REAMS:  That's when.  Yeah.

5          PRESIDING COMMISSIONER DALY:  Okay.

6          INMATE REAMS:  It was very good up until

7   that point.

8          PRESIDING COMMISSIONER DALY:  It said that

9   you felt suicidal at one point.

10          INMATE REAMS:  At the point that the -- that

11   I realized how much trouble I was in.  Yeah.

12          PRESIDING COMMISSIONER DALY:  Okay, and so

13   how do you feel now?

14          INMATE REAMS:  How do I feel now?

15          PRESIDING COMMISSIONER DALY:  Uh-hmm.

16          INMATE REAMS:  Hopeful.  Hopeful as to have

17   a life.

18          PRESIDING COMMISSIONER DALY:  Okay, you were

19   not using alcohol or drugs?

20          INMATE REAMS:  No, Ma'am.

21          PRESIDING COMMISSIONER DALY:  You were sober

22   when you committed these crimes.

23          INMATE REAMS:  Absolutely.

24          PRESIDING COMMISSIONER DALY:  So you knew

25   what you were doing.

26          INMATE REAMS:  I knew exactly what I was

27   doing.

25

1          PRESIDING COMMISSIONER DALY:  Okay, you were

2    never married.

3          INMATE REAMS:  No, Ma'am.

4          PRESIDING COMMISSIONER DALY:  And you have

5    no children.

6          INMATE REAMS:  No, Ma'am.

7          PRESIDING COMMISSIONER DALY:  Who is your

8    social support on the outside?

9          INMATE REAMS:  My family.  I've got extended

10   family and I've got friends.

11         PRESIDING COMMISSIONER DALY:  Okay, and your

12   parents, are they still living?

13         INMATE REAMS:  Yes, both of them.  They're

14   separated.  My mom lives in LA and my dad lives in

15   Kansas.

16         PRESIDING COMMISSIONER DALY:  Okay, and you

17   have good support from them.

18         INMATE REAMS:  I have excellent support from

19   them.

20         PRESIDING COMMISSIONER DALY:  Okay, so you

21   talk to them on the phone and --

22         INMATE REAMS:  Talk to them.  They visit

23   whenever they can.

24         PRESIDING COMMISSIONER DALY:  Okay.

25         INMATE REAMS:  About two or three times a

26   year.

27         PRESIDING COMMISSIONER DALY:  Good.  So

26

1    what's changed on you?

2         INMATE REAMS:  Everything.

3         PRESIDING COMMISSIONER DALY:  So like what

4    do you mean by everything?

5         INMATE REAMS:  Everything has changed.

6    There's no -- The person that you're reading about

7    there no longer exists.  I'm a totally different

8    person.  The things that were important to me back

9    then are no longer important to me.  The maturity

10   that I've gained.  I'm no longer influenced by

11   other people.  I do what I believe is right.  I

12   try to do the right thing and I'm more than

13   willing to do without.

14        PRESIDING COMMISSIONER DALY:  So what and

15   that would --

16        INMATE REAMS:  Whatever my needs are.

17        PRESIDING COMMISSIONER DALY:  That would be

18   my question.  What would happen when you get out

19   and you see what everybody else has?

20        INMATE REAMS:  It doesn't -- It doesn't

21   affect me.  It's what I have, and I've got peace.

22        PRESIDING COMMISSIONER DALY:  Okay, so how

23   did you get that peace?

24        INMATE REAMS:  Maturity, I guess.  Maturity

25   and involving myself in helping other people and

26   realizing that life is about other people and not

27   about myself.

27

1      PRESIDING COMMISSIONER DALY:  Okay, you've

2 been very fortunate to have good family support.

3     INMATE REAMS:  I've been very fortunate.

4 There's a lot of people in here that do not have

5 any help whatsoever.

6      PRESIDING COMMISSIONER DALY:  That have no

7 one.  Right.

8     INMATE REAMS:  I'm very lucky.

9      PRESIDING COMMISSIONER DALY:  Okay, anything

10 else you want to say about your background, about

11 the commitment offense or anything?

12     INMATE REAMS:  The only thing I have to say

13 is that I am 100 percent sorry.

14      PRESIDING COMMISSIONER DALY:  Okay.

15     INMATE REAMS:  That any of this ever

16 happened.

17      PRESIDING COMMISSIONER DALY:  All right.

18 When you first came in, you were reluctant to say

19 whether or not you had any objection to this Panel

20 and I sensed a little bit of reluctance.  Do I

21 want to call it hostility?

22     INMATE REAMS:  No, no hostility.

23      PRESIDING COMMISSIONER DALY:  Okay.

24     INMATE REAMS:  But I was aware that you were

25 on the Panel that found one of my co-defendants

26 suitable for parole.  So I didn't -- I didn't know

27 how that would affect our relationship, but I'm

28

1    sure that you -- that it's not a factor.

2        PRESIDING COMMISSIONER DALY:  Okay, we do 21

3    hearings a week and you times that by four years.

4    I don't remember all of the hearings.

5        INMATE REAMS:  Oh, I didn't expect you to

6    remember.  I was just saying from my point of view

7    and looking at you, I could see that you'll do

8    what you believe is right.

9        PRESIDING COMMISSIONER DALY:  Okay, I -- and

10   the reason I was asking when you were so hesitant

11   to say whether or not you objected to me being on

12   the Panel, because I did sign off in denying your

13   appeal.  Do you remember?  Do you remember that?

14       INMATE REAMS:  No.

15       PRESIDING COMMISSIONER DALY:  And that was

16   back in August of '03, and I signed -- No, it was

17   I signed off in May of '02.  And those are routine

18   when they come, you know, to the Board of Prison

19   Terms and they're signed off.  I didn't remember

20   it until I just looked at it, because we sign off

21   on hundreds of them.

22       INMATE REAMS:  Yeah, yeah, I'm sure that --

23       PRESIDING COMMISSIONER DALY:  Okay, I just

24   wanted -- I just wanted to clarify and make sure

25   that you were comfortable and that there weren't

26   any issues.  Okay.

27       INMATE REAMS:  Yes, Ma'am.

29

1          PRESIDING COMMISSIONER DALY:  All right.
2     Commissioner Harmon.

3          DEPUTY COMMISSIONER HARMON:  Okay, thank
4     you.  Good afternoon, Mr. Reams.

5          INMATE REAMS:  Good afternoon, Mr. Harmon.

6          DEPUTY COMMISSIONER HARMON:  Listen very
7     carefully.  If the information I'm providing is
8     inaccurate, then we need to clear it up for the
9     record.  I'm going to start off by showing that or
10    stating that the last hearing was September 11th of
11    '03.  At that time you had a one year denial.  And
12    then after that on 12/6/04, your hearing was
13    postponed.  You were received at CTF February 23rd,
14    1993, from Corcoran State Prison.  Custody Level
15    today is Medium A with a revised Classification
16    Score of 19.  Does that all sound right to you?

17         INMATE REAMS:  Yeah, you mean received here
18    at Soledad or into the CDC system?

19         DEPUTY COMMISSIONER HARMON:  Soledad.

20         INMATE REAMS:  Okay, that's correct.

21         DEPUTY COMMISSIONER HARMON:  We're going to
22    -- We're going to focus on your counselor's
23    report.  We're going to look at the period of time
24    since your last hearing primarily.  And the
25    counselor writes here in part, from 6/03 to 6/04.
26    Says you remained at CTF in the general
27    population, Medium A Custody.  It says inmate

30

1    Reams took the test of Adult Basic Education on
2    8/5/96, resulting in a total score of 12.9, based
3    on a chrono. It says you remain assigned as a
4    production coordinator in the computer repair
5    program until August 16th of '03. And then in
6    parentheses, it says (due to a closure of the said
7    program.) End of parentheses. Receiving average
8    grades. Then it says you were assigned to the
9    culinary as a dockworker on 9/6/03 to date. Talks
10   about group activities. A laudatory for AA
11   participation. Also for your volunteer
12   participation in the 2003 Children's Holiday
13   Festival. There was no psychiatric treatment and
14   no negative discipline. And then they submitted
15   an update, an addendum here, and it shows that
16   from 6/15 of '04 to 4/11/05, you remained at CTF
17   in the general population, Medium A Custody. You
18   continued to be assigned to the culinary back
19   dock. There's no supervisor report available at
20   the time of the writing. It says that you
21   completed the 13 week Impact Program Workshop
22   based on a chrono. You continue to attend the
23   Twelve Step Program, based on a chrono. And in
24   '04, you got recognition for your participation in
25   the Annual Children's Holiday Festival. No
26   psychiatric treatment, no negative discipline.
27   And that's pretty much, it brings it up to date

31

1   other than the postponement was due to not having

2   a psychological evaluation report ready.  The

3   report on file at the time of your hearing.

4          INMATE REAMS:  That's correct.

5          DEPUTY COMMISSIONER HARMON:  So is that all

6   up to date?  Are you still doing the same job?

7   Are you still in the same assignment?

8          INMATE REAMS:  All correct.  Yes, Sir.

9          DEPUTY COMMISSIONER HARMON:  Okay.

10          PRESIDING COMMISSIONER DALY:  And that's

11   culinary on the dock?

12          INMATE REAMS:  Yes, Ma'am.

13          PRESIDING COMMISSIONER DALY:  Okay.

14          DEPUTY COMMISSIONER HARMON:  I went through

15   your file.  Needless to say, you've got hundreds

16   of pages.  What I've been able to decipher at this

17   point anyway is that in the area of vocational

18   programs, let's see.  You completed the vocational

19   information technologies program in 1996.  In

20   2004, you completed the vocational computer

21   refurbishing program.  You also received a

22   certificate of completion for business

23   applications in 1997, through the Valley Adult

24   School and a certificate of completion for

25   Business Principles and Management.  I noted at

26   one time in there you had worked as a teacher's

27   aide in vocational landscape, but I didn't see you

32

1   actually --

2           INMATE REAMS:   In vocational landscape?

3           DEPUTY COMMISSIONER HARMON:   Yeah, unless

4   maybe it's somebody else's.   That's what I was

5   going to ask you.   Is that somebody else's chrono?

6           INMATE REAMS:   It would have to be.   I've

7   never been in vocational landscaping.

8           DEPUTY COMMISSIONER HARMON:   Yeah, I didn't

9   see it in there, but there's a -- there is a

10  chrono in there talking about you as a teacher's

11  aide.   At least I think it's you and I'll double

12  check.   That's what I wanted to --

13          INMATE REAMS:   I was a teacher's aide while

14  I was in the computer class, which was the

15  information technologies.

16          DEPUTY COMMISSIONER HARMON:   Yeah.

17          INMATE REAMS:   After completing the course,

18  I became a teacher's aide in there.

19          DEPUTY COMMISSIONER HARMON:   Yeah, this

20  would be in '92.

21          INMATE REAMS:   No.   No, definitely not.

22  Definitely not.

23          DEPUTY COMMISSIONER HARMON:   Because of

24  these, besides all the vocational programs that

25  you've been involved in, you've done -- we've

26  talked about as kitchen work.   You've been in --

27  You've held various clerical positions and of

33

1   course, the vocational programs.  All indications

2   are is that you have a high school diploma and you

3   indicated that you have some college.  However, I

4   didn't find a copy of your college transcript in

5   there or a copy of your high school diploma.

6         INMATE REAMS:  I submitted a copy on

7   previous occasions, so if it's -- if it's not in

8   there, I --

9         DEPUTY COMMISSIONER HARMON:  Well did you do

10  an Olson Review?

11        INMATE REAMS:  Yes.

12        DEPUTY COMMISSIONER HARMON:  Did you -- Did

13  you see them in there?

14        INMATE REAMS:  No, I wasn't looking for that

15  document.

16        DEPUTY COMMISSIONER HARMON:  Okay, I

17  couldn't find it.  But then again, I could have

18  missed it, you know.

19        INMATE REAMS:  It's only three semesters

20  anyway.

21        DEPUTY COMMISSIONER HARMON:  Well that's,

22  you know that's --

23        INMATE REAMS:  And it was in 1983 or '82, I

24  mean, so --

25        DEPUTY COMMISSIONER HARMON:  That's fine.

26        INMATE REAMS:  Okay, I'm just --

27        DEPUTY COMMISSIONER HARMON:  It's better

34

1    than somebody with a high school diploma.

2         ATTORNEY TARDIFF:  But you need to make sure

3    that the documents are in your C-File.

4         DEPUTY COMMISSIONER HARMON:  Yeah.

5         ATTORNEY TARDIFF:  Because that's what they

6    look at.  If it's not in there and you submitted

7    it at a hearing, they can't put anything in your

8    C-File.

9         INMATE REAMS:  Okay, I understand.

10        DEPUTY COMMISSIONER HARMON:  Yeah, we don't

11   put anything in there or take it out.

12        INMATE REAMS:  Right.

13        DEPUTY COMMISSIONER HARMON:  Yeah.  So

14   anyway, you might want to -- you might want to

15   clear that up, but the other information seems to

16   be clear that there is definitely education -- an

17   education background.  Self-help group activities,

18   some of the programs that you've participated in

19   your incarceration period include, but not limited

20   to Life Skills in '94, American in '92.  From July

21   through September of '02, you were participating

22   in the Distance Learning Program.  In '97, with

23   Doctor Bakeman, you did some individual therapy.

24   You took an 18 hour program in '02, Creative

25   Conflict Resolution.  You were part of the Men's

26   Advisory Council in '01.  In 1997, you

27   participated in the Science of Mind Treatment and

35

1    Meditation.   That was an 11 week program.

2         INMATE REAMS:   Yes, it was.

3         DEPUTY COMMISSIONER HARMON:   And you also

4    took the various Hepatitis, STD's, TB educational

5    programs.   You did the Impact Program.   You've

6    watched the Destinos (phonetic) video, which I

7    guess you were trying to learn a second language.

8         INMATE REAMS:   I was just seeing what it --

9    what the program was about.

10        DEPUTY COMMISSIONER HARMON:   Did you ever

11   learn a second language?

12        INMATE REAMS:   The very beginning.   I mean

13   I never got any in-depth involvement in it.

14        DEPUTY COMMISSIONER HARMON:   Okay.   Now one

15   thing I -- Let's see, before I do that.   In '97,

16   you took a real estate principles course.

17        INMATE REAMS:   Yes.

18        DEPUTY COMMISSIONER HARMON:   And I noted

19   that also.   Is that something you did on your own?

20        INMATE REAMS:   Yes, they were offering all

21   different kinds of programs.   That's where I took

22   the business management also, at the same place.

23        DEPUTY COMMISSIONER HARMON:   Okay, now a

24   chrono that I found in there is back in '99, you

25   were recognized for your assistance in the

26   development for the curriculum for the Project

27   Change Program.   Is that right?

36

1          INMATE REAMS:  Yes.

2          DEPUTY COMMISSIONER HARMON:  Did you ever

3   take the program?

4          INMATE REAMS:  The Project Change?

5          DEPUTY COMMISSIONER HARMON:  Yeah.

6          INMATE REAMS:  No, we only -- I was only

7   able to support it.  It was the work that was

8   being done was being done out of the information

9   technologies area and then we were assisting with

10   any documents or anything they needed.

11          DEPUTY COMMISSIONER HARMON:  Why didn't you

12   take the program?  A lot of the guys here have

13   been bringing it forward.

14          INMATE REAMS:  I'm not sure.  When was it,

15   the program?

16          DEPUTY COMMISSIONER HARMON:  Well it says

17   that you assisted in the development of the

18   curriculum back in '99.  And I'm simply asking

19   you, did you participate in the program once it

20   was put together?  Because your fellow inmates in

21   here have come forward over the last week with

22   certificates of completion in that program.

23          INMATE REAMS:  Project Change?

24          DEPUTY COMMISSIONER HARMON:  Yeah.

25          INMATE REAMS:  I didn't -- I had no idea it

26   was running.  I know at one point.  Who was

27   running that program?  Do you know who runs that

37

1    program?

2          DEPUTY COMMISSIONER HARMON:   I asked you

3    first.  I don't know.

4          INMATE REAMS:   I'm not -- I'm not sure

5    either.

6          DEPUTY COMMISSIONER HARMON:   It's a 44 week

7    program and it's -- and the last I heard it was

8    offered in the Central Facility.

9          INMATE REAMS:   Didn't know it was available.

10          DEPUTY COMMISSIONER HARMON:   Are you in

11    Central?

12          INMATE REAMS:   Yes, Sir.

13          DEPUTY COMMISSIONER HARMON:   And you didn't

14    know?

15          ATTORNEY TARDIFF:   It's been available for

16    quite a while.

17          DEPUTY COMMISSIONER HARMON:   Yeah.

18          INMATE REAMS:   Project Change?

19          ATTORNEY TARDIFF:   Yeah.

20          INMATE REAMS:   That's new to me.

21          DEPUTY COMMISSIONER HARMON:   Okay.

22          INMATE REAMS:   Does the Friends Outside run

23    that?

24          ATTORNEY TARDIFF:   No, it's run here.

25          INMATE REAMS:   Okay, I'm unaware that it was

26    continuing.

27          DEPUTY COMMISSIONER HARMON:   Well you've got

38

1   -- you've received recognition for your efforts in

2   putting the program together, so.

3          INMATE REAMS:   I've received recognition

4   during that time for several projects that I

5   worked on.   That was just one of them.

6          DEPUTY COMMISSIONER HARMON:   Yeah, I guess

7   it was graphics in that or something, if I

8   remember reading it right.

9          INMATE REAMS:   Right.

10          DEPUTY COMMISSIONER HARMON:   I also noted

11   that, you know, the Annual Children's Holiday

12   Festival in one form or another for a number of

13   years.   You've received recognition for that and

14   also you did some volunteer work.   I guess you

15   were part of several guys that were cataloging

16   books for the Protestant Chapel.

17          INMATE REAMS:   Yes.

18          DEPUTY COMMISSIONER HARMON:   Do you remember

19   that?

20          INMATE REAMS:   That was another project I

21   worked on.

22          DEPUTY COMMISSIONER HARMON:   Right, I found

23   that in there.

24          INMATE REAMS:   They needed a library system

25   for a book checkout.

26          DEPUTY COMMISSIONER HARMON:   Okay, I think

27   I've got most of the self-help group programs.

39

1   Have I missed anything?

2          INMATE REAMS:  Not that I'm aware of.

3          DEPUTY COMMISSIONER HARMON:  And of course,

4   the laudatory chronos in AA and then you've been

5   participating in AA.  What is your background with

6   alcohol and drugs?

7          INMATE REAMS:  Non-existent.

8          DEPUTY COMMISSIONER HARMON:  That's what I

9   thought.  Well what is your -- what is your

10  purpose with the AA?

11         INMATE REAMS:  Self-help.

12         DEPUTY COMMISSIONER HARMON:  Okay, do you

13  know the Twelve Steps?

14         INMATE REAMS:  I know -- Yeah, pretty well.

15  I'm not -- I don't know if I know them by memory,

16  but I know a lot of the Steps.  Yes.

17         DEPUTY COMMISSIONER HARMON:  Okay, well I'm

18  not here to trick you.  What have you done in the

19  areas of the Eighth and Ninth Steps?

20         INMATE REAMS:  Eighth and Ninth.  You're

21  talking about the victims and the reconciliation

22  with the victims.  What I've done was the Impact

23  Program was probably the most that I've done with

24  the victims in hearing -- They have a story, the

25  victim comes in related to whatever crime that

26  they're doing that particular week.

27         DEPUTY COMMISSIONER HARMON:  Right.

40

1    INMATE REAMS:  Tells their story and that is

2    probably the most benefit that I've had concerning

3    the victims.

4    DEPUTY COMMISSIONER HARMON:  Well have you

5    been able to make amends in any way with any of

6    your victims?

7    INMATE REAMS:  I've not made direct amends

8    to them.  No.

9    DEPUTY COMMISSIONER HARMON:  Okay, what have

10   you done in the area of the Fourth Step?

11   INMATE REAMS:  I made a fearless and

12   searching moral inventory of myself.  I continue

13   to do that daily; every day.  That's a part of my

14   meditation process to review what's happened the

15   day before and to -- if you've done any -- if I've

16   done anything that I feel that's not right, to go

17   and make amends for it.  And that's a -- I do that

18   once a day and I do it once a week.  If anything

19   I've said to somebody that I felt was wrong, I'll

20   let them know.

21   DEPUTY COMMISSIONER HARMON:  Okay, you've

22   had two 115's.  You've had no 128's.  Now your

23   115's don't reflect violence or weapons, but each

24   in them self -- each by itself are significant in

25   the sense that the most recent, 12/9 of '97, was

26   for gambling, in parentheses, (bookmaking).  You

27   were found guilty.

41

1        INMATE REAMS:  Well they always attach

2   bookmaking to that charge.  Yeah.

3        DEPUTY COMMISSIONER HARMON:  Right, right, I

4   think it was the stuff that was found in the desk.

5   Wasn't it?

6        INMATE REAMS:  Yeah, that was my folder.  I

7   admitted to it as soon as they found it.

8        DEPUTY COMMISSIONER HARMON:  And then in

9   11/13/86, conspiracy to escape, falsification of

10  records or documents.

11       INMATE REAMS:  Conspiracy to escape out of

12  Tracy.  Yes.

13       PRESIDING COMMISSIONER DALY:  What date was

14  that?

15       DEPUTY COMMISSIONER HARMON:  That was in

16  1986.

17       PRESIDING COMMISSIONER DALY:  Okay.

18       DEPUTY COMMISSIONER HARMON:  Yeah, November.

19  I guess my question with this bookmaking, what's

20  the situation with that?  I mean do you want to

21  explain?

22       INMATE REAMS:  Well the situation with that

23  was I was -- I was participating in picking

24  football and who would win and they have a ticket

25  that was going around and that's the -- that's the

26  -- what I had in my folder.  And yeah, I was

27  participating in it and it was wrong and I've no

42

1    longer participated in it.

2         **DEPUTY COMMISSIONER HARMON:** And the

3    conspiracy to escape?

4         **INMATE REAMS:** The conspiracy to escape,

5    I've always said that I knew it was going on.  I

6    didn't have any direct involvement in it.  It was

7    -- It was behind a confidential informant was the

8    information that was based against me, but I

9    accept full responsibility in that I had knowledge

10   of what was going on and didn't say anything.

11        **DEPUTY COMMISSIONER HARMON:** Okay, I think

12   we've covered all that pretty well.  I don't think

13   we've missed too much.  Let me ask you this.  Do

14   you believe you pose a risk to the people outside

15   of the prison walls today?

16        **INMATE REAMS:** No, I do not.

17        **DEPUTY COMMISSIONER HARMON:** So the follow

18   up question would be, what do you believe makes

19   you a different man today than the man that came

20   into prison?

21        **INMATE REAMS:** The maturity would probably

22   be the best reason is the maturity level.  And

23   because with maturity comes an understanding of

24   the self and an understanding of what your goals

25   and what your desires are and without being

26   influenced by anybody else.  I make my decisions

27   based on my belief of what's wrong, right and

43

1   wrong, rather than what somebody else says is

2   right and wrong and then going with that, which is

3   what my failing grace was when I committed this

4   crime.  I had somebody that I ultimately

5   respected.  I thought he was a great man.  I

6   really did; and that's where I had him.  And

7   whatever he said, I thought was justified at that

8   time in my life.

9          DEPUTY COMMISSIONER HARMON:  Are you

10  speaking of Yellen?

11         INMATE REAMS:  Yes.

12         DEPUTY COMMISSIONER HARMON:  Sir, go ahead.

13  I'm just trying to keep the picture together here.

14         INMATE REAMS:  He essentially talked me into

15  it and made it -- and somehow made it right in my

16  mind that it was okay.  And with the way I looked

17  up to him and the way that I -- the way that I was

18  thinking and the way that I was raised and it just

19  -- it just fit and that's the path that I took

20  with him.  If I would have been my mind -- on my

21  own or by myself, this would have never happened.

22  I was not that kind of individual innately by

23  myself. But when I was mixed within a different

24  environment, I became what I thought he wanted.

25  That's what's changed.  I do what I believe is

26  right in my heart, regardless of -- regardless.

27  If it's right to me, if it's the right thing, if

44

1  it's good for everybody that's there, then that's

2  the right course of action to take.  And if it

3  isn't, I'm not going to do it.  I would rather not

4  do something than do something that's wrong.

5          **DEPUTY COMMISSIONER HARMON:**  Did you

6  complete a thought?  I don't want to interrupt

7  you.  Did you complete a thought?

8          **INMATE REAMS:**  Yes, Sir.  I was --

9          **DEPUTY COMMISSIONER HARMON:**  Because I'm

10  going to move --

11          **INMATE REAMS:**  Did I expound too much?

12          **DEPUTY COMMISSIONER HARMON:**  No, no.  I'm

13  going to move on to the Doctors' reports and when

14  you pause, I'm not quite sure if you're done or

15  thought or if you're thinking or what.

16          **INMATE REAMS:**  I apologize.

17          **DEPUTY COMMISSIONER HARMON:**  No, it's not --

18  No, no, no.  Okay, Doctors' reports.  November

19  '04, you have a report from Stack, Doctor Stack,

20  S-T-A-C-K, for the transcriber.  I'm going to take

21  just parts of that report and you're more than

22  welcome to add to that if you wish.  A lot of it

23  is repetitive.  I'm not going to go over that.

24  But it is the psychosocial assessment.  And Doctor

25  Stack, in the area of clinical assessment writes

26  here in part, during the November 19th, 2004,

27  psychological evaluation, inmate Reams was alert